**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**AIKEN DIVISION**

| | |
|---|---|
| COURIE DENNIS, MARTHA BOETTJER, TANIA BROWN, HARRY COREY, THOMAS DIAZ, DANIEL DODSON, JOSH FLOYD, JEFFREY GARLINGTON, JEFFREY GRINNELL, STEPHEN HALL, PHIL HARMON, RYAN MANN, JASON MARELLA, CHARISSE NAGY, MARK REDD, VANESSA REWIS, SHAWN RHOADES, MILTON SANDERS, TRACY STOVER, NICK VINSON, RYAN WAGNER, MITCHELL WHITTINGTON, AND TINA WINGFIELD | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Case No. 1:25-cv-3546-CMC-TER<br><br>COMPLAINT FOR VIOLATION OF RIGHTS UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964<br><br>*Jury Trial Demanded* |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| SAVANNAH RIVER NUCLEAR SOLUTIONS, LLC, | ) ) ) ) |
| Defendant. | ) |

**PLAINTIFFS' ORIGINAL COMPLAINT**

This action involves claims for religious discrimination under Title VII of the Civil Rights Act of 1964 ("**Title VII**"), 42 U.S.C. 2000e-2 et seq.

## I.    INTRODUCTION

1.    Plaintiffs Martha Boettjer, Tania Brown, Harry Corey, Courie Dennis, Thomas Diaz, Daniel Dodson, Josh Floyd, Jeffrey Garlington, Jeffrey Grinnell, Stephen Hall, Phil Harmon, Ryan Mann, Jason Marella, Charisse Nagy, Mark Redd, Vanessa Rewis, Shawn Rhoades, Milton Sanders, Tracy Stover, Nick Vinson, Ryan Wagner, Mitchell Whittington, and Tina Wingfield ("**Plaintiffs**") worked for Savannah River Nuclear Solutions, LLC ("**SRNS**" or "**Defendant**") in

1

various positions at the time that SRNS declined their religious accommodation requests to SRNS's COVID-19 vaccination mandate (the "**Mandate**") and took adverse employment action against them by terminating their employment or putting them on an uncertain, unpaid leave of absence.

2.    During the pandemic, SRNS transitioned a significant portion of its workforce, including some Plaintiffs, to nearly 100% remote work in an attempt to mitigate against the spread of COVID-19.

3.    SRNS praised employees, including Plaintiffs, during this primarily telework phase based on their outstanding performance.

4.    On or about September 2, 2021, SRNS's President and CEO, Stuart MacVean ("**Mr. MacVean**"), emailed all employees to advise that SRNS would impose a COVID-19 vaccination mandate as a condition of continued employment.

5.    Prior to and after the Mandate, Mr. MacVean continuously pressured employees to receive the COVID-19 vaccine, including those with religious objections to vaccination, even going so far as to tell employees, "It is the right thing to do for you, it is not the right thing to do for me, it is the right thing to do for you." This statement evidences SRNS's undisputable knowledge that the COVID-19 vaccines were a personal protection device and did not stop transmission or infection of COVID-19.

6.    Mr. MacVean formally announced the Mandate in a September 14, 2021, email to all employees.

7.    The Mandate set October 1, 2021, as the submission deadline for religious or medical exemption requests to the Mandate, and set October 15, 2021, as the deadline for employees to receive the first dose of an available COVID-19 vaccine.

8.     The Mandate specifically discussed that the reasonable accommodation given to those who had their exemption request granted would be regular testing, potentially at the employee's own expense, and possibly, adherence to other enhanced safety protocols.

9.     Plaintiffs timely submitted their religious accommodation requests to the Mandate based on their sincerely held religious beliefs in conflict with receipt of a COVID-19 vaccine.

10.     SRNS denied Plaintiffs' religious accommodation requests to the Mandate, concluding that though they articulated a religious belief in conflict with receipt of a COVID-19 vaccine, they could not be accommodated due to the supposed undue burden that accommodating them would cause SRNS.

11.     In the email communications denying Plaintiffs' religious accommodation requests, SRNS specifically noted that "frequent testing in combination with the current masking and social distancing protocols is the sole reasonable accommodation," yet, asserted that it could not offer this reasonable accommodation to Plaintiffs due to an alleged undue burden. SRNS willfully refused to consider other low-cost and no-cost alternative accommodations because it was committed to removing employees who were unvaccinated for religious reasons from its workforce.

12.     SRNS presented Plaintiffs with a date certain that they would lose site access and authorization to continue working, providing no option to continue performing their jobs. In other words, adverse employment action against Plaintiffs was imminent and certain. Ultimately, adverse employment action was taken against all Plaintiffs after they submitted a religious accommodation request.

13.     SRNS advised Plaintiffs that they could retire or take early retirement in lieu of being placed on a "one-year, unprotected leave of absence."

14.     For all intents and purposes, SRNS terminated Plaintiffs' employment when it denied Plaintiffs' religious accommodation requests to the Mandate and informed them of a date-certain separation. Plaintiffs were given no option to continue their employment with SRNS and told that the COVID-19 vaccination Mandate was a permanent condition of employment.

15.     Said differently, SRNS attempted to coerce Plaintiffs into violating their sincerely held religious beliefs by receiving a COVID-19 vaccine by threatening them with an indeterminate, uncertain but long-term, leave of absence, which is an adverse employment action. If not a formal termination, SRNS constructively discharged Plaintiffs because it placed them in an objectively intolerable situation sufficient to render a resignation.

16.     SRNS denied every religious accommodation request it received, while simultaneously granting other employees' medical exemption requests.

17.     Said differently, SRNS gave preferential treatment to those with medical, secular reasons for declining COVID-19 vaccination, but refused to accommodate a single employee whose religious beliefs precluded receipt of a COVID-19 vaccine, including all Plaintiffs.

18.     SRNS terminated Plaintiffs, relying heavily on pretextual workplace safety rationales and based on a patently inauthentic undue hardship defense.

19.     The pretext of SRNS's decision is exemplified by the fact that SRNS is the only company that refused to accommodate employees with religious objections to vaccination on the Savannah River worksite. Other companies seamlessly granted their employees' religious accommodation requests and allowed accommodated employees to continue working onsite, without receiving a COVID-19 vaccine, while simultaneously allowing them to preserve their religious integrity and their careers. This means that SRNS was aware that even if its employees were required to be on site, unvaccinated employees would be present.

20.     Further, SRNS terminated Plaintiffs despite actual knowledge that those vaccinated for COVID-19 were contracting and spreading COVID-19 at similar or even higher rates than unvaccinated employees, like Plaintiffs, which SRNS's own business records will conclusively establish.

21.     Said differently, SRNS terminated Plaintiffs with actual knowledge that their vaccination status posed no greater health or safety threat to anyone than the threat posed by a vaccinated employee.

22.     Plaintiffs could have continued to seamlessly perform their essential job duties exceptionally well, as they had done throughout the pandemic while unvaccinated. In other words, SRNS could have accommodated Plaintiffs at no cost or purported risk to its workplace through simply observing the status quo safety protocols that were already in place and that they had already been adhering to.

23.     Plaintiffs could have been accommodated in numerous ways, including: (1) providing regular proof of a negative COVID-19 test (which Plaintiffs were willing to do at their own expense, not to mention the fact that free testing was available during the relevant time frames); (2) a strict quarantine when symptomatic policy (because one cannot spread the virus if not infected); (3) recognizing the scientific reality of natural immunity against COVID-19 as an accommodation option and inquiring whether Plaintiffs possessed antibodies to COVID-19 from prior infection; (4) allowing for a vaccinated colleague to travel to a worksite in the event that Plaintiffs would have been required to travel to a site (i.e., voluntary schedule swapping); (5) observing other enhanced safety protocols where necessary (e.g., social distancing, masking, quarantining when symptomatic), or (6) any combination of the above.

24.     SRNS understood that accommodating Plaintiffs was possible, particularly, regular testing (potentially at the employee's expense) in conjunction with other enhanced safety protocols, advised its employees of the same, and offered this accommodation to those with secular, medical reasons for remaining unvaccinated. In other words, SRNS conclusively demonstrated its ability to accommodate, provided the employee remained unvaccinated for secular, medical reasons.

25.     SRNS did not offer any accommodations to Plaintiffs because the company disfavors their religious reasons for declining vaccination.

26.     In short, Plaintiffs could have been accommodated without any hardship whatsoever, and in a manner that would have created a *safer* workplace than requiring vaccination alone.

27.     Defendant, therefore, cannot show that it would have been a "substantial burden" or expense to have accommodated Plaintiffs' religious beliefs. *See Groff v. DeJoy*, 600 U.S. 447, 470 (2023) (holding that, under Title VII, employers must accommodate their employee's religious beliefs short of "substantial burden" or expense when viewed in light of the particular businesses' capabilities to accommodate).

28.     Defendant violated Title VII (42 U.S.C. § 2000e-2 *et. seq.*) by failing to engage in a good faith interactive process to determine if a reasonable accommodation existed for Plaintiffs, failing to provide any of the available low-cost and no-cost reasonable accommodations to Plaintiffs, and engaging in wholesale religious discrimination by treating similarly situated, secular employees more favorably than Plaintiffs by denying all religious accommodation requests while simultaneously granting secular, medical accommodation requests.

29.     Accordingly, Plaintiffs seeks damages, including back pay, front pay, loss of salary increases, lost benefits, compensatory damages, damages for emotional distress, pain and suffering, punitive damages, and reasonable attorneys' fees and costs, declaratory relief, injunctive relief, as well as any other relief to which they are entitled.

## II.      JURISDICTION AND VENUE

30.     This court has original jurisdiction of this civil action as one arising under the laws of the United States. *See* 28 U.S.C. §1331. This Court has jurisdiction over the subject matter of this civil action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 *et. seq*.

31.     Venue is proper in the Court under 42 USC § 2000e-5(f)(3) because but for Defendant's unlawful actions, Plaintiffs would have continued working in this District, the unlawful activities alleged occurred within this District, and Defendant is headquartered in this district. 42 USC § 2000e-5(f)(3).

## III.      PARTIES

32.     All Plaintiffs worked as SRNS employees at the Savannah River site in Aiken, South Carolina during the relevant timeframes.

33.     Plaintiff Martha Boettjer is a resident of South Carolina, residing in Cross, South Carolina.

34.     Plaintiff Tania Brown is a resident of Georgia, residing in Martinez, Georgia.

35.     Plaintiff Harry Corey is a resident of South Carolina, residing in Aiken, South Carolina.

36.     Plaintiff Courie Dennis is a resident of South Carolina, residing in Aiken, South Carolina.

37.     Plaintiff Thomas Diaz is a resident of South Carolina, residing in Chapin, South Carolina.

38.     Plaintiff Daniel Dodson is a resident of South Carolina, residing in Wagener, South Carolina.

39.     Plaintiff Josh Floyd is a resident of Georgia, residing in Grovetown, Georgia.

40.     Plaintiff Jeffrey Garlington is a resident of Georgia, residing in Evans, Georgia.

41.     Plaintiff Jeffrey Grinnell is a resident of South Carolina, residing in Irmo, South Carolina.

42.     Plaintiff Stephen Hall is a resident of South Carolina, residing in Saluda, South Carolina.

43.     Plaintiff Phil Harmon is a resident of Texas, residing in Alto, Texas. During the relevant timeframes, Mr. Harmon was a resident of Aiken, South Carolina.

44.     Plaintiff Ryan Mann is a resident of South Carolina, residing in North Augusta, South Carolina.

45.     Plaintiff Jason Marella is a resident of Georgia, residing in Martinez, Georgia.

46.     Plaintiff Charisse Nagy is a resident of South Carolina, residing in Aiken, South Carolina.

47.     Plaintiff Mark Redd is a resident of South Carolina, residing in Wagener, South Carolina.

48.     Plaintiff Vanessa Rewis is a resident of Georgia, residing in Evans, Georgia.

49.     Plaintiff Shawn Rhoades is a resident of South Carolina, residing in North Augusta, South Carolina.

50.     Plaintiff Milton Sanders is a resident of South Carolina, residing in Barnwell, South Carolina.

51.     Plaintiff Tracy Stover is a resident of South Carolina, residing in Aiken, South Carolina.

52.     Plaintiff Nick Vinson is a resident of South Carolina, residing in North Augusta, South Carolina.

53.     Plaintiff Ryan Wagner is a resident of South Carolina, residing in Aiken, South Carolina.

54.     Plaintiff Mitchell Whittington is a resident of Georgia, residing in Blythe, Georgia.

55.     Plaintiff Tina Wingfield is a resident of South Carolina, residing in Lexington, South Carolina.

56.     Defendant SRNS is a corporation with its principal place of business in Aiken, South Carolina. SRNS is headquartered in this district, conducts its business in this District, and the discrimination alleged occurred within this District.

### IV.     FACTUAL ALLEGATIONS

*Plaintiffs' Employment with SRNS*

57.     Plaintiffs worked for SRNS up until they were terminated, forced into involuntary, early retirement with SRNS, or constructively discharged as a result of SRNS denying their religious accommodation request to the Mandate.

58.     Up until SRNS denied Plaintiffs' religious accommodation requests and revoked site access or otherwise disallowed Plaintiffs to continue to perform their jobs, Plaintiffs performed their jobs very well throughout the pandemic.

59.     Plaintiffs, if necessary to benefit SRNS, traveled throughout the heart of the COVID-19 pandemic while unvaccinated and did not have any issues performing the essential functions of their jobs due to their vaccination status.

### SRNS's COVID-19 Vaccination Mandate

60.     SRNS made the independent and affirmative decision to mandate COVID-19 vaccination as a condition of continued employment.

61.     On or about September 2, 2021, SRNS's President and CEO, Stuart MacVean, emailed all employees to advise that SRNS would impose a COVID-19 vaccination mandate as a condition of continued employment. At this time SRNS estimated that 65% of its workforce had already become fully vaccinated.

62.     On September 9, 2021, SRNS emailed all employees to advise of the medical and religious exemption process. In this email, it was noted that "A Site Medical team" will review medical exemption requests, and "HR Policy, General Counsel, and EEO" will review religious exemptions. If any exemption request is approved, "HR will work with the employee to identify the appropriate accommodations, which will include regular testing on a weekly basis."

63.     On September 14, 2021, Mr. MacVean again emailed all employees to formally announce and provide details about the Mandate.

64.     In this formal COVID-19 Vaccine Mandate announcement, he noted that 78% of the SRNS workforce was already fully vaccinated or had begun the vaccination process.

65.     Mr. MacVean also noted that employees were given up to four hours paid time off to get each vaccination injection.

66.     The Mandate set October 1, 2021, as the submission deadline for religious or medical exemption requests to the Mandate.

67.     The Mandate set October 15, 2021, as the date that SRNS employees were required to have received at least one dose of the vaccine, and November 30, 2021, as the date that all employees were required to be fully vaccinated. The SRNS Mandatory COVID-19 Vaccination FAQs advised employees that if they do not have an approved religious exemption, their employment with SRNS will be terminated.

68.     Plaintiffs were provided information in the form of a flow chart advising that if their religious accommodation request was denied, employees would either be forced to abandon their sincerely held religious beliefs in conflict with receipt of a COVID-19 vaccine and submit to COVID-19 vaccination, be put on unpaid leave, be forced to resign, retire, or be terminated, all adverse employment actions Plaintiffs suffered.

69.     On or around October 11, 2021, SRNS denied all religious accommodation requests and simultaneously emailed employees the "Next Steps for Unvaccinated Employees." This email detailed dates certain for out-processing, return of site badges, and dates certain for termination if early retirement was not taken. Importantly, this email noted that "there is no plan for SRNS to drop the vaccination requirement in the future. This is a permanent requirement for SRNS and applies to our staff…regardless of telework status."

70.     On October 12, 2021, SRNS emailed employees a "Mandatory Vaccination and Exemptions Update." It stated that 91% of SRNS employees were either fully or partially vaccinated, some medical exemptions were granted, and that they "also processed a large number of religious exemption requests, and after careful consideration, denied all requests for accommodation, which currently imposes an undue burden on our company."

71.     On October 13, 2021, SRNS emailed employees that "93% of SRNS employees are fully or partially vaccinated for the COVID-19 virus."

72.     At this time, it was abundantly clear that the available COVID-19 vaccines were ineffective at preventing infection and transmission of COVID-19, as SRNS's own internal COVID-19 tracking data will reveal.

73.     Because SRNS closely tracked COVID-19 infections in its workforce, SRNS had actual knowledge that vaccinated employees were still contracting and transmitting COVID-19 at similar or higher rates than unvaccinated employees.

74.     SRNS admitted in its COVID-19 Vaccination FAQ that COVID-19 vaccines did not stop transmission and infection of COVID-19.

75.     As early as August 2021, the Centers of Disease Control and Prevention ("**CDC**") recognized that the COVID-19 vaccines worked "with regard to severe illness and death…but what they c[ouldn't] do anymore is prevent transmission." Statement by Rochelle Walensky, U.S. Centers for Disease Control, CNN Interview (Aug. 5, 2021).[1] As such, federal health authorities acknowledged prior to Plaintiffs' termination that the mandated vaccines were personal protection devices incapable of preventing infection and transmission of the virus.

76.     During the relevant period, SRNS possessed actual and/or constructive knowledge that the mandated vaccines were neither safe, nor effective at preventing transmission and infection by any reasonable or objective measure. In fact, SRNS's records will show its vaccinated employees were contracting COVID-19 at similar or higher rates than unvaccinated religious employees, like Plaintiffs, consistent with research from one of the world's most prestigious

---

[1] *See* Madeline Holcombe, *Fully vaccinated people who get a Covid-19 breakthrough infection can transmit the virus, CDC chief says, CNN Aug. 6, 2021,* last visited Sept. 20, 2024, available at https://www.cnn.com/2021/08/05/health/us-coronavirus-thursday/index.html.

medical institutions-the Cleveland Clinic, which has found that the risk of contracting COVID-19 **increases** with the number of vaccine doses received.[2]

77.    Regardless of its contemporaneous knowledge that COVID-19 vaccines were ineffective at preventing the transmission and infection of COVID-19, SRNS implemented and maintained the Mandate as a condition of continued employment against employees it knew were unable to comply for religious reasons, knowing that the mandated medical procedure was at best a personal protection device, and those employees with religious objections to vaccination could have been seamlessly accommodated at little or no cost (even assuming the fiction that the mandated vaccines actually worked to prevent infection and transmission – the undergirding rationale for Plaintiffs' adverse employment actions).

78.    On November 30, 2021, in prior testimony given in this court before The Honorable J. Michelle Childs, on a Motion by many unvaccinated SRNS employees facing termination for a preliminary injunction relating to the vaccine mandate, Lee Schifer, Director of Safeguards, Security, and Emergency services at the time relevant decisions were made, testified that he was the emergency director in charge of the "War Room." During the relevant period, the "War Room" "wrote all the protocol for the site, site response plan," including "…all the protocols for social distancing, all those different types of things, all like extent of condition reviews, contact tracing…so all the contact tracing for the site," and gave advice to SRNS leadership.

79.    SRNS kept extensive contact tracing records during the relevant period, evidenced by Mr. Schifer's testimony at the preliminary injunction hearing. Mr. Schifer testified that "we

---

[2] *See* Nabin K. Shrestha et al., MedRxiv, *Effectiveness of Coronavirus Disease (COVID-19) Bivalent Vaccine*, (Dec. 19, 2022), available at https://www.medrxiv.org/content/10.1101/2022.12.17.22283625v1 (in comprehensive study, researchers found the risk "of COVID-19 increased with time since the most recent prior COVID-19 episode *and with the number of vaccine doses previously received*") (**emphasis added**) (last visited Sept. 20, 2024).

have – everyone that has gotten Covid for the – since really the pandemic started that has contacted us, yes, sir, we have that information."

80.     Mr. Schifer testified that SRNS had extensive records of employees that tested positive for COVID-19 after becoming fully vaccinated for COVID-19. When asked "So, therefore, the vaccination did not stop the employee from getting Covid; correct?" Mr. Schifer responded, "Correct."

81.     Moreover, during the relevant period, SRNS sectioned off its offices to make a vaccinated section and an unvaccinated section.

82.     Employees unvaccinated for religious reasons were also made to work in roped off areas, segregated from other employees, if they were unvaccinated.

83.     These protocols were both subjectively and objectively hostile to Plaintiffs.

84.     SRNS also knew or should have known that the mandated vaccines were not "safe" by any reasonable measure. Its business records will demonstrate the same.

85.     Despite actual and/or constructive knowledge of adverse events related to the COVID-19 vaccines readily available to SRNS after Plaintiffs submitted their religious exemption requests, SRNS required Plaintiffs to violate their religious beliefs, justifying the necessity of violation of their religious integrity on provably false justifications that the mandated vaccines were "safe" and "effective" and, therefore, that workplace safety demanded they discard their religious beliefs.

86.     Despite that Plaintiffs had clearly stated religious reasons for declining vaccination, SRNS—in reckless disregard of Plaintiffs' Title VII rights—insisted that Plaintiffs abandon their religious integrity in exchange for personal protection, counterfactually insisting that accommodating Plaintiffs' beliefs would cause an undue hardship on its business.

87.     Again, the mandated vaccines do not prevent transmission or infection, which SRNS was aware of during the relevant period. At best, the mandated vaccines provided an undefined level of personal protection, a benefit Plaintiffs declined to preserve their religious integrity.

88.     Plaintiffs requested religious accommodations from the Mandate.

89.     Plaintiffs made clear to SRNS that they had sincerely held religious beliefs in conflict with receipt of a COVID-19 vaccine.

90.     SRNS acknowledged that Plaintiffs presented and hold religious beliefs in conflict with receipt of a COVID-19 vaccine. In other words, SRNS clearly understood it possessed a legal obligation to potentially accommodate Plaintiffs.

91.     In fact, SRNS explicitly stated that Plaintiffs articulated a religious belief in conflict with receipt of a COVID-19 vaccine.

92.     However, SRNS refused to engage in a good faith interactive process to identify what reasonable accommodations were available. SRNS ignored its previous instruction to employees that "HR will work with the employee to identify the appropriate accommodations, which will include regular testing on a weekly basis." Had SRNS operated in good faith, it would have identified a variety of low-cost and no-cost accommodation options and would have accommodated Plaintiffs, which it could have done without any meaningful hardship whatsoever.

93.     Instead, SRNS summarily concluded that granting any religious accommodation request would result in undue hardship to the company (regardless of the individual employee's unique circumstances, including those who were teleworking). This was despite the fact that SRNS simultaneously accommodated those with secular, medical accommodation requests to the Mandate. In fact, Mr. Schifer, at the time of the hearing for the preliminary injunction, testified

that "right now we have an active 59 [medical] exemptions" which consisted of both temporary and permanent medical exemptions.

***SRNS's Bad Faith Accommodations Process***

94.     SRNS provided instructions on obtaining religious and medical exemptions from the Mandate. Exemption requests had to be submitted by October 1, 2021, with the relevant forms submitted to HRPolicy@srs.gov.

95.     Prior to the official policy announcement and solicitation of religious accommodation requests, SRNS leadership had conversations in the "War Room" discussing religious accommodation requests and the associated process. At this time, SRNS personnel cast doubt on the validity that an employee could have religious beliefs that prevented them from receiving a COVID-19 vaccine.

96.     SRNS leadership referred to unvaccinated employees as "conspiracy theorists." This accusation was made via email from a Director, Geoffrey Reynolds, and sent to management in response to a survey where leadership was attempting to understand the number of accommodation requests to the Mandate that SRNS would receive.

97.     Even though SRNS had predetermined it would not grant religious accommodation requests, Plaintiffs complied with the sham process and submitted timely religious accommodation requests.  Plaintiffs detailed to SRNS that they held sincerely held religious beliefs that precluded them from receiving a COVID-19 vaccine.

98.     SRNS informed Plaintiffs that their religious accommodation request had articulated a religious belief in conflict with receipt of a COVID-19 vaccine.

99.     No HR representative, or any SRNS employee, ever spoke to Plaintiffs about reasonable accommodation options. SRNS failed to engage in any process to discuss employee questions or potential accommodation options.

100.     Free testing was available for Plaintiffs during the relevant period, so regular testing was a no-cost option that Plaintiffs would have abided by.

101.     Moreover, Plaintiffs were willing to cover the cost of regular testing in order to preserve their careers.

102.     SRNS explicitly acknowledged, both at the time of denying Plaintiffs' religious accommodation requests and in subsequent communications with the Equal Employment Opportunity Commission ("EEOC") that "the only reasonable accommodation" for unvaccinated employees with an approved exemption request was "frequent (twice a week) COVID-19 testing." SRNS unequivocally understood that regular testing would alleviate any concerns regarding in-person contact/appearance requirements and alleviate all workplace safety concerns.

103.     Despite this admission, regular testing was never offered to Plaintiffs, even at their own expense.

104.     SRNS did not allow any form of appeal to their decision on employees' religious accommodation requests.

105.     On information and belief, other attorneys contacted SRNS prior to Plaintiffs' terminations and/or constructive discharges and highlighted that SRNS's actions related to the Mandate and its religious accommodation process were violating Title VII.

106.     Nonetheless, SRNS willfully disregarded Title VII's requirements and continued to insist it would not accommodate Plaintiffs' clearly stated religious conflicts with receipt of a COVID-19 vaccine.

107.    SRNS terminated and/or constructively discharged Plaintiffs in October of 2021, by advising Plaintiffs that it would not accommodate their sincerely held religious beliefs with respect to a prohibition on receipt of a COVID-19 vaccine and would not allow them to continue their employment with them.

108.    SRNS made the decision that it would deny all religious employees' religious accommodation requests to the Mandate even though SRNS could have easily accommodated any religious employee without imposing undue hardship on its business operations. Simultaneously, however, SRNS granted medical exemption requests to the Mandate and accommodated certain employees with secular, medical reasons precluding receipt of a COVID-19 vaccine.

109.    SRNS treated similarly situated employees, those with secular, medical reasons precluding receipt of a COVID-19 vaccine, more favorably than religious employees who requested accommodation to the Mandate.

110.    SRNS discriminated against Plaintiffs and took adverse employment action against them because of their sincerely held religious beliefs in conflict with receipt of a COVID-19 vaccine.

## V. **PLAINTIFFS**

### **Martha Boettjer**

111.    Plaintiff Martha LeAnne Boettjer worked for SRNS for over seven months. Ms. Boettjer was employed by SRNS through Quest Diagnostics as a Specimen Collection Technician at the time of being terminated.

112.    Throughout her career, Ms. Boettjer performed well in her role, was qualified for her job, and had an exceptional performance record. In fact, Ms. Boettjer was deemed a "top collector."

113.    Quest Diagnostics did not have a COVID-19 requirement.

114.    SRNS controlled Ms. Boettjer's work on the job site, including the ability to have her work for them at the Savannah River site and the ability to impose conditions of employment on her.

115.    As further evidence that SRNS controlled Ms. Boettjer's work, SRNS mandated that she take a COVID-19 vaccine. SRNS also processed and evaluated Ms. Boettjer's religious accommodation request and denied it. After denying her religious accommodation request, SRNS then refused to allow her to continue to complete her job duties and took adverse employment action against her.

116.    SRNS was Ms. Boettjer's employer because SRNS was the party that took adverse action against Ms. Boettjer by denying her religious accommodation request, failing to accommodate her sincerely held religious beliefs in conflict with the Mandate, and discriminating against and terminating her because of her religious beliefs.

117.    SRNS terminated Ms. Boettjer on or about October 15, 2021, when she was forced to turn her badge in and SRNS discontinued her employment for upholding her religious beliefs and practices in conflict with the Mandate.

118.    Ms. Boettjer is a Hebrew Israelite.

119.    Ms. Boettjer believes that human life begins at conception and that abortion is murder. As such, it is a sin in her system of religious beliefs to use medical products she understands to be created using aborted fetal cell lines. It is Ms. Boettjer's understanding that the Pfizer and Moderna vaccines used aborted fetal cell lines in their testing, development, and/or manufacture, and that the Johnson & Johnson vaccine used aborted fetal cells in the production of their vaccine. With this understanding, Ms. Boettjer is precluded from receiving one of the then

available COVID-19 vaccines because they are the result of the taking of an innocent human life, which is a sin in her religious system of beliefs.

120.    Separately and independently, Ms. Boettjer must follow her conscience, given by God. She will not ingest a substance when her conscience tells her it will adversely affect her relationship with God or violate her God-given and stewardship duties over her body, which she believes is a responsibility commanded by God. With this understanding, Ms. Boettjer is precluded from receiving one of the then available COVID-19 vaccines.

121.    Ms. Boettjer believes that an individual is morally bound to obey her conscience. Ms. Boettjer believes the conscience to be God-given and is a moral "gut check" by which God guides Christians. Ms. Boettjer believes following her God-given conscience is incredibly important, especially during life situations where an individual is being pressed to make a quick decision in conflict with her conscience. After thoughtful prayer and reflection, Ms. Boettjer's conscience was provoked not to receive a vaccine, and to act in conflict with her God-given conscience would be a profound violation of her religious integrity. With this understanding, Ms. Boettjer is precluded from receiving one of the then available COVID-19 vaccines.

122.    Separately and independently, Ms. Boettjer believes the COVID-19 vaccines are a prelude to the "Mark of the Beast." Ms. Boettjer's religious beliefs preclude her from participation in activities connected to the "Mark of the Beast" described in Revelations. With this sincere belief, Ms. Boettjer is precluded from receiving one of the then available COVID-19 vaccines.

123.    Separately and distinctly, Ms. Boettjer believes that her body is a living temple where the Spirit of God resides and indwells. She must protect this Temple, her body, both spiritually and physically. The introduction of COVID-19 vaccines to her body is not prudent stewardship of her body and would be a sin in her religious system of beliefs because it would

harm her spiritually. With this understanding, Ms. Boettjer is precluded from receiving one of the then available COVID-19 vaccines.

124.     Separately and distinctly, Ms. Boettjer believes that God blessed her with a well-created, divine, and functioning immune system and she cannot preemptively alter her immune system, which would exhibit a lack of faith and be a sin in her religious system of beliefs. With this sincerely held religious belief, Ms. Boettjer is precluded from receiving one of the then available COVID-19 vaccines.

125.     Ms. Boettjer believes that God created her in his image and that she cannot alter His Design. The COVID-19 vaccines are specifically intended to alter the immune system's design. To do so would be a sin in her religious system of beliefs. With this sincerely held religious belief, Ms. Boettjer is precluded from receiving one of the then available COVID-19 vaccines.

126.     Accordingly, because of the above-described religious objections to receipt of a COVID-19 vaccine, Ms. Boettjer requested a religious accommodation from SRNS's COVID-19 vaccination policy. SRNS advised Ms. Boettjer to apply for a medical exemption request instead of a religious accommodation request.

127.     As explained above, SRNS denied Ms. Boettjer's religious accommodation request after verifying that she held a religious belief in conflict with receipt of a COVID-19 vaccine.

128.     SRNS pretextually refused to offer or otherwise provide any accommodation options because of Ms. Boettjer's disfavored religious beliefs.

129.     There were multiple no-cost and/or less than de minimis-cost accommodation options available that SRNS could have provided to Ms. Boettjer. Specifically, SRNS could have required Ms. Boettjer to be tested prior to entering facilities or performing any other role SRNS determined required in-person contact.

130.     SRNS even acknowledged that "regular testing" was a reasonable accommodation in their Position Statement filed with the Equal Employment Opportunity Commission but refused to offer it to a single religious exemption requester.

131.     In addition to the testing accommodation option, there were also multiple other no-cost and/or less than de minimis-cost accommodation options available that SRNS could have provided to Ms. Boettjer. Ms. Boettjer was willing to bear any such costs personally in an effort to simultaneously preserve her career and religious convictions.

132.     SRNS did not address several low-cost and no-cost alternative reasonable accommodations available, including but not limited to: recognition of natural immunity in lieu of vaccination or required testing, a strict quarantining when symptomatic protocol (because one cannot transmit the virus if not infected), enhanced safety protocols, telework, schedule swapping with vaccinated employees if in-person contact requiring proof of vaccination were an actual requirement for the job, or any combination of these options.

133.     During the height of the pandemic, Ms. Boettjer contributed to the ongoing operation and success of SRNS while unvaccinated and while preserving her religious convictions.

134.     SRNS provided functional accommodations, consistent with Ms. Boettjer's religious convictions, during this period and allowed Ms. Boettjer to work unvaccinated while observing enhanced safety protocols. These safety protocols included some combination of a social distancing policy, mask requirements, sanitizer, temperature checks, and/or remote work.

135.     Ms. Boettjer's sincerely held religious beliefs in conflict with vaccination could have been accommodated without any undue burden whatsoever and Ms. Boettjer would have accepted any of the numerous reasonable accommodation options available that SRNS refused to consider.

136.     Simultaneously, SRNS accommodated those with medical/secular objections to receipt of a COVID-19 vaccine.

137.     As a direct and proximate cause of SRNS's discriminatory actions, Ms. Boettjer's finances were significantly and negatively impacted. Specifically, Ms. Boettjer lost out on regular pay, benefits, vacation time, and promotional opportunities, amongst other financial harm.

138.     In addition to financial loss, Ms. Boettjer suffered emotional and psychological harm while still employed at SRNS from the months of uncertainty and repeated coercion to abandon her sincere religious beliefs in order to preserve her livelihood and career, all related to the adverse employment actions taken by SRNS. Specifically, Ms. Boettjer was forced to move hours away from her daughter in an effort to find comparable employment and does not see her daughter regularly anymore.

139.     As a result of the discriminatory treatment she experienced, Ms. Boettjer suffered from emotional distress which is or has been marked by some combination of feelings of despondency, social anxiety, loss of interest in leisure activities, and feelings of agitation and irritability.

140.     Following this adverse employment action, Ms. Boettjer suffered financial, emotional, and psychological harm.

**Tania Brown**

141.     Plaintiff Tania Brown worked for SRNS for over two years. Ms. Brown was employed at SRNS as an Operations Support Manager at the time of being put on an indefinite, uncertain unpaid leave and being told that the SRNS COVID-19 vaccination Mandate was permanent and would not be dropped in the future.

142.    Throughout her career, Ms. Brown performed well in her role, was qualified for her job, and had an exceptional performance record.

143.    SRNS placed Ms. Brown on an involuntary leave of absence on or about October 15, 2021, for upholding her religious beliefs and practices in conflict with the Mandate. This was an adverse employment action, whether a termination or a constructive discharge, because Ms. Brown was informed that she could no longer complete her essential job duties while adhering to her sincerely held religious beliefs.

144.    Ms. Brown is a Christian. As a Christian who believes in the Bible, Ms. Brown objects to receipt of a COVID-19 vaccine because she believes in and follows God and the principles laid out in his words.

145.    As a believer in Jesus Christ as her Lord and Savior, Ms. Brown requested a religious exemption from the mandate because of the COVID-19 vaccines' connections to aborted fetal cells. As stated in her religious exemption request, co-signed by Ms. Brown's faith leader, Ms. Brown believes that all human beings are image bearers of God, and this concept affirms the unique value of human life.  Mindful of the 6th commandment "You shall not murder" (Ex. 20:13), Ms. Brown believes that abortion is gravely wrong at every stage, and she cannot benefit from an abortion, no matter how remote in time. With this sincerely held religious belief, Ms. Brown is precluded from receiving one of the then available COVID-19 vaccines because they are the result of the taking of an innocent human life.

146.    Furthermore, Ms. Brown believes the physical body is given to each person by their loving Heavenly Father. Ms. Brown believes that her body is a living temple where the Spirit of God resides. She must protect this Temple, her body, both spiritually and physically. She cannot receive a COVID-19 vaccine because it would result in both spiritual and physical harm. The

24

introduction of COVID-19 vaccines to her body would be a sin in her religious system of beliefs because it would harm her spiritually. With this sincerely held religious belief, Ms. Brown is precluded from receiving one of the then available COVID-19 vaccines.

147.    Separately and independently, Ms. Brown must follow her conscience, given by God. She will not take a substance when her conscience tells her it will adversely affect her relationship with God. To act in opposite of her conscience would violate her God-given stewardship duties over her body, which she believes is a responsibility commanded by God. With this sincerely held religious belief, Ms. Brown is precluded from receiving one of the then available COVID-19 vaccines.

148.    Separate and independently, Ms. Brown also sincerely believes that an individual is morally bound to obey her conscience. Ms. Brown believes the conscience to be God-given, and is an internal, moral sounding board by which God guides Christians. Ms. Brown believes following her God-given conscience is incredibly important, especially during life situations where an individual is being pressed to make a quick decision in conflict with her conscience. Ms. Brown believes undergoing a medical procedure is a major life decision that requires thoughtful prayer and demands observing one's conscience. In Ms. Brown's personal system of religious beliefs, undergoing a major medical procedure—like vaccination—must be voluntary because vaccination is not biblically obligatory (there is no biblical authoritative teaching that requires Christians to receive any vaccine). After thoughtful prayer and reflection, Ms. Brown's conscience was provoked not to receive a vaccine, and to act in conflict with her God-given conscience would be a profound violation of her religious integrity. With this sincerely held religious belief, Ms. Brown is precluded from receiving one of the then available COVID-19 vaccines.

149.    Separately and distinctly, Ms. Brown believes that God blessed her with a well-created, divine, and functioning immune system and she cannot preemptively alter her immune system, which would show a lack of faith and be a sin in her religious system of beliefs. With this sincerely held religious belief, Ms. Brown is precluded from receiving one of the then available COVID-19 vaccines.

150.    Ms. Brown believes that God created her in his image and that she cannot alter His Design. The COVID-19 vaccines are specifically intended to alter the immune system's design. To do so would be a sin in her religious system of beliefs. With this sincerely held religious belief, Ms. Brown is precluded from receiving one of the then available COVID-19 vaccines.

151.    Accordingly, because of the above-described religious objections to receipt of a COVID-19 vaccine, Ms. Brown requested a religious accommodation from SRNS's COVID-19 vaccination policy.

152.    As explained above, SRNS denied Ms. Brown's religious accommodation request after verifying that she held a religious belief in conflict with receipt of a COVID-19 vaccine.

153.    SRNS pretextually refused to offer or otherwise provide any accommodation options because of Ms. Brown's disfavored religious beliefs.

154.    There were multiple no-cost and/or less than de minimis cost accommodation options available that SRNS could have provided to Ms. Brown. Specifically, SRNS could have required Ms. Brown to be tested prior to entering facilities or performing any other role SRNS determined required in-person contact.

155.    SRNS even acknowledged that "regular testing" was a reasonable accommodation in their Position Statement filed with the Equal Employment Opportunity Commission but refused to offer it to a single religious exemption requester.

156.     Importantly, Ms. Brown had tested positive for COVID-19 and informed SRNS of this. This means that Ms. Brown had naturally occurring COVID-19 antibodies and could have been treated equally as vaccinated employees, who were not made to regularly test.

157.     In addition to the testing accommodation option, there were also multiple other no-cost and/or less than de minimis cost accommodation options available that SRNS could have provided to Ms. Brown. Ms. Brown was willing to bear any such costs personally in an effort to simultaneously preserve her career and religious convictions.

158.     SRNS did not address several low-cost and no-cost alternative reasonable accommodations available, including but not limited to: recognition of natural immunity in lieu of vaccination or required testing, enhanced safety protocols, a strict quarantining when symptomatic protocol (because one cannot transmit the virus if not infected),  telework, schedule swapping with vaccinated employees if in-person contact requiring proof of vaccination were an actual requirement for the job, or any combination of these options.

159.     During the height of the pandemic, Ms. Brown contributed to the ongoing operation and success of SRNS while unvaccinated and while preserving her religious convictions.

160.     SRNS provided functional accommodations, consistent with Ms. Brown's religious convictions, during this period and allowed Ms. Brown to work unvaccinated while observing enhanced safety protocols. These safety protocols included some combination of a social distancing policy, mask requirements, sanitizer, temperature checks, and/or remote work.

161.     Ms. Brown's sincerely held religious beliefs in conflict with vaccination could have been accommodated without any undue burden whatsoever and Ms. Brown would have accepted any of the numerous reasonable accommodation options available that SRNS refused to consider.

162.    SRNS did not engage in any interactive process calculated towards finding a reasonable accommodation for any individual employee, which the company would have identified had it engaged in an actual good faith accommodation process.

163.    Simultaneously, SRNS accommodated those with medical/secular objections to receipt of a COVID-19 vaccine.

164.    As a direct and proximate cause of SRNS's discriminatory actions, Ms. Brown's finances were significantly and negatively impacted. Specifically, Ms. Brown lost out on regular pay, benefits, vacation time, and promotional opportunities, amongst other financial harm.

165.    In addition to financial loss, Ms. Brown suffered emotional and psychological harm while still employed at SRNS from the months of uncertainty and repeated coercion to abandon her sincere religious beliefs in order to preserve her livelihood and career, all related to the adverse employment actions taken by SRNS.

166.    As a result of the discriminatory treatment she experienced, Ms. Brown suffered from emotional distress which is or has been marked by some combination of feelings of despondency, social anxiety, loss of interest in leisure activities, and feelings of agitation, and irritability.

167.    Following this adverse employment action, Ms. Brown suffered financial, emotional, and psychological harm.

**Harry Corey**

168.    Plaintiff Harry C. Corey worked for SRNS for over 20 years. Mr. Corey was employed at SRNS through Value Added Solutions as a Senior Design Specialist at the at the time of being terminated.

169.    Throughout his career, Mr. Corey performed well in his role, was qualified for his job, and had an exceptional performance record.

170.    Value Added Solutions did not have a COVID-19 vaccine mandate.

171.    SRNS controlled Mr. Corey's work, as evidenced by SRNS's ability to have him work for it, and control over the equipment given to him to complete his job at SRNS's job site, the job site, timesheets with charge code number requirements, training, and the ability to reprimand him for performance and other reasons.

172.    As further evidence that SRNS controlled all aspects of Mr. Corey's work, SRNS mandated that he take a COVID-19 vaccine. SRNS also processed and evaluated Mr. Corey's religious accommodation request and denied it. After denying his religious accommodation request, SRNS then refused to allow him to continue to complete his job duties and took adverse employment action against him.

173.    SRNS terminated Mr. Corey on or about October 15, 2021, for upholding his religious beliefs and practices in conflict with the Mandate. This was an adverse employment action, whether a termination or a constructive discharge, because Mr. Corey was informed that he could no longer complete his essential job duties while adhering to his sincerely held religious beliefs.

174.    Mr. Corey is a Christian.

175.    Mr. Corey believes life begins at conception and that abortion is the same as murder.  As such, it is a sin in his religious system of beliefs to use medical products he understands to be created using aborted fetal cell lines. The available COVID-19 vaccines used cell lines originating from aborted children in their manufacturing, development, testing, and/or production. With this connection between the COVID-19 vaccines and his religious system of beliefs, Mr.

Corey is precluded from receiving one of the then available COVID-19 vaccines because they are the result of the taking of an innocent human life, and he cannot benefit from a sin in his religious system of beliefs.

176.     Mr. Corey also believes that he was created in the image of God and that he cannot alter His Design. The COVID-19 vaccines are specifically intended to alter the immune system's design. Mr. Corey believes that God blessed him with a divine immune system, and it would show a lack of faith to alter that immune system, amounting to a sin in his religious system of beliefs.

177.     Separately and independently, Mr. Corey must follow his conscience, given by God. Mr. Corey prayed to God and received guidance not to receive the COVID-19 vaccine. He believes that God imparts wisdom on him, and he does not question that wisdom. With this sincerely held religious belief, Mr. Corey is precluded from receiving one of the then available COVID-19 vaccines.

178.     Mr. Corey believes that his body is a living temple where the Spirit of God resides. He must protect this Temple, his body, both spiritually and physically. The introduction of COVID-19 vaccines to his body would be a sin in his religious system of beliefs because it would harm him spiritually as he received wisdom, from God, not to receive a COVID-19 vaccine. With this sincerely held religious belief, Mr. Corey is precluded from receiving one of the then available COVID-19 vaccines.

179.     Accordingly, because of the above-described religious objections to receipt of a COVID-19 vaccine, Mr. Corey requested a religious accommodation from SRNS's COVID-19 vaccination policy.

180.     As explained above, SRNS denied Mr. Corey's religious accommodation request after verifying that he held a religious belief in conflict with receipt of a COVID-19 vaccine.

181.    SRNS pretextually refused to offer or otherwise provide any accommodation options because of Mr. Corey's disfavored religious beliefs.

182.    There were multiple no-cost and/or less than de minimis-cost accommodation options available that SRNS could have provided to Mr. Corey. Specifically, SRNS could have required Mr. Corey to be tested prior to entering facilities or performing any other role SRNS determined required in-person contact.  Mr. Corey also would have willingly paid out of pocket or had the cost of testing deducted from his pay for testing in order to retain his job.

183.    SRNS even acknowledged that "regular testing" was a reasonable accommodation in their Position Statement filed with the Equal Employment Opportunity Commission but refused to offer it to a single religious exemption requester.

184.    In addition to the testing accommodation option, there were also multiple other no-cost and/or less than de minimis cost accommodation options available that SRNS could have provided to Mr. Corey. Mr. Corey was willing to bear any such costs personally in an effort to simultaneously preserve his career and religious convictions.

185.    SRNS did not address several low-cost and no-cost alternative reasonable accommodations available, including but not limited to: recognition of natural immunity in lieu of vaccination or required testing, enhanced safety protocols, a strict quarantining when symptomatic protocol (because one cannot transmit the virus if not infected), telework, schedule swapping with vaccinated employees if in-person contact requiring proof of vaccination were an actual requirement for the job, or any combination of these options.

186.    During the height of the pandemic, Mr. Corey contributed to the ongoing operation and success of SRNS while unvaccinated and while preserving his religious convictions.

187.    SRNS provided functional accommodations, consistent with Mr. Corey's religious convictions, during this period and allowed Mr. Corey to work unvaccinated while observing enhanced safety protocols. These safety protocols included some combination of a social distancing policy, mask requirements, sanitizer, temperature checks, and/or remote work.

188.    Mr. Corey's sincerely held religious beliefs in conflict with vaccination could have been accommodated without any undue burden whatsoever and Mr. Corey would have accepted any of the numerous reasonable accommodation options available that SRNS refused to consider.

189.    SRNS did not engage in any interactive process calculated towards finding a reasonable accommodation for any individual employee, which the company would have identified had it engaged in an actual good faith accommodation process.

190.    Simultaneously, SRNS accommodated those with medical/secular objections to receipt of a COVID-19 vaccine.

191.    As a direct and proximate cause of SRNS's discriminatory actions, Mr. Corey's finances were significantly and negatively impacted. Specifically, Mr. Corey lost out on regular pay, benefits, vacation time, and promotional opportunities, amongst other financial harm.

192.    In addition to financial loss, Mr. Corey suffered emotional and psychological harm while still employed at SRNS from the months of uncertainty and repeated coercion to abandon his sincere religious beliefs in order to preserve his livelihood and career, all related to the adverse employment actions taken by SRNS.

193.    As a result of the discriminatory treatment he experienced, Mr. Corey suffered from emotional distress which is or has been marked by some combination of feelings of despondency, social anxiety, loss of interest in leisure activities, and feelings of agitation, and irritability. Specifically, Mr. Corey experienced emotional distress because he had to use his savings, which

he planned to use later in life, and faced the anxiety of potentially needing to sell his possessions for money. Following the adverse employment action and subsequent stress, Mr. Corey started to experience heart-related issues which ultimately culminated in several surgeries.

194.    Following this adverse employment action, Mr. Corey suffered financial, emotional and psychological harm.

**Courie Dennis**

195.    Plaintiff Courie Dennis worked for SRNS for over one year. Mr. Dennis was employed at SRNS as a Financial Analyst at the at the time of being put on an indefinite, uncertain unpaid leave and being told that the SRNS COVID-19 vaccination Mandate was permanent and would not be dropped in the future.

196.    Throughout his career, Mr. Dennis performed well in his role, was qualified for his job, and had an exceptional performance record.

197.    SRNS placed Mr. Dennis on an involuntary leave of absence on or about October 15, 2021, for upholding his religious beliefs and practices in conflict with the Mandate. This was an adverse employment action, whether a termination or a constructive discharge, because Mr. Dennis was informed that he could no longer complete his essential job duties while adhering to his sincerely held religious beliefs.

198.    Mr. Dennis is a Christian and believes that prayer is key to living a life that is pleasing to God.  Mr. Dennis prayed diligently over if he should get a COVID-19 vaccine.  He asked the Holy Spirit for wisdom to make the decision and received guidance.  James 1:5 states, "5If any of you lacks wisdom, you should ask God, who gives generously to all without finding fault, and it will be given to you." Through his prayers, he has been given a conviction that he should not take the vaccine. It is his belief that his moral and religious principles are to be adhered

to.  If he ignores and disregards his convictions, he would be violating his morals and jeopardizing his faith.  James 1:6-8 says, "6But when you ask, you must believe and not doubt, because the one who doubts is like a wave of the sea, blown and tossed by the wind. 7That person should not expect to receive anything from the Lord. 8Such a person is double-minded and unstable in all they do."

199.    Mr. Dennis also believes Christianity does not condone abortion because life begins at conception.  The available COVID-19 vaccines used cell lines originating from aborted children in their manufacturing or testing.  With this connection between the COVID-19 vaccines and his religious system of beliefs, Mr. Dennis is precluded from receiving one of the then available COVID-19 vaccines because they are the result of the taking of an innocent human life, and he cannot benefit from a sin in his religious system of beliefs.

200.    Mr. Dennis also believes that he was created in the image of God, as it states in Genesis.  He was created with a God-given immune system, in God's image, and he cannot alter His Design. The COVID-19 vaccines are specifically intended to alter the immune system's design. Mr. Dennis believes that God blessed him with a well-created, divine, and functioning immune system and he cannot preemptively alter his immune system, which would exhibit a lack of faith and be a sin in his religious system of beliefs. Mr. Dennis believes that the COVID-19 vaccines insert genetic code instructions into the cell to direct it to make spike proteins. This interferes with the function of the human immune system. God's intent was for the DNA within a person's body in a cell nucleus to give genetic code instructions, not anything outside the cell. Therefore, he believes it is against God's will for him to receive a COVID-19 vaccine.

201.    Separately and independently, Mr. Dennis must follow his conscience, given by God. He will not ingest a substance when his conscience tells him potential adverse effects to his relationship with God potentially outweigh the benefits, and to do otherwise would be to violate

his God-given and stewardship duties over his body, which he believes is a responsibility commanded by God. With this sincerely held religious belief, Mr. Dennis is precluded from receiving one of the then available COVID-19 vaccines.

202.    Mr. Dennis believes that an individual is morally bound to obey his conscience. Mr. Dennis believes the conscience to be God-given and is a moral "gut check" by which God guides Christians. Mr. Dennis believes following his God-given conscience is incredibly important and it guides him through significant life decisions.  Mr. Dennis believes undergoing a medical procedure is a major life decision that requires thoughtful prayer and demands observing one's conscience. In Mr. Dennis's personal system of religious beliefs, receiving a COVID-19 vaccination must be voluntary because vaccination is not biblically obligatory (there is no biblical authoritative teaching that requires Christians to receive any vaccine). After thoughtful prayer and reflection, Mr. Dennis' conscience was provoked not to receive a vaccine, and to act in conflict with his God-given conscience would be a profound violation of his religious integrity.  With this sincerely held religious belief, Mr. Dennis is precluded from receiving one of the then available COVID-19 vaccines.

203.    Separately and independently, Mr. Dennis believes the COVID-19 vaccines are a prelude to the "Mark of the Beast," particularly, he saw parallels in the manner in which the vaccines were being pushed and how they divided large swaths of humanity. With this sincerely held religious belief, Mr. Dennis is precluded from receiving one of the then available COVID-19 vaccines.

204.    Mr. Dennis also believes that his body is a living temple where the Spirit of God resides and indwells. He must protect this Temple, his body, both spiritually and physically. The introduction of COVID-19 vaccines to his body is not prudent stewardship of his body and would

be a sin in his religious system of beliefs because it would harm him spiritually. With this sincerely held religious belief, Mr. Dennis is precluded from receiving one of the then available COVID-19 vaccines.

205.    Mr. Dennis believes he was created in the image of God, which Mr. Dennis derives from text in Genesis.  Mr. Dennis believes it would be wrong to undergo a major medical procedure prior to having signs of needing such a treatment, which would show a lack of faith and trust God.

206.    Accordingly, because of the above-described religious objections to receipt of a COVID-19 vaccine, Mr. Dennis requested a religious accommodation from SRNS's COVID-19 vaccination policy.

207.    As explained above, SRNS denied Mr. Dennis's religious accommodation request after verifying that he held a religious belief in conflict with receipt of a COVID-19 vaccine.

208.    SRNS pretextually refused to offer or otherwise provide any accommodation options because of Mr. Dennis's disfavored religious beliefs.

209.    There were multiple no-cost and/or less than de minimis cost accommodation options available that SRNS could have provided to Mr. Dennis. Specifically, SRNS could have required Mr. Dennis to be tested prior to entering facilities or performing any other role SRNS determined required in-person contact.  Mr. Dennis also would have willingly paid out of pocket or had the cost of testing deducted from his pay for testing in order to retain his job.

210.    SRNS even acknowledged that "regular testing" was a reasonable accommodation in their Position Statement filed with the Equal Employment Opportunity Commission but refused to offer it to a single religious exemption requester.

211.    In addition to the testing accommodation option, there were also multiple other no-cost and/or less than de minimis cost accommodation options available that SRNS could have

36

provided to Mr. Dennis. Mr. Dennis was willing to bear any such costs personally in an effort to simultaneously preserve his career and religious convictions.

212.     SRNS did not address several low-cost and no-cost alternative reasonable accommodations available, including but not limited to: recognition of natural immunity in lieu of vaccination or required testing, enhanced safety protocols, a strict quarantining when symptomatic protocol (because one cannot transmit the virus if not infected), telework, schedule swapping with vaccinated employees if in-person contact requiring proof of vaccination were an actual requirement for the job, or any combination of these options.

213.     During the height of the pandemic, Mr. Dennis contributed to the ongoing operation and success of SRNS while unvaccinated and while preserving his religious convictions.

214.     SRNS provided functional accommodations, consistent with Mr. Dennis' religious convictions, during this period and allowed Mr. Dennis to work unvaccinated while observing enhanced safety protocols. These safety protocols included some combination of a social distancing policy, mask requirements, sanitizer, temperature checks, and/or remote work.

215.     Mr. Dennis's sincerely held religious beliefs in conflict with vaccination could have been accommodated without any undue burden whatsoever and Mr. Dennis would have accepted any of the numerous reasonable accommodation options available that SRNS refused to consider.

216.     SRNS did not engage in any interactive process calculated towards finding a reasonable accommodation for any individual employee, which the company would have identified had it engaged in an actual good faith accommodation process.

217.     Simultaneously, SRNS accommodated those with medical/secular objections to receipt of a COVID-19 vaccine. Mr. Dennis has personal knowledge that employees were allowed to keep their job and not receive the vaccine.

218.    As a direct and proximate cause of SRNS's discriminatory actions, Mr. Dennis's finances were significantly and negatively impacted. Specifically, Mr. Dennis lost out on regular pay, benefits, vacation time, and promotional opportunities, amongst other financial harm.

219.    In addition to financial loss, Mr. Dennis suffered emotional and psychological harm while still employed at SRNS from the months of uncertainty and repeated coercion to abandon his sincere religious beliefs in order to preserve his livelihood and career, all related to the adverse employment actions taken by SRNS.

220.    As a result of the discriminatory treatment he experienced, Mr. Dennis suffered from emotional distress which is or has been marked by some combination of feelings of despondency, social anxiety, loss of interest in leisure activities, and feelings of agitation and irritability. Specifically, Mr. Dennis experienced depression, loss of sleep, anxiety, and humiliation.  He was jobless through the Christmas holiday due to SRNS's conduct.  Mr. Dennis felt devastated and humiliated that he went from having a successful career to being unemployed, all while having to figure out how to provide for his wife, who is a stay-at-home mom, and four children.

221.    Following this adverse employment action, Mr. Dennis suffered financial, emotional and psychological harm.

**<u>Thomas Diaz</u>**

222.    Plaintiff Thomas John Diaz worked for SRNS for over 10 years. Mr. Diaz was employed at SRNS as the Manager of the Emergency Readiness Training and Evaluation Group at the time of being placed on indefinite, uncertain unpaid leave and being told that the SRNS COVID-19 vaccination Mandate was permanent and would not be dropped in the future.

223. Throughout his career, Mr. Diaz performed well in his role, was qualified for his job, and had an exceptional performance record.

224. SRNS placed Mr. Diaz on an involuntary leave of absence on or about October 15, 2021, for upholding his religious beliefs and practices in conflict with the Mandate. This was an adverse employment action, whether a termination or a constructive discharge, because Mr. Diaz was informed that he could no longer complete his essential job duties while adhering to his sincerely held religious beliefs.

225. Mr. Diaz is a Non-denominational Christ-following Christian.

226. Mr. Diaz believes that human life is sacred as it begins at conception and ends at natural death. Abortion is tantamount to murder. As such, it is a sin in his system of religious beliefs to use medical products he understands to be created using aborted fetal cell lines. It is Mr. Diaz's understanding that the Pfizer and Moderna vaccines used aborted fetal cell lines in their testing, development, and/or manufacture, and that the Johnson & Johnson vaccine used aborted fetal cells in the production of their vaccine. With this sincerely held religious belief, Mr. Diaz is precluded from receiving one of the then available COVID-19 vaccines because they are the result of the taking of an innocent human life and thus supporting and promoting the practice of murder.

227. Separately and independently, Mr. Diaz must follow his conscience, given by God. As a Christ follower, he prayed and meditated on the COVID-19 vaccine for a significant period of time and sincerely believed receiving a COVID-19 vaccine is not God's Will for him. Mr. Diaz came under firm conviction that he must not receive a COVID-19 vaccine through his prayer. With this sincerely held religious belief, Mr. Diaz is precluded from receiving one of the then available COVID-19 vaccines.

228.    Mr. Diaz believes that an individual is morally bound to obey his conscience. Mr. Diaz believes the conscience to be God-given and is a moral "gut check" by which God guides Christians.  Mr. Diaz believes following his God-given conscience is incredibly important. After thoughtful prayer and reflection, Mr. Diaz's conscience was provoked not to receive a vaccine, and to act in conflict with his God-given conscience would be a profound violation of his religious integrity.  With this sincerely held religious belief, Mr. Diaz is precluded from receiving one of the then available COVID-19 vaccines.

229.    Accordingly, because of the above-described religious objections to receipt of a COVID-19 vaccine, Mr. Diaz requested a religious accommodation from SRNS's COVID-19 vaccination policy.

230.    As explained above, SRNS denied Mr. Diaz's religious accommodation request after verifying that he held a religious belief in conflict with receipt of a COVID-19 vaccine.

231.    SRNS pretextually refused to offer or otherwise provide any accommodation options because of Mr. Diaz's disfavored religious beliefs.

232.    There were multiple no-cost and/or less than de minimis cost accommodation options available that SRNS could have provided to Mr. Diaz. Specifically, SRNS could have required Mr. Diaz to be tested prior to entering facilities or performing any other role SRNS determined required in-person contact.  Mr. Diaz also would have willingly paid out of pocket or had the cost of testing deducted from his pay for testing in order to retain his job.

233.    SRNS even acknowledged that "regular testing" was a reasonable accommodation in their Position Statement filed with the Equal Employment Opportunity Commission but refused to offer it to a single religious exemption requester.

234. Importantly, Mr. Diaz had tested positive for COVID-19 September of 2020 and May of 2021. Mr. Diaz informed SRNS of this and was able to continue his employment with the established accommodations. This means that Mr. Diaz had naturally occurring COVID-19 antibodies and could have been treated equally as vaccinated employees, who were not made to regularly test.

235. In addition to the testing accommodation option, there were also multiple other no-cost and/or less than de minimis cost accommodation options available that SRNS could have provided to Mr. Diaz. Mr. Diaz was willing to bear any such costs personally in an effort to simultaneously preserve his career and religious convictions.

236. SRNS did not address several low-cost and no-cost alternative reasonable accommodations available, including but not limited to: recognition of natural immunity in lieu of vaccination or required testing, enhanced safety protocols, a strict quarantining when symptomatic protocol (because one cannot transmit the virus if not infected), telework, schedule swapping with vaccinated employees if in-person contact requiring proof of vaccination were an actual requirement for the job, or any combination of these options.

237. During the height of the pandemic, Mr. Diaz contributed to the ongoing operation and success of SRNS while unvaccinated and while preserving his religious convictions.

238. SRNS provided functional accommodations, consistent with Mr. Diaz's religious convictions, during this period and allowed Mr. Diaz to work unvaccinated while observing enhanced safety protocols. These safety protocols included some combination of a social distancing policy, mask requirements, sanitizer, temperature checks, and/or remote work.

239.    Mr. Diaz's sincerely held religious beliefs in conflict with vaccination could have been accommodated without any undue burden whatsoever and Mr. Diaz would have accepted any of the numerous reasonable accommodation options available that SRNS refused to consider.

240.    SRNS did not engage in any interactive process calculated towards finding a reasonable accommodation for any individual employee, which the company would have identified had it engaged in an actual good faith accommodation process.

241.    Simultaneously, SRNS accommodated those with medical/secular objections to receipt of a COVID-19 vaccine.

242.    As a direct and proximate cause of SRNS's discriminatory actions, Mr. Diaz's finances were significantly and negatively impacted. Specifically, Mr. Diaz lost out on regular pay, benefits, vacation time, and bonus pay potential, amongst other financial harm.

243.    In addition to financial loss, Mr. Diaz suffered emotional, psychological harm as well as developing medical conditions requiring treatment while still employed at SRNS from the months of uncertainty and repeated coercion to abandon his sincere religious beliefs in order to preserve his livelihood and career, all related to the adverse employment actions taken by SRNS.

244.    As a result of the discriminatory treatment he experienced, Mr. Diaz suffered from emotional distress which is or has been marked by some combination of feelings of despondency, social anxiety, loss of interest in leisure activities, and feelings of agitation and irritability. Specifically, Mr. Diaz had an increased anxiety level requiring medication and on-going therapy, sleeping issues, and even suffered his hair graying and falling out as a result of SRNS's conduct.

245.    Following this adverse employment action, Mr. Diaz suffered financial, physical, emotional and psychological harm.

**Daniel Dodson**

246.    Plaintiff Daniel Ryan Dodson ("Mr. Dodson") worked for SRNS for approximately one and a half years and was employed at SRNS as an Engineer at the at the time of being put on an indefinite, uncertain unpaid leave and being told that the SRNS COVID-19 vaccination Mandate was permanent and would not be dropped in the future.

247.    Throughout his career, Mr. Dodson performed well in his role, was qualified for his job, and had an exceptional performance record.

248.    SRNS placed Mr. Dodson on an involuntary leave of absence on or about October 15, 2021, for upholding his religious beliefs and practices in conflict with the Mandate. This was an adverse employment action, whether a termination or a constructive discharge, because Mr. Dodson was informed that he could no longer complete his essential job duties while adhering to his sincerely held religious beliefs.

249.    Mr. Dodson is a Bible believing Christian and follower of Jesus Christ.

250.    Mr. Dodson believes that human life begins at conception and that abortion is sinful and equal to murder. As such, it is a sin in his system of religious beliefs to use medical products he understands to be created using aborted fetal cell lines. It is Mr. Dodson's understanding that the Pfizer and Moderna vaccines used aborted fetal cell lines in their testing, development, and/or manufacture, and that the Johnson & Johnson vaccine used aborted fetal cells in the production of their vaccine. With this sincerely held religious belief, Mr. Dodson is precluded from receiving one of the then available COVID-19 vaccines because they are the result of the taking of an innocent human life.

251.    Separately and independently, Mr. Dodson must follow his conscience, given by God. He follows God's teachings and lives by God's commands and instructions to honor his

relationship with God. After thoughtful prayer and reflection, Mr. Dodson's conscience was provoked not to receive a COVID-19 vaccine, and to act in conflict with his God-given conscience would be a profound violation of his religious integrity. With this sincerely held religious belief, Mr. Dodson is precluded from receiving one of the then available COVID-19 vaccines.

252.     Separately and distinctly, Mr. Dodson believes that his body is a living temple for the Holy Spirit. He must protect this Temple, his body, both spiritually and physically, from unclean substances. Mr. Dodson believes that the COVID-19 vaccines are unclean, and the introduction of COVID-19 vaccines to his body would be a sin in his religious system of beliefs because it would harm him spiritually and physically.

253.     Mr. Dodson believes that vaccines, including COVID-19 vaccines, contain neurotoxins, hazardous substances including toxic heavy metals (E.G., aluminum), formaldehyde, attenuated viruses (meaning an infectious agent that poisons the mind or soul), biological material from animals (parts, cells, or fluids), foreign DNA, albumin from human blood, carcinogens and chemical wastes that are proven harmful to the human body. Mr. Dodson cannot ingest these ingredients because it would be a sin in his religious system of beliefs. Moreover, the potential for devastation side effects to the body are in his religious belief system, a result of evil. The Bible says, "A wise man feareth, and departeth from evil: but the fool rageth, and is confident." Proverbs 14:16 (KJV) "A prudent man foreseeth the evil, and hideth himself; but the simple pass on, and are punished." Proverbs 27:12 (KJV).

254.     Separately and distinctly, Mr. Dodson believes that God blessed him with a well-created, divine, and functioning immune system and he cannot preemptively alter his immune system, or it would evidence a lack of faith and be a sin in his religious system of beliefs. With

this sincerely held religious belief, Mr. Dodson is precluded from receiving one of the then available COVID-19 vaccines.

255.    Mr. Dodson believes that God created him in God's own image and that he cannot alter His Design. He believes that he is fearfully and wonderfully made and cannot alter God's work. The COVID-19 vaccines are specifically intended to alter the immune system's design. To do so would be a sin in his religious system of beliefs. With this sincerely held religious belief, Mr. Dodson is precluded from receiving one of the then available COVID-19 vaccines.

256.    Mr. Dodson believes that the COVID-19 vaccines and/or any of their subsequent variations, with their numerous additives/ingredients (including poisons, toxins, and aborted human baby material, etc.) and their mechanism for altering his body using cellular genetic modification technology mRNA, not only harms God's temple (his body), they defile it, making it (his body) unclean, and are an abomination to God and therefore prohibited to him. The bible says, "But the man that shall be unclean, and shall not purify himself, that soul shall be cut off from among the congregation, because he hath defiled the sanctuary of the Lord: the water of separation hath not been sprinkled upon him; he is unclean." Numbers 19:20 (KJV). This scripture forbids him to take anything unclean which will defile his body. Mr. Dodson believes in and follows God and the principles laid out in His Word the Bible and believes that vaccines violate God's Word. With this sincerely held religious belief, Mr. Dodson is precluded from receiving one of the then available COVID-19 vaccines.

257.    Accordingly, because of the above-described religious objections to receipt of a COVID-19 vaccine, Mr. Dodson requested a religious accommodation from SRNS's COVID-19 vaccination policy.

258.    As explained above, SRNS denied Mr. Dodson's religious accommodation request after verifying that he held a religious belief in conflict with receipt of a COVID-19 vaccine.

259.    SRNS pretextually refused to offer or otherwise provide any accommodation options because of Mr. Dodson's disfavored religious beliefs.

260.    There were multiple no-cost and/or less than de minimis cost accommodation options available that SRNS could have provided to Mr. Dodson. Specifically, SRNS could have required Mr. Dodson to be tested prior to entering facilities or performing any other role SRNS determined required in-person contact. Mr. Dodson also would have willingly paid out of pocket or had the cost of testing deducted from his pay for testing in order to retain his job.

261.    SRNS even acknowledged that "regular testing" was a reasonable accommodation in their Position Statement filed with the Equal Employment Opportunity Commission but refused to offer it to a single religious exemption requester.

262.    Importantly, Mr. Dodson had tested positive for COVID-19 in August 2021, and informed SRNS of this. This means that Mr. Dodson had naturally occurring COVID-19 antibodies and could have been treated equally as vaccinated employees.

263.    In addition to the testing accommodation option, there were also multiple other no-cost and/or less than de minimis cost accommodation options available that SRNS could have provided to Mr. Dodson. Mr. Dodson was willing to bear any such costs personally in an effort to simultaneously preserve his career and religious convictions.

264.    SRNS did not address several low-cost and no-cost alternative reasonable accommodations available, including but not limited to: recognition of natural immunity in lieu of vaccination or required testing, enhanced safety protocols, a strict quarantining when symptomatic protocol (because one cannot transmit the virus if not infected), telework, schedule swapping with

vaccinated employees if in-person contact requiring proof of vaccination were an actual requirement for the job, or any combination of these options.

265.     During the height of the pandemic, Mr. Dodson contributed to the ongoing operation and success of SRNS while unvaccinated and while preserving his religious convictions.

266.     SRNS provided functional accommodations, consistent with Mr. Dodson's religious convictions, during this period and allowed Mr. Dodson to work unvaccinated while observing enhanced safety protocols. These safety protocols included some combination of a social distancing policy, mask requirements, sanitizer, temperature checks, and/or remote work.

267.     Mr. Dodson's sincerely held religious beliefs in conflict with vaccination could have been accommodated without any undue burden whatsoever and Mr. Dodson would have accepted any of the numerous reasonable accommodation options available that SRNS refused to consider.

268.     SRNS did not engage in any interactive process calculated towards finding a reasonable accommodation for any individual employee, which the company would have identified had it engaged in an actual good faith accommodation process.

269.     Simultaneously, SRNS accommodated those with medical objections to receipt of a COVID-19 Vaccine.

270.     As a direct and proximate cause of SRNS's discriminatory actions, Mr. Dodson's finances were significantly and negatively impacted. Specifically, Mr. Dodson lost out on regular pay, benefits, vacation time, and bonus pay potential, amongst other financial harm.

271.     In addition to financial loss, Mr. Dodson suffered emotional and psychological harm while still employed at SRNS from the months of uncertainty and repeated coercion to

abandon his sincere religious beliefs in order to preserve his livelihood and career, all related to the adverse employment actions taken by SRNS.

272.    As a result of the discriminatory treatment he experienced, Mr. Dodson suffered from emotional distress which is or has been marked by some combination of feelings of despondency, social anxiety, emotional distress, sleepless nights and trouble sleeping, anxiety, negative changes in mood and emotional wellbeing, feelings of being a second-class citizen at work, feelings of abandonment, loss of interest in leisure activities, feelings of agitation, and irritability.

273.    Following this adverse employment action, Mr. Dodson suffered financial, emotional and psychological harm.

**Josh Floyd**

274.    Plaintiff Joshua Floyd ("Mr. Floyd") worked for SRNS through Omega Technical Services, for almost a year. Mr. Floyd was employed at SRNS as a Lead HVAC Field Engineer at the time he was terminated.

275.    Omega Technical Services did not have a COVID-19 vaccination mandate.

276.    SRNS controlled Mr. Floyd's work, including the ability to have him work for them, the equipment given to him to complete his job at SRNS's job sites, and the ability to reprimand him for performance and other reasons, amongst other aspects.

277.    As further evidence that SRNS controlled all aspects of Mr. Floyd's work, SRNS mandated that he take a COVID-19 vaccine. SRNS also processed and evaluated Mr. Floyd's religious accommodation request and denied it. After denying his religious accommodation request, SRNS then refused to allow him to continue to complete his job duties and took adverse employment action against him.

278.    Throughout his career, Mr. Floyd performed well in his role, was qualified for his job, and had an exceptional performance record.

279.    SRNS terminated Mr. Floyd on or about October 15, 2021, for upholding his religious beliefs and practices in conflict with the Mandate.

280.    Mr. Floyd is a Christian and was raised in the Apostolic Pentecostal Church.

281.    Mr. Floyd believes that human life begins at conception and that abortion is murder of the unborn.  Psalm 139: 13-14 "For you formed my inward parts; you knitted me together in my mother's womb.  I praise you, for I am fearfully and wonderfully made."  Psalm 139: 16 "Your eyes saw my unformed substance; in your book were written, every one of them, the days that were formed for me, when as yet there was none of them." Mr. Floyd believes it is undeniable that a child in the womb is a human being.  As such, it is a sin in his system of religious beliefs to use medical products he understands to be created using aborted fetal cell lines. It is Mr. Floyd's understanding that the Pfizer and Moderna vaccines used aborted fetal cell lines in their testing, development, and/or manufacture, and that the Johnson & Johnson vaccine used aborted fetal cells in the production of their vaccine.  With this sincerely held religious belief, Mr. Floyd is precluded from receiving one of the then available COVID-19 vaccines because they are the result of the taking of an innocent human life.

282.    Accordingly, because of the above-described religious objections to receipt of a COVID-19 vaccine, Mr. Floyd requested a religious accommodation from SRNS's COVID-19 vaccination policy.

283.    As explained above, SRNS denied Mr. Floyd's religious accommodation request after verifying that he held a religious belief in conflict with receipt of a COVID-19 vaccine.

284.     SRNS pretextually refused to offer or otherwise provide any accommodation options because of Mr. Floyd's disfavored religious beliefs.

285.     There were multiple no-cost and/or less than de minimis cost accommodation options available that SRNS could have provided to Mr. Floyd. Specifically, SRNS could have required Mr. Floyd to be tested prior to entering facilities or performing any other role SRNS determined required in-person contact.  Mr. Floyd also would have willingly paid out of pocket or had the cost of testing deducted from his pay for testing in order to retain his job.

286.     SRNS even acknowledged that "regular testing" was a reasonable accommodation in their Position Statement filed with the Equal Employment Opportunity Commission but refused to offer it to a single religious exemption requester.

287.     Importantly, Mr. Floyd had tested positive for COVID-19 in August of 2021 and informed SRNS of this. This means that Mr. Floyd had naturally occurring COVID-19 antibodies and could have been treated equally as vaccinated employees, who were not made to regularly test.

288.     In addition to the testing accommodation option, there were also multiple other no-cost and/or less than de minimis cost accommodation options available that SRNS could have provided to Mr. Floyd. Mr. Floyd was willing to bear any such costs personally in an effort to simultaneously preserve his career and religious convictions.

289.     SRNS did not address several low-cost and no-cost alternative reasonable accommodations available, including but not limited to: recognition of natural immunity in lieu of vaccination or required testing, enhanced safety protocols, a strict quarantining when symptomatic protocol (because one cannot transmit the virus if not infected),  telework, schedule swapping with vaccinated employees if in-person contact requiring proof of vaccination were an actual requirement for the job, or any combination of these options.

290.     During the height of the pandemic, Mr. Floyd contributed to the ongoing operation and success of SRNS while unvaccinated and while preserving his religious convictions.

291.     SRNS provided functional accommodations, consistent with Mr. Floyd's religious convictions, during this period and allowed Mr. Floyd to work unvaccinated while observing enhanced safety protocols. These safety protocols included some combination of a social distancing policy, mask requirements, sanitizer, temperature checks, and/or remote work.

292.     Mr. Floyd's sincerely held religious beliefs in conflict with vaccination could have been accommodated without any undue burden whatsoever and Mr. Floyd would have accepted any of the numerous reasonable accommodation options available that SRNS refused to consider.

293.     SRNS did not engage in any interactive process calculated towards finding a reasonable accommodation for any individual employee, which the company would have identified had it engaged in an actual good faith accommodation process.

294.     Simultaneously, SRNS accommodated those with medical/secular objections to receipt of a COVID-19 vaccine.

295.     As a direct and proximate cause of SRNS's discriminatory actions, Mr. Floyd's finances were significantly and negatively impacted. Specifically, Mr. Floyd lost out on regular pay, benefits, vacation time, and pay increases given to those that continued working on site, amongst other financial harm.

296.     In addition to financial loss, Mr. Floyd suffered emotional and psychological harm while still employed at SRNS from the months of uncertainty and repeated coercion to abandon his sincere religious beliefs in order to preserve his livelihood and career, all related to the adverse employment actions taken by SRNS.

297.    As a result of the discriminatory treatment he experienced, Mr. Floyd suffered from emotional distress which is or has been marked by some combination of feelings of despondency, social anxiety, loss of interest in leisure activities, feelings of agitation, and irritability, trouble sleeping, loss of focus, nausea, headaches, depression, helplessness, hopelessness, and the feeling of letting his family down. Along with SRNS's conduct, his wife was also expecting their second child. This emotional distress exacerbated the situation because of the financial burden he expected following the birth of his second child and the stress this put on his wife.  Mr. Floyd felt as though he failed as a husband and father because he was not able to contribute financially.  This strained his relationship with his family.

298.    Following this adverse employment action, Mr. Floyd suffered financial, emotional and psychological harm.

**Jeffrey Garlington**

299.    Plaintiff Jeffrey Garlington ("Mr. Garlington") worked for SRNS for over 1 year. Mr. Garlington was employed at SRNS as a Principal Engineer at the time of being put on an indefinite, uncertain unpaid leave and being told that the SRNS COVID-19 vaccination Mandate was permanent and would not be dropped in the future.

300.    Throughout his career, Mr. Garlington performed well in his role, was qualified for his job, and had an exceptional performance record.

301.    SRNS placed Mr. Garlington on an involuntary leave of absence on or about October 15, 2021, for upholding his religious beliefs and practices in conflict with the Mandate. This was an adverse employment action, whether a termination or a constructive discharge, because Mr. Garlington was informed that he could no longer complete his essential job duties while adhering to his sincerely held religious beliefs.

302.    Mr. Garlington is a Christian. He has been a faithful serving member to his churches for most of his adult life.  He regularly gives time, money, and resources to his Church and other Christian causes.  Among other things, he and his wife have taught youth Sunday school, hosted bible studies at their house, served on church safety and security ministry teams, and served as leaders in Christian youth organizations.  As a Christian, he must use the principles learned from the Bible in conjunction with prayer and his worldly understanding to make decisions.

303.    It is Mr. Garlington's sincerely held religious belief that his body and his life are the Lord's (1 Corinthians 6:19-20) and that, as a Christian, he is charged to be a good steward of both.  He thoughtfully and prayerfully considered the COVID-19 vaccine and was called to not get it. As a child of God who has thoughtfully and prayerfully reached a conclusion, it would be sinful for him to take a path other than the one he is called to (Luke 11:28).

304.    Mr. Garlington prayed and received guidance given by God. He will not ingest a substance when his conscience tells him potential adverse effects to his relationship with God potentially outweigh the benefits, and to do otherwise would be to violate his God-given and stewardship duties over his body, which he believes is a responsibility commanded by God. Mr. Garlington prays on a daily basis and was called by the Lord not to receive a COVID-19 vaccine. When called to action, or in this case, non-action, he feels it is a sin to be intentionally disobedient to guidance he receives from the Lord, who freely gives guidance when asked (James 1:5). After thoughtful prayer and reflection, Mr. Garlington's was convicted not to receive a COVID-19 vaccine, and to act in conflict with his God's guidance would be a violation of his religious integrity. With this sincerely held religious belief, Mr. Garlington is precluded from receiving one of the then available COVID-19 vaccines.

305.     Accordingly, because of the above-described religious objections to receipt of a COVID-19 vaccine, Mr. Garlington requested a religious accommodation from SRNS's COVID-19 vaccination policy.

306.     As explained above, SRNS denied Mr. Garlington's religious accommodation request after verifying that he held a religious belief in conflict with receipt of a COVID-19 vaccine.

307.     SRNS pretextually refused to offer or otherwise provide any accommodation options because of Mr. Garlington's disfavored religious beliefs.

308.     There were multiple no-cost and/or less than de minimis cost accommodation options available that SRNS could have provided to Mr. Garlington. Specifically, SRNS could have required Mr. Garlington to be tested prior to entering facilities or performing any other role SRNS determined required in-person contact.  Mr. Garlington also would have willingly paid out of pocket or had the cost of testing deducted from his pay for testing in order to retain his job.

309.     SRNS even acknowledged that "regular testing" was a reasonable accommodation in their Position Statement filed with the Equal Employment Opportunity Commission but refused to offer it to a single religious exemption requester.

310.     Importantly, Mr. Garlington had tested positive for COVID-19 prior to the vaccine being available, and informed SRNS of this. This means that Mr. Garlington had naturally occurring COVID-19 antibodies and could have been treated equally as vaccinated employees, who were not made to regularly test.

311.     In addition to the testing accommodation option, there were also multiple other no-cost and/or less than de minimis cost accommodation options available that SRNS could have

provided to Mr. Garlington. Mr. Garlington was willing to bear any such costs personally in an effort to simultaneously preserve his career and religious convictions.

312.    SRNS did not address several low-cost and no-cost alternative reasonable accommodations available, including but not limited to: recognition of natural immunity in lieu of vaccination or required testing, enhanced safety protocols, a strict quarantining when symptomatic protocol (because one cannot transmit the virus if not infected),  telework, schedule swapping with vaccinated employees if in-person contact requiring proof of vaccination were an actual requirement for the job, or any combination of these options.

313.    During the height of the pandemic, Mr. Garlington contributed to the ongoing operation and success of SRNS while unvaccinated and while preserving his religious convictions.

314.    SRNS provided functional accommodations, consistent with Mr. Garlington's religious convictions, during this period and allowed him to work unvaccinated while observing enhanced safety protocols. These safety protocols included some combination of a social distancing policy, mask requirements, sanitizer, temperature checks, and/or remote work.

315.    Mr. Garlington's sincerely held religious beliefs in conflict with vaccination could have been accommodated without any undue burden whatsoever and Mr. Garlington would have accepted any of the numerous reasonable accommodation options available that SRNS refused to consider.

316.    SRNS did not engage in any interactive process calculated towards finding a reasonable accommodation for any individual employee, which the company would have identified had it engaged in an actual good faith accommodation process.

317.    Simultaneously, SRNS accommodated those with medical/secular objections to receipt of a COVID-19 vaccine.

318.    As a direct and proximate cause of SRNS's discriminatory actions, Mr. Garlington's finances were significantly and negatively impacted. Specifically, Mr. Garlington lost out on regular pay, 401k match and interest, vacation time, and a promotion that was in process and delayed, amongst other financial harms.

319.    In addition to financial loss, Mr. Garlington suffered emotional and psychological harm while still employed at SRNS from the months of uncertainty and repeated coercion to abandon his sincere religious beliefs in order to preserve his livelihood and career, all related to the adverse employment actions taken by SRNS.

320.    As a result of the discriminatory treatment Mr. Garlington experienced, he suffered from emotional distress which is or has been marked by some combination of feelings of despondency, anxiety, loss of interest in leisure activities, and feelings of agitation, and irritability.

321.    Following this adverse employment action, Mr. Garlington suffered financial, emotional and psychological harm.

**Jeffrey Grinnell**

322.    Plaintiff Jeffrey Grinnell ("Mr. Grinnell") worked for SRNS through Value Added Solutions for over seven years. Mr. Grinnell was employed at SRNS as a Senior Design Engineer at the at the time of being terminated.

323.    Value Added Solutions did not have a COVID-19 vaccination mandate.

324.    SRNS controlled Mr. Grinnell's work, including the ability to have him work for them, the equipment given to him to complete his job at SRNS's job sites, and the ability to reprimand him for performance and other reasons, amongst other aspects.

325.    As further evidence that SRNS controlled all aspects of Mr. Grinnell's work, SRNS mandated that he take a COVID-19 vaccine. SRNS also processed and evaluated Mr. Grinnell's

religious accommodation request and denied it. After denying his religious accommodation request, SRNS then refused to allow him to continue to complete his job duties and took adverse employment action against him.

326.    Throughout his career, Mr. Grinnell performed well in his role, was qualified for his job, and had an exceptional performance record.  His contract with SRNS was in effect until June of 2022.

327.    SRNS terminated Mr. Grinnell on or about October 15, 2021, for upholding his religious beliefs and practices in conflict with the Mandate.

328.    Mr. Grinnell believes that human life begins at conception and because of that, abortion is murder.  As such, it is a sin in his system of religious beliefs to use medical products he understands to be created using aborted fetal cell lines. It is Mr. Grinnell's understanding that the Johnson & Johnson vaccine  used retinal cells from a fetus that was aborted in 1985 and treated in a lab since and the Pfizer and Moderna vaccines tested the mRNAs on fetal cell lines from an aborted fetus cell from 1973.that the Pfizer and Moderna vaccines used aborted fetal cell lines in their testing, development, and/or manufacture, and that the Johnson & Johnson vaccine used aborted fetal cells in the production of their vaccine.  "For you created my innermost being. You knit me together in my mother's womb." Psalm 139:13. He will not knowingly participate in a process that uses such a product that violates the right to life and dishonors the lives of the unborn. With this sincerely held religious belief, Mr. Grinnell is precluded from receiving one of the then available COVID-19 vaccines because they are the result of the taking of an innocent human life.

329.    Separately and independently, Mr. Grinnell must follow his conscience, given by God. His conscience, prayer, and reading Scripture leads him to what is right and what is wrong. Mr. Grinnell believes following his God-given conscience is incredibly important, and that to

intentionally disregard his conscience is a sin in his religious system of beliefs. Mr. Grinnell came under the firm religious conviction not to receive a COVID-19 vaccine. With this sincerely held religious belief, Mr. Grinnell is precluded from receiving one of the then available COVID-19 vaccines.

330.    Separately and independently, Mr. Grinnell believes the COVID-19 vaccines are a prelude to the "Mark of the Beast." He believes the Mandate was a God-given test to determine compliance with sin and who would be willing to commit wrongs, which Mr. Grinnell relates to the "Mark of the Beast." With this sincerely held religious belief, Mr. Grinnell is precluded from receiving one of the then available COVID-19 vaccines.

331.    Separately and distinctly, Mr. Grinnell believes that his body is a living temple where the Spirit of God resides and indwells. He must protect this Temple, his body, both spiritually and physically. He believes that Ephesians 6:10-18 directs us to "put on the armor of God," so that we can be equipped with truth, righteousness, peace, and faith. The introduction of COVID-19 vaccines to his body is not prudent stewardship of his body and would be a sin in his religious system of beliefs because it would harm him spiritually. With this sincerely held religious belief, Mr. Grinnell is precluded from receiving one of the then available COVID-19 vaccines.

332.    Separately and distinctly, Mr. Grinnell believes that God blessed him with a divine immune system that he must not alter, which would exhibit a lack of faith and be a sin in his religious system of beliefs. With this sincerely held religious belief, Mr. Grinnell is precluded from receiving one of the then available COVID-19 vaccines.

333.    Mr. Grinnell believes that the God created him in His image and that he cannot alter His Design. The COVID-19 vaccines are specifically intended to alter the immune system's

design. To do so would be a sin in his religious system of beliefs. With this sincerely held religious belief, Mr. Grinnell is precluded from receiving one of the then available COVID-19 vaccines.

334.    Accordingly, because of the above-described religious objections to receipt of a COVID-19 vaccine, Mr. Grinnell requested a religious accommodation from SRNS's COVID-19 vaccination policy.

335.    As explained above, SRNS denied Mr. Grinnell's religious accommodation request after verifying that he held a religious belief in conflict with receipt of a COVID-19 vaccine.

336.    SRNS pretextually refused to offer or otherwise provide any accommodation options because of Mr. Grinnell's disfavored religious beliefs.

337.    There were multiple no-cost and/or less than de minimis cost accommodation options available that SRNS could have provided to Mr. Grinnell. Specifically, SRNS could have required Mr. Grinnell to be tested prior to entering facilities or performing any other role SRNS determined required in-person contact.  Mr. Grinnell also would have willingly paid out of pocket or had the cost of testing deducted from his pay for testing in order to retain his job.

338.    SRNS even acknowledged that "regular testing" was a reasonable accommodation in their Position Statement filed with the Equal Employment Opportunity Commission but refused to offer it to a single religious exemption requester.

339.    In addition to the testing accommodation option, there were also multiple other no-cost and/or less than de minimis cost accommodation options available that SRNS could have provided to Mr. Grinnell. Mr. Grinnell was willing to bear any such costs personally in an effort to simultaneously preserve his career and religious convictions.

340.    SRNS did not address several low-cost and no-cost alternative reasonable accommodations available, including but not limited to: recognition of natural immunity in lieu of

vaccination or required testing, enhanced safety protocols, a strict quarantining when symptomatic protocol (because one cannot transmit the virus if not infected), telework, schedule swapping with vaccinated employees if in-person contact requiring proof of vaccination were an actual requirement for the job, or any combination of these options.

341.    During the height of the pandemic, Mr. Grinnell contributed to the ongoing operation and success of SRNS while unvaccinated and while preserving his religious convictions.

342.    SRNS provided functional accommodations, consistent with Mr. Grinnell's religious convictions, during this period and allowed Mr. Grinnell to work unvaccinated while observing enhanced safety protocols. These safety protocols included some combination of a social distancing policy, mask requirements, sanitizer, temperature checks, and/or remote work.

343.    Mr. Grinnell's sincerely held religious beliefs in conflict with vaccination could have been accommodated without any undue burden whatsoever and Mr. Grinnell would have accepted any of the numerous reasonable accommodation options available that SRNS refused to consider.

344.    SRNS did not engage in any interactive process calculated towards finding a reasonable accommodation for any individual employee, which the company would have identified had it engaged in an actual good faith accommodation process.

345.    Simultaneously, SRNS accommodated those with medical/secular objections to receipt of a COVID-19 vaccine.

346.    As a direct and proximate cause of SRNS's discriminatory actions, Mr. Grinnell's finances were significantly and negatively impacted. Specifically, Mr. Grinnell lost out on regular pay, benefits, and vacation time, amongst other financial harm.

347.　In addition to financial loss, Mr. Grinnell suffered emotional and psychological harm while still employed at SRNS from the months of uncertainty and repeated coercion to abandon his sincere religious beliefs in order to preserve his livelihood and career, all related to the adverse employment actions taken by SRNS.

348.　As a result of the discriminatory treatment he experienced, Mr. Grinnell suffered from emotional distress which is or has been marked by some combination of feelings of despondency, social anxiety, loss of interest in leisure activities, and feelings of agitation, and irritability.

349.　Following this adverse employment action, Mr. Grinnell suffered financial, emotional and psychological harm.

### Stephen Hall

350.　Plaintiff Stephen J. Hall worked for SRNS for just under 35 years. Mr. Hall was employed at SRNS as a Senior Firefighter at the time of SRNS's adverse employment action against him, forcing him to take early, involuntary retirement because it would not allow him to continue working.

351.　Mr. Hall would not have taken early retirement and planned to work longer before retiring. He was left with no other option as SRNS advised it would not accommodate his sincerely held religious beliefs precluding receipt of a COVID-19 vaccine and it would not allow him to continue to do his job unless he was willing to violate his sincerely held religious beliefs.

352.　Throughout his career, Mr. Hall performed well in his role, was qualified for his job, and had an exceptional performance record.

353.　SRNS terminated or constructively discharged Mr. Hall. Specifically, SRNS denied his religious accommodation request and communicated to him a date certain for his termination.

In other words, SRNS forced Mr. Hall to choose between continuing his essential job duties and abandoning his sincerely held religious beliefs by unequivocally setting a date certain termination if he did not violate his religious beliefs. SRNS would not allow Mr. Hall to honor his sincerely held religious beliefs in conflict with receipt of a COVID-19 vaccine and continue his employment with them. Unsurprisingly, because he could not violate his religious integrity, Mr. Hall was forced into early retirement. This adverse employment action forced Mr. Hall to take early retirement on or about October 31, 2021, for upholding his religious beliefs and practices in conflict with the Mandate.

354.    Mr. Hall is a Southern Baptist.

355.    It is Mr. Hall's belief and understanding according to the Bible that God gave man everything he needs for life. 2 Peter 1:3: His divine power has given us everything we need for life and godliness through our knowledge of him who called us by his own glory and goodness. NIV

356.    Mr. Hall believes that human life begins at conception and that abortion is the murder of an unborn child.  As such, it is a sin in his system of religious beliefs to use medical products he understands to be created using aborted fetal cell lines. It is Mr. Hall's understanding that the Pfizer and Moderna vaccines used aborted fetal cell lines in their testing, development, and/or manufacture, and that the Johnson & Johnson vaccine used aborted fetal cells in the production of their vaccine.  With this sincerely held religious belief, Mr. Hall is precluded from receiving one of the then available COVID-19 vaccines because they are the result of the taking of an innocent human life.

357.    Separately and independently, Mr. Hall must follow his conscience, given by God. He will not ingest a substance when his conscience tells him to do so would have adverse effects to his relationship with God. To do otherwise would be to violate his God-given and stewardship

duties over his body, which he believes is a responsibility commanded by God. With this sincerely held religious belief, Mr. Hall is precluded from receiving one of the then available COVID-19 vaccines.

358. Separately and distinctly, Mr. Hall believes that God blessed him with a well-created, divine, and functioning immune system which he cannot alter, as this would exhibit a lack of faith and be a sin in his religious system of beliefs. With this sincerely held religious belief, Mr. Hall is precluded from receiving one of the then available COVID-19 vaccines.

359. Accordingly, because of the above-described religious objections to receipt of a COVID-19 vaccine, Mr. Hall requested a religious accommodation from SRNS's COVID-19 vaccination policy.

360. As explained above, SRNS denied Mr. Hall's religious accommodation request after verifying that he held a religious belief in conflict with receipt of a COVID-19 vaccine.

361. SRNS pretextually refused to offer or otherwise provide any accommodation options because of Mr. Hall's disfavored religious beliefs.

362. There were multiple no-cost and/or less than de minimis cost accommodation options available that SRNS could have provided to Mr. Hall. Specifically, SRNS could have required Mr. Hall to be tested prior to entering facilities or performing any other role SRNS determined required in-person contact. Mr. Hall also would have willingly paid out of pocket or had the cost of testing deducted from his pay for testing in order to retain his job.

363. SRNS even acknowledged that "regular testing" was a reasonable accommodation in their Position Statement filed with the Equal Employment Opportunity Commission but refused to offer it to a single religious exemption requester.

364.    Importantly, Mr. Hall had tested positive for COVID-19 in early July 2021, and informed SRNS of this. This means that Mr. Hall had naturally occurring COVID-19 antibodies and could have been treated equally as vaccinated employees, who were not made to regularly test.

365.    In addition to the testing accommodation option, there were also multiple other no-cost and/or less than de minimis cost accommodation options available that SRNS could have provided to Mr. Hall. Mr. Hall was willing to bear any such costs personally in an effort to simultaneously preserve his career and religious convictions.

366.    SRNS did not address several low-cost and no-cost alternative reasonable accommodations available, including but not limited to: recognition of natural immunity in lieu of vaccination or required testing, enhanced safety protocols, a strict quarantining when symptomatic protocol (because one cannot transmit the virus if not infected),  telework, schedule swapping with vaccinated employees if in-person contact requiring proof of vaccination were an actual requirement for the job, or any combination of these options.

367.    During the height of the pandemic, Mr. Hall contributed to the ongoing operation and success of SRNS while unvaccinated and while preserving his religious convictions.

368.    SRNS provided functional accommodations, consistent with Mr. Hall's religious convictions, during this period and allowed Mr. Hall to work unvaccinated while observing enhanced safety protocols. These safety protocols included some combination of a social distancing policy, mask requirements, sanitizer, temperature checks, and/or remote work.

369.    Mr. Hall's sincerely held religious beliefs in conflict with vaccination could have been accommodated without any undue burden whatsoever and Mr. Hall would have accepted any of the numerous reasonable accommodation options available that SRNS refused to consider.

370.     SRNS did not engage in any interactive process calculated towards finding a reasonable accommodation for any individual employee, which the company would have identified had it engaged in an actual good faith accommodation process.

371.     Simultaneously, SRNS accommodated those with medical/secular objections to receipt of a COVID-19 vaccine. Mr. Hall is aware that Chris Alverson was given a medical exemption.

372.     As a direct and proximate cause of SRNS's discriminatory actions, Mr. Hall's finances were significantly and negatively impacted. Specifically, Mr. Hall lost out on regular pay, benefits, including pension, vacation time, and suffered other financial harms.

373.     In addition to financial loss, Mr. Hall suffered emotional and psychological harm while still employed at SRNS from the months of uncertainty and repeated coercion to abandon his sincere religious beliefs in order to preserve his livelihood and career, all related to the adverse employment actions taken by SRNS.

374.     As a result of the discriminatory treatment he experienced, Mr. Hall suffered from emotional distress which is or has been marked by some combination of feelings of despondency, social anxiety, loss of interest in leisure activities, and feelings of agitation, and irritability.

375.     Following this adverse employment action, Mr. Hall suffered financial, emotional and psychological harm from the months of uncertainty leading up to his constructive discharge/forced involuntary retirement.

376.     Specifically, Mr. Hall had trouble sleeping and anxiety and was particularly troubled when SRNS made him suffer humiliation during his out-processing when he was surrounded by armored guards and marched off-site in an effort to embarrass him.

**Phil Harmon**

377.     Plaintiff Jimmie Phillip Harmon worked for SRNS for over six years. Mr. Harmon was employed at SRNS as the Technical Security Program Manager at the time of being placed on indefinite, uncertain unpaid leave and being told that the SRNS COVID-19 vaccination Mandate was permanent and would not be dropped in the future.

378.     Throughout his career, Mr. Harmon performed well in his role, was qualified for his job, and had an exceptional performance record.

379.     SRNS terminated or constructively discharged Mr. Harmon on October 15, 2021, for upholding his religious beliefs and practices in conflict with the Mandate, when it put him on an indefinite, uncertain unpaid leave and told him that the SRNS COVID-19 vaccination Mandate was permanent and would not be dropped in the future. At that time, Mr. Harmon was informed that he could no longer complete his essential job duties while adhering to his sincerely held religious beliefs.

380.     Mr. Harmon is a practicing member of the Ecclesia Dei community within the Roman Catholic Church, and as such is forbidden by church teachings and Ecclesiastical Law (i.e., Canon Law), as established through Papal Pronouncements, from receiving any vaccine, or any medication, that utilizes fetal therapy, or which supports abortion in any fashion. The Social Life Tenants and Papal Proclamations of the Roman Catholic Church, define the absolute inadmissibility of medicines prepared using fetal therapy. The Church believes it to be definitely inadmissible to use the methods of so-called fetal therapy, in which the human fetus in various stages of its development is aborted and used in attempts to treat various diseases and to "rejuvenate" an organism. This practice presents an example of glaring immorality and is criminal in the eyes of the Church. It would be a violation of his faith to receive any of the existing COVID-

19 vaccines, and based upon the teachings of the Church, upon Ecclesiastical Law, and his own personal religious belief, to receive such a vaccine would place his immortal soul in absolute risk.

381.    Mr. Harmon's objection to the COVID-19 vaccine was formalized by the Roman Catholic Church in the Vatican's, Pontificia Academia pro Vita in a formal dictate dated June 9, 2005. In this Vatican dictate, the Sacred Congregation of the Doctrine of Faith responded to a call for clarification about the liceity of vaccinating children with vaccines prepared using cell lines derived from aborted human fetuses. The Church's response stated, "Firstly, one must consider morally illicit every form of formal cooperation (sharing the evil intention) in the action of those who have performed a voluntary abortion, which in turn has allowed the retrieval of fetal tissues, required for preparation of vaccines. Therefore, whoever – regardless of the category to which he belongs – cooperates in some way, sharing its intention, to the performance of voluntary abortion with the aim of producing the above-mentioned vaccines, participates, in actuality, in the same moral evil as the person who has performed that abortion."

382.    In the eyes of the Church, in the Tenants of his faith, and in his deeply held personal religious beliefs and personal interpretations of the requirements of the Church, if he accepts any vaccine prepared using the fetal harvesting process, Mr. Harmon is just as guilty as the person who performed the actual abortion, and he would share the stain of that sin upon his soul. It is his deeply held personal religious belief that abortion is murder. He cannot support abortion, nor any industry that profits from the act of abortion. Mr. Harmon believes that receiving a COVID-19 vaccine would lead to his eternal spiritual disaster.

383.    In April 2021, Mr. Harmon and his wife adopted a child to save the child's life from abortion.

384.    Separately and independently, Mr. Harmon must follow his conscience, given by God. He will not ingest a substance when his conscience leads him to believe it will negatively affect his relationship with God by defying God's instructions. To do otherwise would be to violate his God-given and stewardship duties over his body, which he believes is a responsibility commanded by God. The only way that he will potentially contradict his conscience is if the Ecclesia Dei community within the Roman Catholic Church teachings dictate to the contrary, which, after careful thought and prayer, Mr. Harmon has deemed not to be the case here. After thoughtful prayer and reflection, Mr. Harmon's conscience was provoked not to receive a vaccine, and to act in conflict with his God-given conscience would be a profound violation of his religious integrity. With this sincerely held religious belief, Mr. Harmon is precluded from receiving one of the then available COVID-19 vaccines.

385.    Accordingly, because of the above-described religious objections to receipt of a COVID-19 vaccine, Mr. Harmon requested a religious accommodation from SRNS's COVID-19 vaccination policy.

386.    As explained above, SRNS denied Mr. Harmon's religious accommodation request after verifying that he held a religious belief in conflict with receipt of a COVID-19 vaccine.

387.    SRNS pretextually refused to offer or otherwise provide any accommodation options because of Mr. Harmon's disfavored religious beliefs.

388.    There were multiple no-cost and/or less than de minimis cost accommodation options available that SRNS could have provided to Mr. Harmon. Mr. Harmon explicitly agreed to adhere to any conditions of employment (i.e., testing, masking, social distancing, etc.) deemed necessary by SRNS. Specifically, SRNS could have required Mr. Harmon to be tested prior to entering facilities or performing any other role SRNS determined required in-person contact. Mr.

Harmon also would have willingly paid out of pocket or had the cost of testing deducted from his pay for testing in order to retain his job.

389. SRNS even acknowledged that "regular testing" was a reasonable accommodation in their Position Statement filed with the Equal Employment Opportunity Commission but refused to offer it to a single religious exemption requester.

390. In addition to the testing accommodation option, there were also multiple other no-cost and/or less than de minimis cost accommodation options available that SRNS could have provided to Mr. Harmon. Mr. Harmon was willing to bear any such costs personally in an effort to simultaneously preserve his career and religious convictions.

391. SRNS did not address several low-cost and no-cost alternative reasonable accommodations available, including but not limited to: recognition of natural immunity in lieu of vaccination or required testing, enhanced safety protocols, a strict quarantining when symptomatic protocol (because one cannot transmit the virus if not infected), telework, schedule swapping with vaccinated employees if in-person contact requiring proof of vaccination were an actual requirement for the job, or any combination of these options.

392. During the height of the pandemic, Mr. Harmon contributed to the ongoing operation and success of SRNS while unvaccinated and while preserving his religious convictions.

393. SRNS provided functional accommodations, consistent with Mr. Harmon's religious convictions, during this period and allowed Mr. Harmon to work unvaccinated while observing enhanced safety protocols. These safety protocols included some combination of a social distancing policy, mask requirements, sanitizer, temperature checks, and/or remote work.

394. Mr. Harmon's sincerely held religious beliefs in conflict with vaccination could have been accommodated without any undue burden whatsoever and Mr. Harmon would have

accepted any of the numerous reasonable accommodation options available that SRNS refused to consider.

395.    SRNS did not engage in any interactive process calculated towards finding a reasonable accommodation for any individual employee, which the company would have identified had it engaged in an actual good faith accommodation process.

396.    Simultaneously, SRNS accommodated those with medical/secular objections to receipt of a COVID-19 vaccine.

397.    As a direct and proximate cause of SRNS's discriminatory actions, Mr. Harmon's finances were significantly and negatively impacted. Specifically, Mr. Harmon lost out on regular pay, benefits, vacation time, promotional opportunities, amongst other financial harm.

398.    In addition to financial loss, Mr. Harmon suffered emotional and psychological harm while still employed at SRNS from the months of uncertainty and repeated coercion to abandon his sincere religious beliefs in order to preserve his livelihood and career, all related to the adverse employment actions taken by SRNS. In fact, during this period, SRNS advised other employees to monitor unvaccinated employees and report any behavior they deemed suspicious, which Mr. Harmon found to be particularly repulsive behavior causing him harm.

399.    As a result of the discriminatory treatment he experienced, Mr. Harmon suffered from emotional distress which is or has been marked by some combination of feelings of despondency, anxiety, trouble sleeping, and feelings of agitation and irritability. Moreover, Mr. Harmon adamantly believes that he has been "black balled" within the security industry by SRNS for his refusal to take the COVID-19 vaccine.

400.    Following this adverse employment action, Mr. Harmon suffered financial, emotional and psychological harm.

**Ryan Mann**

401.    Plaintiff Ryan Mann worked for SRNS through Innovative Solutions Unlimited for over one year. Mr. Mann was employed at SRNS as a Security Escort at the time of being terminated.

402.    Innovative Solutions Unlimited did not have a COVID-19 vaccination mandate.

403.    SRNS controlled Mr. Mann's work, including the ability to have him work for them, the equipment given to him to complete his job at SRNS's job sites, and the ability to reprimand him for performance and other reasons, amongst other aspects.

404.    As further evidence that SRNS controlled all aspects of Mr. Mann's work, SRNS mandated that he take a COVID-19 vaccine. SRNS also processed and evaluated Mr. Mann's religious accommodation request and denied it. After denying his religious accommodation request, SRNS then refused to allow him to continue to complete his job duties and took adverse employment action against him.

405.    Throughout his career, Mr. Mann performed well in his role, was qualified for his job, and had an exceptional performance record.

406.    SRNS terminated Mr. Mann on or about October 15, 2021, for upholding his religious beliefs and practices in conflict with the Mandate. This was an adverse employment action, whether a termination or a constructive discharge, because Mr. Mann was informed that he could no longer complete his essential job duties while adhering to his sincerely held religious beliefs.

407.    Mr. Mann is a Christian.

408.    Mr. Mann believes that human life begins at conception and that abortion is tantamount to murder.  As such, it is a sin in his system of religious beliefs to use medical products

he understands to be created using aborted fetal cell lines, whether they are contained in the vaccines themselves, created through aid of aborted fetal cell lines, or that aborted fetal cell lines are merely used in proof-of-concept testing. Mr. Mann understood the COVID-19 vaccines to have this illicit connection to aborted fetal cell lines, which means ingesting any of the available COVID-19 vaccines is a sin in his religious system of beliefs. With this sincerely held religious belief, Mr. Mann is precluded from receiving one of the then available COVID-19 vaccines because they are the result of the taking of an innocent human life.

409.    Separately and independently, Mr. Mann must follow his conscience, given by God. He will not ingest a substance when his conscience tells him potential adverse effects to his relationship with God. If that is the case, as it was with receipt of a COVID-19 vaccine, he will not defy his conscience and his God given instructions. With this sincerely held religious belief, Mr. Mann is precluded from receiving one of the then available COVID-19 vaccines.

410.    Mr. Mann believes that an individual is morally bound to obey his conscience. Mr. Mann believes the conscience to be God-given and is a moral "gut check" by which God guides Christians. Mr. Mann believes following his God-given conscience is incredibly important, especially during life situations where an individual is being pressed to make a quick decision in conflict with his conscience. After thoughtful prayer and reflection, Mr. Mann's conscience was provoked not to receive a vaccine, and to act in conflict with his God-given conscience would be a profound violation of his religious integrity.  With this sincerely held religious belief, Mr. Mann is precluded from receiving one of the then available COVID-19 vaccines.

411.    Separately and distinctly, Mr. Mann believes that his body is a living temple where the Spirit of God resides and indwells as stated in 1 Corinthians 6: 19-20 "or do you not know that your body is a temple of the Holy Spirit within you, who you have from God? You are not your

own, for you were bought with a price. So glorify God in your body." Mr. Mann must protect this Temple, his body, both spiritually and physically. To Mr. Mann, this means listening to guidance from the Holy Spirit when given. He believes that the introduction of COVID-19 vaccines to his body is not prudent stewardship of his body and would be a sin in his religious system of beliefs because it would harm him spiritually. With this sincerely held religious belief, Mr. Mann is precluded from receiving one of the then available COVID-19 vaccines.

412.    Accordingly, because of the above-described religious objections to receipt of a COVID-19 vaccine, Mr. Mann requested a religious accommodation from SRNS's COVID-19 vaccination policy.

413.    As explained above, SRNS denied Mr. Mann's religious accommodation request after verifying that he held a religious belief in conflict with receipt of a COVID-19 vaccine. SRNS never approached Mr. Mann to inquire on the sincerity of his religious beliefs before denying his request for religious accommodation.

414.    SRNS pretextually refused to offer or otherwise provide any accommodation options because of Mr. Mann's disfavored religious beliefs.

415.    There were multiple no-cost and/or less than de minimis-cost accommodation options available that SRNS could have provided to Mr. Mann. Specifically, SRNS could have required Mr. Mann to be tested prior to entering facilities or performing any other role SRNS determined required in-person contact.  Mr. Mann also would have willingly paid out of pocket or had the cost of testing deducted from his pay for testing in order to retain his job.

416.    SRNS even acknowledged that "regular testing" was a reasonable accommodation in their Position Statement filed with the Equal Employment Opportunity Commission but refused to offer it to a single religious exemption requester.

417.    In addition to the testing accommodation option, there were also multiple other no-cost and/or less than de minimis cost accommodation options available that SRNS could have provided to Mr. Mann. Mr. Mann was willing to bear any such costs personally in an effort to simultaneously preserve his career and religious convictions.

418.    SRNS did not address several low-cost and no-cost alternative reasonable accommodations available, including but not limited to: recognition of natural immunity in lieu of vaccination or required testing, enhanced safety protocols, a strict quarantining when symptomatic protocol (because one cannot transmit the virus if not infected), telework, schedule swapping with vaccinated employees if in-person contact requiring proof of vaccination were an actual requirement for the job, or any combination of these options.

419.    During the height of the pandemic, Mr. Mann contributed to the ongoing operation and success of SRNS while unvaccinated and while preserving his religious convictions.

420.    SRNS provided functional accommodations, consistent with Mr. Mann's religious convictions, during this period and allowed Mr. Mann to work unvaccinated while observing enhanced safety protocols. These safety protocols included some combination of a social distancing policy, mask requirements, sanitizer, temperature checks, and/or remote work.

421.    Mr. Mann's sincerely held religious beliefs in conflict with vaccination could have been accommodated without any undue burden whatsoever and Mr. Mann would have accepted any of the numerous reasonable accommodation options available that SRNS refused to consider.

422.    SRNS did not engage in any interactive process calculated towards finding a reasonable accommodation for any individual employee, which the company would have identified had it engaged in an actual good faith accommodation process.

423.    Simultaneously, SRNS accommodated those with medical/secular objections to receipt of a COVID-19 vaccine.

424.    As a direct and proximate cause of SRNS's discriminatory actions, Mr. Mann's finances were significantly and negatively impacted. Specifically, Mr. Mann lost out on regular pay, benefits, vacation time, and promotional opportunities, amongst other financial harm.

425.    In addition to financial loss, Mr. Mann suffered emotional and psychological harm while still employed at SRNS from the months of uncertainty and repeated coercion to abandon his sincere religious beliefs in order to preserve his livelihood and career, all related to the adverse employment actions taken by SRNS.

426.    As a result of the discriminatory treatment he experienced, Mr. Mann suffered from emotional distress which is or has been marked by some combination of feelings of despondency, social anxiety, and feelings of agitation, and irritability.

427.    Following this adverse employment action, Mr. Mann suffered financial, emotional and psychological harm.

**Jason Marella**

428.    Plaintiff Jason Marella ("Mr. Marella") worked for SRNS for over 24 years. Mr. Marella was employed at SRNS as a Principal Systems Engineer at the time of being put on an indefinite, uncertain unpaid leave and being told that the SRNS COVID-19 vaccination Mandate was permanent and would not be dropped in the future.

429.    Throughout his career, Mr. Marella performed well in his role, was qualified for his job, and had an exceptional performance record.

430.    SRNS placed Mr. Marella on an involuntary leave of absence on or about October 15, 2021, for upholding his religious beliefs and practices in conflict with the Mandate. This was

an adverse employment action, whether a termination or a constructive discharge, because Mr. Marella was informed that he could no longer complete his essential job duties while adhering to his sincerely held religious beliefs.

431.    Mr. Marella is a Christian.

432.    Mr. Marella believes that human life begins at conception and that abortion is a sin and equivalent to murder.  As such, it is a sin in his system of religious beliefs to use medical products he understands to be created using aborted fetal cell lines. It is Mr. Marella's understanding that the Pfizer and Moderna vaccines used aborted fetal cell lines in their testing, development, and/or manufacture, and that the Johnson & Johnson vaccine used aborted fetal cells in the production of their vaccine.  With this sincerely held religious belief, Mr. Marella is precluded from receiving one of the then available COVID-19 vaccines because they are the result of the taking of an innocent human life.

433.    Separately and independently, Mr. Marella must follow his conscience, given by God. Mr. Marella did not have an easy time deciding whether to take the COVID-19 vaccine and prayed extensively about the decision. After prayer, he ultimately came under the firm conviction that he could not receive a COVID-19 vaccine because it would cause him spiritual harm.

434.    Separately and independently, Mr. Marella believes the COVID-19 vaccines are a prelude to the "Mark of the Beast." Mr. Marella quoted Revelation 13:17 in his religious accommodation request, which states, "…so that no one can buy or sell unless he has the mark, that is, the name of the Beast or the number of his name."  This warning is in Revelation 13:16-18, the verse understood to discuss the "Mark of the Beast," which Mr. Marella interprets as an explicit warning from God to the believer, to be cautious and obedient when God leads him to believe     a     situation     potentially     spoken     about     in     Revelation     arises.

The vaccine passports and vaccine cards that were, at the time, being required to be shown in certain parts of this country and abroad to enter events or even to cross international boarders, seemed reminiscent to Mr. Marella of the way the Bible described the Mark of the Beast. Conceivably, using modern technology, these passports and vaccine cards (or a combination of both) could have eventually been mandated by the government to be implanted in the body in order to buy goods or receive services. In Mr. Marella's personal system of religious beliefs, if he does not heed God's warnings, he would be subject to judgment and could lose God's blessings and even his salvation. With this sincerely held religious belief, Mr. Marella is precluded from receiving one of the then available COVID-19 vaccines.

435.    Accordingly, because of the above-described religious objections to receipt of a COVID-19 vaccine, Mr. Marella requested a religious accommodation from SRNS's COVID-19 vaccination policy.

436.    As explained above, SRNS denied Mr. Marella's religious accommodation request after verifying that he held a religious belief in conflict with receipt of a COVID-19 vaccine.

437.    SRNS pretextually refused to offer or otherwise provide any accommodation options because of Mr. Marella's disfavored religious beliefs.

438.    There were multiple no-cost and/or less than de minimis cost accommodation options available that SRNS could have provided to Mr. Marella. Specifically, SRNS could have required Mr. Marella to be tested prior to entering facilities or performing any other role SRNS determined required in-person contact.  Mr. Marella also would have willingly paid out of pocket or had the cost of testing deducted from his pay for testing in order to retain his  job.

439.    SRNS even acknowledged that "regular testing" was a reasonable accommodation in their Position Statement filed with the Equal Employment Opportunity Commission but refused to offer it to a single religious exemption requester.

440.    In addition to the testing accommodation option, there were also multiple other no-cost and/or less than de minimis cost accommodation options available that SRNS could have provided to Mr. Marella. Mr. Marella was willing to bear any such costs personally in an effort to simultaneously preserve his career and religious convictions.

441.    SRNS did not address several low-cost and no-cost alternative reasonable accommodations available, including but not limited to: recognition of natural immunity in lieu of vaccination or required testing, enhanced safety protocols, a strict quarantining when symptomatic protocol (because one cannot transmit the virus if not infected), telework, schedule swapping with vaccinated employees if in-person contact requiring proof of vaccination were an actual requirement for the job, or any combination of these options.

442.    During the height of the pandemic, Mr. Marella contributed to the ongoing operation and success of SRNS while unvaccinated and while preserving his religious convictions. When telework was mandated for the site, Mr. Marella was deemed "situationally essential" personnel and worked from home.

443.    Mr. Marella's sincerely held religious beliefs in conflict with vaccination could have been accommodated without any undue burden whatsoever, and Mr. Marella would have accepted any of the numerous reasonable accommodation options available that SRNS refused to consider.

444.    SRNS did not engage in any interactive process calculated towards finding a reasonable accommodation for any individual employee, which the company would have

identified had it engaged in an actual good faith accommodation process. Following the denial of his religious accommodation request, Mr. Marella attempted to discuss accommodations with SRNS in an effort to retain his career, but all efforts were rejected by SRNS.

445.    Simultaneously, Mr. Marella is aware of one employee who received a medical accommodation to the Mandate. On belief, this employee was not made to submit to expensive offsite testing twice weekly, which shows that SRNS's stated justification for the mass terminations/constructive discharges was pretextual. On belief, SRNS performed the testing of this employee themselves at the N-Area Medical facility. SRNS could have done the same for each employee requesting religious accommodation but chose not to do so.

446.    As a direct and proximate cause of SRNS's discriminatory actions, Mr. Marella's finances were significantly and negatively impacted. Specifically, Mr. Marella lost out on regular pay, benefits, vacation time, and site seniority time, amongst other financial harm. Specifically, Mr. Marella was forced to seek a hardship withdrawal from his Savings and Investment Plan, which was denied due to SRNS reporting to the 401K managing company, Transamerica, that Mr. Marella was currently employed. This request ended up being taken as a 401K loan in the amount of $50,000, which Mr. Marella ultimately defaulted on, causing further financial harm. Mr. Marella was also denied unemployment benefits based on SRNS's conduct.

447.    In addition to financial loss, Mr. Marella suffered severe emotional and psychological harm while still employed at SRNS from the months of uncertainty and repeated coercion to abandon his sincere religious beliefs in order to preserve his livelihood and career, all related to the adverse employment actions taken by SRNS.

448.    As a result of the discriminatory treatment he experienced, Mr. Marella suffered from emotional distress which is or has been marked by a combination of feelings of despondency,

social anxiety, loss of interest in leisure activities, and feelings of agitation, loss of confidence, and irritability – some of which continue to affect him to this day, and interfere with his ability to focus and think while on the job and off. Mr. Marella has experienced symptoms of Post-Traumatic Stress Disorder following SRNS's adverse employment action and continues to experience symptoms to this day. These symptoms have been marked by anxiety, a scarred sense of confidence, difficulty with cognition and motor function, lack of focus, and a diminished sense of self-worth.

449.    Following this adverse employment action and after reinstatement, Mr. Marella has been retaliated against and suffered financial and emotional harm. Mr. Marella went from being the #1 ranked eRounds Team Member and having good relationships with management to being belittled and mistreated by his management. This mistreatment includes an allegation from his former Lead, Karen Bodiford, that Mr. Marella had "threatened" her, which led to Mr. Marella having his badge temporarily confiscated and enduring an embarrassing pat down and vehicle search in the parking lot of his work area (B-Area Trailer Complex) in full view of other employees. This was humiliating to Mr. Marella. After investigation, Centerra Police Officers found no evidence of wrongdoing on Mr. Marella's part, and despite two witness statements that contradicted Ms. Bodiford's claims, Mr. Marella was removed from the eRounds group and placed in an entry-level position with the company, a forced change to his career trajectory causing financial harm.

450.    Following this adverse employment action, Mr. Marella suffered financial, emotional and psychological harm.

**Charisse Nagy**

451.    Plaintiff Charisse Nagy ("Ms. Nagy") worked for SRNS for over 32 years. Ms. Nagy was employed at SRNS as a Business Systems Administrator at the at the time of being put on an indefinite, uncertain unpaid leave and being told that the SRNS COVID-19 vaccination Mandate was permanent and would not be dropped in the future.

452.    Throughout her career, Ms. Nagy performed well in her role, was qualified for her job, and had an exceptional performance record.

453.    SRNS placed Ms. Nagy on an involuntary leave of absence on or about October 15, 2021, for upholding her religious beliefs and practices in conflict with the Mandate. This was an adverse employment action, whether a termination or a constructive discharge, because Ms. Nagy was informed that she could no longer complete her essential job duties while adhering to her sincerely held religious beliefs.

454.    Ms. Nagy is a strong Christian and lives by her convictions.

455.    Ms. Nagy believes that human life begins at conception and that abortion is equivalent to murder. As such, it is a sin in her system of religious beliefs to use medical products she understands to be created using aborted fetal cell lines. It is Ms. Nagy's understanding that the Pfizer and Moderna vaccines used aborted fetal cell lines in their testing, development, and/or manufacture, and that the Johnson & Johnson vaccine used aborted fetal cells in the production of their vaccine. With this sincerely held religious belief, Ms. Nagy is precluded from receiving one of the then available COVID-19 vaccines because they are the result of the taking of an innocent human life. Jeremiah 29:11 states "For I know the thoughts and plans that I have for you, says the Lord, thoughts and plans for welfare and peace and not for evil, to give you hope in your final outcome." Ms. Nagy believes that in this scripture, God is telling each of us that we have a great

destiny. Abortion steals the destiny of the aborted children and because of this, she cannot receive the COVID-19 vaccines for religious purposes.

456.    Accordingly, because of the above-described religious objections to receipt of a COVID-19 vaccine, Ms. Nagy requested a religious accommodation from SRNS's COVID-19 vaccination policy.

457.    As explained above, SRNS denied Ms. Nagy's religious accommodation request after verifying that she held a religious belief in conflict with receipt of a COVID-19 vaccine.

458.    SRNS pretextually refused to offer or otherwise provide any accommodation options because of Ms. Nagy's disfavored religious beliefs.

459.    There were multiple no-cost and/or less than de minimis cost accommodation options available that SRNS could have provided to Ms. Nagy. Specifically, SRNS could have required Ms. Nagy to be tested prior to entering facilities or performing any other role SRNS determined required in-person contact. Ms. Nagy also would have willingly paid out of pocket or had the cost of testing deducted from her pay for testing in order to retain her job.

460.    SRNS even acknowledged that "regular testing" was a reasonable accommodation in their Position Statement filed with the Equal Employment Opportunity Commission but refused to offer it to a single religious exemption requester.

461.    In addition to the testing accommodation option, there were also multiple other no-cost and/or less than de minimis cost accommodation options available that SRNS could have provided to Ms. Nagy. Ms. Nagy was willing to bear any such costs personally in an effort to simultaneously preserve her career and religious convictions.

462.    SRNS did not address several low-cost and no-cost alternative reasonable accommodations available, including but not limited to: recognition of natural immunity in lieu of

vaccination or required testing, enhanced safety protocols, a strict quarantining when symptomatic protocol (because one cannot transmit the virus if not infected), telework, schedule swapping with vaccinated employees if in-person contact requiring proof of vaccination were an actual requirement for the job, or any combination of these options.

463.    During the height of the pandemic, Ms. Nagy contributed to the ongoing operation and success of SRNS while unvaccinated and while preserving her religious convictions.

464.    SRNS provided functional accommodations, consistent with Ms. Nagy's religious convictions, during this period and allowed Ms. Nagy to work unvaccinated while observing enhanced safety protocols. These safety protocols included some combination of a social distancing policy, mask requirements, sanitizer, temperature checks, and/or remote work.

465.    Ms. Nagy's sincerely held religious beliefs in conflict with vaccination could have been accommodated without any undue burden whatsoever and Ms. Nagy would have accepted any of the numerous reasonable accommodation options available that SRNS refused to consider.

466.    SRNS did not engage in any interactive process calculated towards finding a reasonable accommodation for any individual employee, which the company would have identified had it engaged in an actual good faith accommodation process.

467.    Simultaneously, SRNS accommodated those with medical/secular objections to receipt of a COVID-19 vaccine.

468.    As a direct and proximate cause of SRNS's discriminatory actions, Ms. Nagy's finances were significantly and negatively impacted. Specifically, Ms. Nagy lost out on regular pay, benefits, vacation time, bonus pay potential, amongst other financial harm.

469.    In addition to financial loss, Ms. Nagy suffered emotional and psychological harm while still employed at SRNS from the months of uncertainty and repeated coercion to abandon

her sincere religious beliefs in order to preserve her livelihood and career, all related to the adverse employment actions taken by SRNS.

470.    As a result of the discriminatory treatment she experienced, Ms. Nagy suffered from emotional distress, which is or has been marked by some combination of feelings of despondency, social anxiety, loss of interest in leisure activities, and feelings of agitation, and irritability. More specifically, Ms. Nagy's marriage was substantially strained due to SRNS's conduct and has not been fully repaired to this day.

471.    Following this adverse employment action, Ms. Nagy suffered financial, emotional and psychological harm.

**Mark Redd**

472.    Plaintiff Joseph "Mark" Redd worked for SRNS for over 33 years. Mr. Redd was employed at SRNS as a Fire Department Station Captain/Paramedic, at the time of being put on at the time of being put on an indefinite, uncertain unpaid leave and being told that the SRNS COVID-19 vaccination Mandate was permanent and would not be dropped in the future. This forced Mr. Redd into taking involuntary, early retirement with SRNS, and amounts to a constructive discharge.

473.    Mr. Redd would not have taken early retirement and planned to work longer before retiring. He was left with no other option as SRNS advised it would not accommodate his sincerely held religious beliefs precluding receipt of a COVID-19 vaccine and it would not allow him to continue to do his job unless he was willing to violate his sincerely held religious beliefs. Thus, he was terminated or constructively discharged by SRNS.

474.    Throughout his career, Mr. Redd performed well in his role, was qualified for his job, and had an exceptional performance record.

475.     SRNS forced Mr. Redd to leave the site after his last shift was October 12, 2021. Mr. Redd returned to the designated location on Friday, October 15, 2021, to process out of employment, all for upholding his religious beliefs and practices in conflict with the Mandate. At that time, Mr. Redd was informed that he could no longer complete his essential job duties while adhering to his sincerely held religious beliefs, amounting to a termination or constructive discharge and forcing Mr. Redd into involuntary, early retirement at a time that he intended to keep working.

476.     Mr. Redd is of the Southern Baptist Faith, believing that the Holy Bible is the God inspired Word put in place by men of faith chosen by God to do so.

477.     Mr. Redd believes that human life begins at conception and that abortion is the same as murder.  As such, it is a sin in his system of religious beliefs to use medical products he understands to be created using aborted fetal cell lines. It is Mr. Redd's understanding that the Pfizer and Moderna vaccines used aborted fetal cell lines in their testing, development, and/or manufacture, and that the Johnson & Johnson vaccine used aborted fetal cells in the production of their vaccine.  With this sincerely held religious belief, Mr. Redd is precluded from receiving one of the then available COVID-19 vaccines because they are the result of the taking of an innocent human life.

478.     Separately and independently, Mr. Redd must follow his conscience, given by God. He will not ingest a substance when his conscience tells him potential adverse effects to his relationship with God potentially outweigh the benefits, and to do otherwise would be to violate his God-given and stewardship duties over his body, which he believes is a responsibility commanded by God. With this sincerely held religious belief, Mark is precluded from receiving one of the then available COVID-19 vaccines.

479.     Mr. Redd believes that an individual is morally bound to obey his conscience. Mr. Redd believes the conscience to be God-given guidance and a moral compass by which God guides Christians. Mr. Redd believes following his God-given conscience is incredibly important, especially during significant life situations. After thoughtful prayer and reflection, Mr. Redd's conscience was provoked not to receive a vaccine, and to act in conflict with his God-given conscience would be a profound violation of his religious integrity.  With this sincerely held religious belief, Mr. Redd is precluded from receiving one of the then available COVID-19 vaccines.

480.     Separately and independent, Mr. Redd believes the COVID-19 vaccines are a prelude to the "Mark of the Beast." Mr. Redd's religious beliefs preclude him from participation in activities connected to the "Mark of the Beast" described in Revelations, which he believes receipt of a COVID-19 vaccine was. With this sincere belief, Mr. Redd is precluded from receiving one of the then available COVID-19 vaccines.

481.     Separately and distinctly, Mr. Redd believes that his body is a living temple where the Spirit of God resides and indwells. He must protect this Temple, his body, both spiritually and physically. The introduction of COVID-19 vaccines to his body is not prudent stewardship of his body and would be a sin in his religious system of beliefs because it would harm him spiritually. With this sincerely held religious belief, Mr. Redd is precluded from receiving one of the then available COVID-19 vaccines.

482.     Separately and distinctly, Mr. Redd believes that God blessed him with a well-created, divine, and functioning immune system and he cannot preemptively alter his immune system. To alter God's perfect immune system, which he believes the COVID-19 vaccines would do, would display a lack of faith and be a sin in his religious system of beliefs. With this sincerely

held religious belief, Mr. Redd is precluded from receiving one of the then available COVID-19 vaccines.

483.     Mr. Redd believes that the God created him in his image and that he cannot alter His Design. The COVID-19 vaccines are specifically intended to alter the immune system's design. To do so would be a sin in his religious system of beliefs. With this sincerely held religious belief, Mr. Redd is precluded from receiving one of the then available COVID-19 vaccines.

484.     Separately and independent, Mr. Redd believes that this mandate attempted to force him to question his faith, specifically God's promise of protection as written in Isaiah 41:10 "Fear not for I am with you; be not dismayed, for I am your God: I will strengthen you, I will help you, I will uphold you with my righteous right hand." Mr. Redd will not question his faith, and as such, cannot receive a COVID-19 vaccine.

485.     Accordingly, because of the above-described religious objections to receipt of a COVID-19 vaccine, Mr. Redd requested a religious accommodation from SRNS's COVID-19 vaccination policy.

486.     As explained above, SRNS denied Mr. Redd's religious accommodation request after verifying that he held a religious belief in conflict with receipt of a COVID-19 vaccine.

487.     SRNS pretextually refused to offer or otherwise provide any accommodation options because of Mr. Redd's disfavored religious beliefs.

488.     There were multiple no-cost and/or less than de minimis cost accommodation options available that SRNS could have provided to Mr. Redd. Specifically, SRNS could have required Mr. Redd to be tested prior to entering facilities or performing any other role SRNS determined required in-person contact.  Mr. Redd also would have willingly paid out of pocket or had the cost of testing deducted from his pay for testing in order to retain his job.

489.    SRNS even acknowledged that "regular testing" was a reasonable accommodation in their Position Statement filed with the Equal Employment Opportunity Commission but refused to offer it to a single religious exemption requester.

490.    In addition to the testing accommodation option, there were also multiple other no-cost and/or less than de minimis cost accommodation options available that SRNS could have provided to Mr. Redd. Mr. Redd was willing to bear any such costs personally in an effort to simultaneously preserve his career and religious convictions.

491.    SRNS did not address several low-cost and no-cost alternative reasonable accommodations available, including but not limited to: recognition of natural immunity in lieu of vaccination or required testing, enhanced safety protocols, a strict quarantining when symptomatic protocol (because one cannot transmit the virus if not infected), telework, schedule swapping with vaccinated employees if in-person contact requiring proof of vaccination were an actual requirement for the job, or any combination of these options, which he had observed for almost a year and a half.

492.    During the height of the pandemic, Mr. Redd contributed to the ongoing operation and success of SRNS while unvaccinated and while preserving his religious convictions.

493.    SRNS provided functional accommodations, consistent with Mr. Redd's religious convictions, during this period and allowed Mr. Redd to work unvaccinated while observing enhanced safety protocols. These safety protocols included some combination of a social distancing policy, mask requirements, sanitizer, temperature checks, and/or remote work.

494.    Mr. Redd's sincerely held religious beliefs in conflict with vaccination could have been accommodated without any undue burden whatsoever and Mr. Redd would have accepted any of the numerous reasonable accommodation options available that SRNS refused to consider.

495. SRNS did not engage in any interactive process calculated towards finding a reasonable accommodation for any individual employee, which the company would have identified had it engaged in an actual good faith accommodation process.

496. Simultaneously, SRNS accommodated those with medical/secular objections to receipt of a COVID-19 vaccine. Specifically, Mr. Redd is aware of one Captain in the Fire Department that was exempted for medical, secular reasons based on his physician's directive.

497. As a direct and proximate cause of SRNS's discriminatory actions, Mr. Redd's finances were significantly and negatively impacted. Specifically, Mr. Redd lost out on regular pay, benefits, vacation time, Savings Investment Plan (SIP) contributions, and 401k increases, amongst other financial harm.

498. In addition to financial loss, Mr. Redd suffered emotional and psychological harm while still employed at SRNS from the months of uncertainty and repeated coercion to abandon his sincere religious beliefs in order to preserve his livelihood and career, all related to the adverse employment actions taken by SRNS.

499. As a result of the discriminatory treatment he experienced, Mr. Redd suffered from emotional distress which is or has been marked by some combination of feelings of despondency, social anxiety, loss of interest in leisure activities, feelings of agitation and irritability, restless and sleepless nights, and strain on his relationship with his wife.

500. Following this adverse employment action, Mr. Redd suffered financial, emotional and psychological harm.

**Vanessa Rewis**

501. Plaintiff Vanessa F. Rewis worked for SRNS for over seven years. Ms. Rewis was employed at SRNS as a Benefits Integration Specialist at the at the time of being put on an

indefinite, uncertain unpaid leave and being told that the SRNS COVID-19 vaccination Mandate was permanent and would not be dropped in the future.

502.     Throughout her career, Ms. Rewis performed well in her role, was qualified for her job, and had an exceptional performance record.

503.     SRNS placed Ms. Rewis on an involuntary leave of absence on or about October 14, 2021, for upholding her religious beliefs and practices in conflict with the Mandate. At that time, Ms. Rewis was informed that she could no longer complete her essential job duties while adhering to her sincerely held religious beliefs.

504.     Ms. Rewis was born and raised a Christian. She knows that the greatest commandments are to love the Lord her God with all her heart, soul, and mind, and to love her neighbor as she loves herself. The available COVID-19 vaccines use aborted fetal cell lines in their manufacturing and/or testing. As a Christian, Ms. Rewis is not pro-abortion (We shall not murder. Ex: 20:13). Abortion is taking away the life of another human being. Ms. Rewis believes that human life begins at conception and that abortion is tantamount to murder.  As such, it is a sin in her system of religious beliefs to use medical products she understands to be created using aborted fetal cell lines, no matter how remote in time the abortion occurred.

505.     Separately and independently, Ms. Rewis must follow her conscience, given by God. She will not ingest a substance when her conscience tells her there will be adverse effects on her relationship with God. With this sincerely held religious belief, Ms. Rewis is precluded from receiving one of the then available COVID-19 vaccines.

506.     As explained above, SRNS denied Ms. Rewis' religious accommodation request after verifying that she held a religious belief in conflict with receipt of a COVID-19 vaccine.

507.   SRNS pretextually refused to offer or otherwise provide any accommodation options because of Ms. Rewis' disfavored religious beliefs.

508.   There were multiple no-cost and/or less than de minimis-cost accommodation options available that SRNS could have provided to Ms. Rewis. Specifically, SRNS could have required Ms. Rewis to be tested prior to entering facilities or performing any other role SRNS determined required in-person contact. Ms. Rewis also would have willingly paid out of pocket or had the cost of testing deducted from her pay for testing in order to retain her job.

509.   SRNS even acknowledged that "regular testing" was a reasonable accommodation in their Position Statement filed with the Equal Employment Opportunity Commission but refused to offer it to a single religious exemption requester.

510.   Importantly, Ms. Rewis had tested positive for COVID-19 on or about September 24, 2021, and informed SRNS of this. This means that Ms. Rewis had naturally occurring COVID-19 antibodies and could have been treated equally as vaccinated employees, who were not made to regularly test.

511.   In addition to the testing accommodation option, there were also multiple other no-cost and/or less than de minimis cost accommodation options available that SRNS could have provided to Ms. Rewis. Ms. Rewis was willing to bear any such costs personally in an effort to simultaneously preserve her career and religious convictions.

512.   SRNS did not address several low-cost and no-cost alternative reasonable accommodations available, including but not limited to: recognition of natural immunity in lieu of vaccination or required testing, enhanced safety protocols, telework, schedule swapping with vaccinated employees if in-person contact requiring proof of vaccination were an actual requirement for the job, or any combination of these options.

513.     During the height of the pandemic, Ms. Rewis contributed to the ongoing operation and success of SRNS while unvaccinated and while preserving her religious convictions.

514.     SRNS provided functional accommodations, consistent with Ms. Rewis' religious convictions, during this period and allowed Ms. Rewis to work unvaccinated while observing enhanced safety protocols. These safety protocols included some combination of a social distancing policy, mask requirements, sanitizer, temperature checks, and/or remote work.

515.     Ms. Rewis sincerely held religious beliefs in conflict with vaccination could have been accommodated without any undue burden whatsoever and Ms. Rewis would have accepted any of the numerous reasonable accommodation options available that SRNS refused to consider.

516.     SRNS did not engage in any interactive process calculated towards finding a reasonable accommodation for any individual employee, which the company would have identified had it engaged in an actual good faith accommodation process.

517.     Simultaneously, SRNS accommodated those with medical/secular objections to receipt of a COVID-19 vaccine.

518.     As a direct and proximate cause of SRNS's discriminatory actions, Ms. Rewis' finances were significantly and negatively impacted. Specifically, Ms. Rewis lost out on regular pay, benefits, vacation time, 401K, a reasonable annual merit rate, reduction on the service date which reflects on accrual of vacation and seniority, potential spot awards or promotions, amongst other financial harm.

519.     In addition to financial loss, Ms. Rewis suffered emotional and psychological harm while still employed at SRNS from the months of uncertainty and repeated coercion to abandon her sincere religious beliefs in order to preserve her livelihood and career, all related to the adverse employment actions taken by SRNS.

520.    As a result of the discriminatory treatment she experienced, Ms. Rewis suffered from emotional distress which is or has been marked by some combination of feelings of despondency, social anxiety, loss of interest in leisure activities, and feelings of agitation and irritability, depression, reclusiveness, sleepless nights, and took a toll on Ms. Rewis' relationships with family, friends and coworkers, causing insecurity.

521.    Following this adverse employment action, Ms. Rewis suffered financial, emotional and psychological harm.

**Shawn Rhoades**

522.    Plaintiff Shawn Rhoades worked for SRNS for over six years. Mr. Rhoades was employed at SRNS as a Supply Chain Management Resource in Excess at the time of being put on an indefinite, uncertain unpaid leave and being told that the SRNS COVID-19 vaccination Mandate was permanent and would not be dropped in the future.

523.    Throughout his career, Mr. Rhoades performed well in his role, was qualified for his job, and had an exceptional performance record.

524.    SRNS placed Mr. Rhoades on an involuntary leave of absence on or about October 15, 2021, for upholding his religious beliefs and practices in conflict with the Mandate. At that time, Mr. Rhoades was informed that he could no longer complete his essential job duties while adhering to his sincerely held religious beliefs.

525.    Mr. Rhoades is a Christian and was attending New Life Church in North Augusta, South Carolina, and a member of the volunteer staff, at the time of being put on uncertain, involuntary leave. He currently attends New Spring Church, in Aiken, South Carolina.

526.    Mr. Rhoades believes, as 2 Corinthians 7 teaches, that we should "cleanse ourselves from every impurity of flesh and spirit." The way he practices his religion includes aligning himself with scriptures on issues that oppose the wisdom of the world.

527.    Mr. Rhoades does not believe that using fetal cells from an aborted fetus for the benefit of the greater good or his personal benefit can be reconciled within his religious system of beliefs. Mr. Rhoades believes that human life begins at conception and that abortion is murder. As such, it is a sin in his system of religious beliefs to use medical products he understands to be created using aborted fetal cell lines.  Mr. Rhoades will not knowingly participate in the process to use such a product that violates the right to life and dishonors the lives of the unborn. With this sincerely held religious belief, Mr. Rhoades is precluded from receiving one of the then available COVID-19 vaccines because they are the result of the taking of an innocent human life.

528.    Separately and independently, Mr. Rhoades, after many days and nights of prayer and reading God's Word, determined he must follow his conscience, given by God. He will not ingest a substance when his conscience tells him potential adverse effects to his relationship with God potentially outweigh the benefits, and to do otherwise would be to violate his God-given and stewardship duties over his body, which he believes is a responsibility commanded by God.  With this sincerely held religious belief, Mr. Rhoades is precluded from receiving one of the, then available, COVID-19 vaccines.

529.    Mr. Rhoades, according to his learning of the Word of God, believes that an individual is morally bound to obey his or her conscience. Mr. Rhoades believes the conscience to be God-given and is a moral "gut check" by which God guides Christians. After thoughtful prayer and reflection, Mr. Rhoades' conscience was provoked not to receive a vaccine, and to act in conflict with his God-given conscience would be a profound violation of his religious integrity.

With this sincerely held religious belief, Mr. Rhoades is precluded from receiving one of the then available COVID-19 vaccines.

530.     Separately and independently, Mr. Rhoades believes the COVID-19 vaccines to be a tool of the devil to invade the body of God's creation. Specifically, Mr. Rhoades believes the COVID-19 vaccines are a prelude to the "Mark of the Beast" and he cannot participate in activities he believes are connected to the Mark of the Beast. With this sincerely held religious belief, Mr. Rhoades is precluded from receiving one of the then available COVID-19 vaccines.

531.     Separately and distinctly, as stated in 1 Corinthians 6: 19, "your body is the temple of the Holy Spirit who is in you" Mr. Rhoades believes that his body is a living temple where the Spirit of God resides and indwells. He must protect this Temple, his body, both spiritually and physically. The introduction of COVID-19 vaccines to his body is not prudent stewardship of his body and would be a sin in his religious system of beliefs because it would harm him spiritually. With this sincerely held religious belief, Mr. Rhoades is precluded from receiving one of the then available COVID-19 vaccines.

532.     Separately and distinctly, Mr. Rhoades believes that God blessed him with a divine and immune system which he cannot knowingly alter. To do this would be a lack of faith and be a sin in his religious system of beliefs. With this sincerely held religious belief, Mr. Rhoades is precluded from receiving one of the then available COVID-19 vaccines.

533.     Mr. Rhoades believes that the God created him in His image and that he cannot alter His Design. The COVID-19 vaccines are specifically intended to alter the immune system's design. To do so would be a sin in his religious system of beliefs. With this sincerely held religious belief, Mr. Rhoades is precluded from receiving one of the then available COVID-19 vaccines.

534.    Accordingly, because of the above-described religious objections to receipt of a COVID-19 vaccine, Mr. Rhoades requested a religious accommodation from SRNS's COVID-19 vaccination policy.

535.    As explained above, SRNS denied Mr. Rhoades' religious accommodation request after verifying that he held a religious belief in conflict with receipt of a COVID-19 vaccine.

536.    SRNS pretextually refused to offer or otherwise provide any accommodation options because of Mr. Rhoades' disfavored religious beliefs.

537.    There were multiple no-cost and/or less than de minimis cost accommodation options available that SRNS could have provided to Mr. Rhoades. Specifically, SRNS could have required Mr. Rhoades to be tested prior to entering facilities or performing any other role SRNS determined required in-person contact.  Mr. Rhoades also would have willingly paid out of pocket for testing in order to retain his job.

538.    SRNS even acknowledged that "regular testing" was a reasonable accommodation in their Position Statement filed with the Equal Employment Opportunity Commission but refused to offer it to a single religious exemption requester.

539.    Importantly, Mr. Rhoades had tested positive for COVID-19 in October of 2020, and informed SRNS of this. This means that Mr. Rhoades had naturally occurring COVID-19 antibodies and could have been treated equally as vaccinated employees, who were not made to regularly test.

540.    In addition to the testing accommodation option, there were also multiple other no-cost and/or less than de minimis cost accommodation options available that SRNS could have provided to Mr. Rhoades. Mr. Rhoades was willing to bear any such costs personally in an effort to simultaneously preserve his career and religious convictions.

541.    SRNS did not address several low-cost and no-cost alternative reasonable accommodations available, including but not limited to:  recognition of natural immunity in lieu of vaccination or required testing, enhanced safety protocols, a strict quarantining when symptomatic protocol (because one cannot transmit the virus if not infected), telework, schedule swapping with vaccinated employees if in-person contact requiring proof of vaccination were an actual requirement for the job, or any combination of these options.

542.    During the height of the pandemic, Mr. Rhoades contributed to the ongoing operation and success of SRNS while unvaccinated and while preserving his religious convictions.

543.    SRNS provided functional accommodations, consistent with Mr. Rhoades' religious convictions, during this period and allowed Mr. Rhoades to work unvaccinated while observing enhanced safety protocols. These safety protocols included some combination of a social distancing policy, mask requirements, sanitizer, temperature checks, and/or remote work.

544.    Mr. Rhoades' sincerely held religious beliefs in conflict with vaccination could have been accommodated without any undue burden whatsoever and Mr. Rhoades would have accepted any of the numerous reasonable accommodation options available that SRNS refused to consider.

545.    SRNS did not engage in any interactive process calculated towards finding a reasonable accommodation for any individual employee, which the company would have identified had it engaged in an actual good faith accommodation process.

546.    Simultaneously, SRNS accommodated those with medical/secular objections to receipt of a COVID-19 vaccine.

547.    As a direct and proximate cause of SRNS's discriminatory actions, Mr. Rhoades' finances were significantly and negatively impacted. Specifically, Mr. Rhoades lost out on regular

pay, benefits, vacation time, along with accruing credit debt to be able to cover time without pay and years in a lesser-paying position that are still affecting his family's quality of life and ability to get out of debt, amongst other financial harm.

548.    In addition to financial loss, Mr. Rhoades suffered emotional and psychological harm while still employed at SRNS from the months of uncertainty and repeated coercion to abandon his sincere religious beliefs in order to preserve his livelihood and career, and stress to maintain his home and family, all related to the adverse employment actions taken by SRNS.

549.    As a result of the discriminatory treatment he experienced, Mr. Rhoades suffered from emotional distress which is or has been marked by some combination of feelings of despondency, social anxiety, loss of interest in leisure activities, and feelings of agitation, and irritability. Specifically, Mr. Rhoades has had more erratic mood swings, worse sleep habits, near-ending marital stress and struggle, lower self-esteem from years of not being able to get an equal paying job through numerous applications, fear and anxiety over debt and his ability to afford needed items for his family, including a wife and newborn daughter with extreme health issues. Mr. Rhoades' quality of life has been, and still is, negatively impacted daily, since SRNS took adverse employment action against him.

550.    Following this adverse employment action, Mr. Rhoades suffered financial, emotional and psychological harm.

**Milton Sanders**

551.    Plaintiff Milton J. Sanders worked for SRNS for over 23 years. Mr. Sanders was employed at SRNS as a Senior Electrical and Controls Engineer at the time he was forced into early retirement, an adverse employment action.

552.    Mr. Sanders would not have taken early retirement and planned to work longer before retiring. He was left with no other option as SRNS advised it would not accommodate his sincerely held religious beliefs precluding receipt of a COVID-19 vaccine and it would not allow him to continue to do his job unless he was willing to violate his sincerely held religious beliefs.

553.    Throughout his career, Mr. Sanders was an "A" performer and was qualified for his job. Mr. Sanders received high praises from engineering management regarding his exceptional performance record and product deliverables for the Department of Defense.

554.    SRNS placed Mr. Sanders on an involuntary leave of absence on or about October 15, 2021, for upholding his religious beliefs and practices in conflict with the Mandate. At that time, Mr. Sanders was informed that he could no longer complete his essential job duties while adhering to his sincerely held religious beliefs.

555.    As a Pastor with knowledge of the scriptures, long-accustomed to researching, he wanted to understand from where the COVID-19 vaccines were derived and what the long term effects might be from participating in the mandate, especially as he had just turned fifty years of age. SRNS was mandating taking any of the available COVID-19 vaccines; however, they were offering the Pfizer vaccine on site.  After a few hours on the Pfizer website, Mr. Sanders found that HEK 293 was used for and had connections to all the COVID-19 vaccines.  He found out that HEK stands for "Human-Embryo-Kidney, baby number 293," which are aborted fetal cells that were used in the development of the COVID-19 vaccines.

556.    Mr. Sanders strongly believes that human life begins at conception and that abortion is tantamount to murder.  As such, it is a sin in his religious belief to use medical products he understands to be created using aborted fetal cell lines. It is Mr. Sanders' understanding, partially derived from reading information on the Pfizer website, that the Pfizer and Moderna vaccines used

aborted fetal cell lines in their testing, development, and/or manufacture, and that the Johnson & Johnson vaccine used aborted fetal cells in the production of their vaccine. With this understanding, Mr. Sanders is precluded from receiving one of the then-available COVID-19 vaccines because they are the result of the taking of an innocent human life. Participation in such vaccines would be an indirect engagement, and thereby a participant, in the abortion of HEK 293. This is morally compromising and a direct threat to his deeply held Christian beliefs and furthermore contrary to what is allowable per the instruction found in the Bible. With this sincerely held religious belief, Mr. Sanders is precluded from receiving one of the then available COVID-19 vaccines.

557.    Separately and distinctly, Mr. Sanders firmly believes that his body is a living temple where the Spirit of God resides and indwells. He must protect this Temple, his body, both spiritually and physically (1 John 5:17-18, Hebrews 9:15). The introduction of COVID-19 vaccines to his body is not prudent stewardship of his body and would be a sin in his religious belief because it would harm him spiritually. With this sincerely held religious belief, Mr. Sanders is precluded from receiving one of the then-available COVID-19 vaccines.

558.    Separately and distinctly, Mr. Sanders believes that God blessed him with a well-created, divine, and functioning immune system and he cannot preemptively alter his immune system, which would exhibit a lack of faith and be a sin in his religious system of beliefs. (Psalms 91:11 "For he shall give his angels charge over thee, to keep thee in all thy ways.") With this sincerely held religious belief, Mr. Sanders is precluded from receiving one of the then-available COVID-19 vaccines.

559.     Accordingly, because of the above-described religious objections to receipt of a COVID-19 vaccine, Mr. Sanders requested a religious accommodation from SRNS's COVID-19 vaccination policy.

560.     As explained above, SRNS denied Mr. Sanders' religious accommodation request after verifying that he held a religious belief in conflict with receipt of a COVID-19 vaccine.

561.     SRNS pretextually refused to offer or otherwise provide any accommodation options because of Mr. Sanders' disfavored religious beliefs.

562.     There were multiple no-cost and/or less than de minimis cost accommodation options available that SRNS could have provided to Mr. Sanders. Specifically, SRNS could have required Mr. Sanders to be tested prior to entering facilities or performing any other role SRNS determined required in-person contact. Mr. Sanders also would have willingly paid out of pocket or had the cost of testing deducted from his pay for testing in order to retain his job.

563.     SRNS even acknowledged that "regular testing" was a reasonable accommodation in their Position Statement filed with the Equal Employment Opportunity Commission but refused to offer it to a single religious exemption requester.

564.     Mr. Sanders had tested positive for COVID-19 on or about October 8, 2021, and informed SRNS of this on that day. As a result, Mr. Sanders had naturally occurring COVID-19 antibodies and could have been treated equally as vaccinated employees, who were not made to regularly test.

565.     In addition to the testing accommodation option, there were also multiple other no-cost and/or less than de minimis cost accommodation options available that SRNS could have provided to Mr. Sanders. He was willing to bear any such costs personally in an effort to simultaneously preserve his career and religious convictions.

566. SRNS did not address several low-cost and no-cost alternative reasonable accommodations available, including but not limited to: recognition of natural immunity in lieu of vaccination or required testing, enhanced safety protocols, telework, schedule swapping with vaccinated employees if in-person contact requiring proof of vaccination were an actual requirement for the job, or any combination of these options.

567. During the height of the pandemic, Mr. Sanders contributed to the ongoing operation and success of SRNS while unvaccinated and while preserving his religious convictions.

568. SRNS provided functional accommodations consistent with Mr. Sanders' religious convictions during this period and allowed Mr. Sanders to work unvaccinated while observing enhanced safety protocols. These safety protocols included some combination of a social distancing policy, mask requirements, sanitizer, temperature checks, and/or remote work.

569. Mr. Sanders' sincerely held religious beliefs in conflict with vaccination could have been accommodated without any undue burden whatsoever and Mr. Sanders would have accepted any of the numerous reasonable accommodation options available that SRNS refused to consider.

570. SRNS did not engage in any interactive process calculated towards finding a reasonable accommodation for any individual employee, which the company would have identified had it engaged in an actual good faith accommodation process.

571. Simultaneously, SRNS accommodated those with medical/secular objections to receipt of a COVID-19 vaccine.

572. As a direct and proximate cause of SRNS's discriminatory actions, Mr. Sanders' finances were significantly and negatively impacted. Specifically, Mr. Sanders lost out on regular pay, benefits, vacation time, and his pension plan, amongst other financial harm.

573.    In addition to financial loss, Mr. Sanders suffered emotional and psychological harm while still employed at SRNS from the months of uncertainty and repeated coercion to abandon his sincere religious beliefs in order to preserve his livelihood and career, all related to the adverse employment actions taken by SRNS.

574.    As a result of the discriminatory treatment he experienced, Mr. Sanders suffered from emotional distress which is or has been marked by some combination of feelings of despondency, social anxiety, loss of interest in leisure activities, the near loss of his home, and feelings of agitation, and irritability.

575.    Following this adverse employment action, Mr. Sanders suffered financial, emotional and psychological harm.

**Tracy Stover**

576.    Plaintiff Dr. Tracy Eugene Stover, Jr. worked for SRNS for over six years. Dr. Stover was employed at SRNS as a Principal Engineer in Nuclear Criticality Safety at the time of being put on an indefinite, uncertain unpaid leave and being told that the SRNS COVID-19 vaccination Mandate was permanent and would not be dropped in the future.

577.    Throughout his career, Dr. Stover performed well in his role, was qualified for his job, and had an exceptional performance record.

578.    At all relevant times, Dr. Stover was an employee of SRNS.

579.    SRNS placed Dr. Stover on an involuntary leave of absence on or about October 15, 2021, for upholding his religious beliefs and practices in conflict with the Mandate. This was an adverse employment action, whether a termination or a constructive discharge, because Mr. Marella was informed that he could no longer complete his essential job duties while adhering to his sincerely held religious beliefs.

580.    Dr. Stover is a faithful practicing Roman Catholic Christian.

581.    Dr. Stover believes he has the God given right, duty, and obligation to refuse an illicitly derived treatment which conflicts with his religious beliefs.

582.    Dr. Stover believes that the then available COVID-19 vaccines were produced using aborted fetal cell lines, tested using aborted fetal cell lines, or both.

583.    As a Christian, Dr. Stover believes the development, production, and/or testing of COVID-19 vaccines using the remains of aborted human beings is immoral and in total violation of his religious beliefs against abortion. Dr. Stover believes that humans at all stages of life are living souls (Psalm 139:13) and all humans are made in the image of God (Genesis 1:26). Those souls' lives were taken, they did not consent to be experimented upon, and their body parts were trafficked to provide the means for COVID-19 vaccine creation. As such, it is a sin in Dr. Stover's religious system of beliefs to take a COVID-19 vaccine.

584.    Dr. Stover's sincerely held religious beliefs oppose the trafficking and commodification of human beings at all stages of life.  Dr. Stover cannot, consistent with his religious beliefs, participate in or accept practices (here, receipt of a COVID-19 vaccine) that perpetuate and encourage the relationship between abortion, biomedical science, and human trafficking. For Dr. Stover, it does not matter when the connection was initiated, how widespread or frequent the practice is, or if the practice has been accepted socially or legally.

585.    For religious reasons, Dr. Stover sincerely believes that he has a moral obligation to refuse to participate in acts that permit the trafficking and commodification of human beings for the advancement of science, which he believes the COVID-19 vaccines in fact, do.

586.    Separately and independently, Dr. Stover believes Christians have a duty to honor and care for the body God has given us as a temple of the Holy Spirit (Romans 12:1, 1 Corinthians

3:16, 1 Corinthians 6:20). Dr. Stover believes that we are to love our bodies as Christ loves his people (Ephesians 5:29). He believes that from the moment of conception, we have a natural and spiritual body (1 Corinthians 15:44), inseparable until death. He believes that he must love and protect the body, including refusing to defile it, because there are severe eternal consequences for willfully defiling that temple (1 Corinthians 3:17, Ezekiel 5:11).

587.    In accordance with these beliefs, decisions regarding vaccination are personal and must be determined by the individual's own moral and religious convictions, as instructed by God, who Dr. Stover recognizes as the supreme authority in his life, relying on (Romans 13:1). Since his conversion in 2015, Dr. Stover has not received any vaccine derived from aborted fetal cell lines and will continue to refuse vaccines, or any medical treatment, that conflicts with his religious beliefs. Dr. Stover believes that forced or coerced vaccination violates the right of the person to uphold their bodily integrity in accordance with their religious beliefs.

588.    Accordingly, because of the above-described religious objections to receipt of a COVID-19 vaccine, Dr. Stover requested a religious accommodation from SRNS's COVID-19 vaccination policy.

589.    As explained above, SRNS denied Dr Stover's religious accommodation request after verifying that he held a religious belief in conflict with receipt of a COVID-19 vaccine.

590.    SRNS pretextually refused to offer or otherwise provide any accommodation options because of Dr. Stover's disfavored religious beliefs.

591.    There were multiple no-cost and/or less than de minimis cost accommodation options available that SRNS could have provided to Dr. Stover. Specifically, SRNS could have required Dr. Stover to be tested prior to entering facilities or performing any other role SRNS

determined required in-person contact. Dr. Stover also would have willingly paid out of pocket or had the cost of testing deducted from his pay for testing in order to retain his job.

592.   SRNS even acknowledged that "regular testing" was a reasonable accommodation in their Position Statement filed with the Equal Employment Opportunity Commission but refused to offer it to a single religious exemption requester.

593.   Importantly, Dr. Stover had tested positive for COVID-19 on or about August 2, 2021, and informed SRNS of this. This means that Dr. Stover had naturally occurring COVID-19 antibodies and could have been treated equally as vaccinated employees, who were not made to regularly test.

594.   In addition to the testing accommodation option, there were also multiple other no-cost and/or less than de minimis cost accommodation options available that SRNS could have provided to Dr. Stover. Dr. Stover was willing to bear any such costs personally in an effort to simultaneously preserve his career and religious convictions.

595.   SRNS did not address several low-cost and no-cost alternative reasonable accommodations available, including but not limited to: recognition of natural immunity in lieu of vaccination or required testing, enhanced safety protocols, a strict quarantining when symptomatic protocol (because one cannot transmit the virus if not infected), telework, schedule swapping with vaccinated employees if in-person contact requiring proof of vaccination were an actual requirement for the job, or any combination of these options.

596.   During the height of the pandemic, Dr. Stover contributed to the ongoing operation and success of SRNS while unvaccinated and while preserving his religious convictions.

597.   SRNS provided functional accommodations, consistent with Dr. Stover's religious convictions, during this period and allowed Dr. Stover to work unvaccinated while observing

enhanced safety protocols. These safety protocols included some combination of a social distancing policy, mask requirements, sanitizer, temperature checks, and/or remote work.

598.    Dr. Stover's sincerely held religious beliefs in conflict with vaccination could have been accommodated without any undue burden whatsoever and Dr. Stover would have accepted any of the numerous reasonable accommodation options available that SRNS refused to consider.

599.    SRNS did not engage in any interactive process calculated towards finding a reasonable accommodation for any individual employee, which the company would have identified had it engaged in an actual good faith accommodation process.

600.    Simultaneously, SRNS accommodated those with medical/secular objections to receipt of a COVID-19 vaccine.

601.    As a direct and proximate cause of SRNS's discriminatory actions, Dr. Stover's finances were significantly and negatively impacted. Specifically, Dr. Stover lost out on regular pay, benefits, vacation time, and years of accrued qualification/retention stipends, amongst other financial harm.

602.    In addition to financial loss, Dr. Stover suffered emotional and psychological harm while still employed at SRNS from the months of uncertainty and repeated coercion to abandon his sincere religious beliefs in order to preserve his livelihood and career, all related to the adverse employment actions taken by SRNS.

603.    As a result of the discriminatory treatment he experienced, Dr. Stover suffered from emotional distress which is or has been marked by some combination of feelings of despondency, social anxiety, loss of interest in leisure activities, and feelings of agitation, and irritability.

604.    Following this adverse employment action, Dr. Stover suffered financial, emotional and psychological harm.

**Nick Vinson**

605.    Plaintiff John N. Vinson worked for SRNS for over three years. Mr. Vinson was employed at SRNS as an E.M. operator at the time of being put on an indefinite, uncertain unpaid leave and being told that the SRNS COVID-19 vaccination Mandate was permanent and would not be dropped in the future.

606.    Throughout his career, Mr. Vinson performed well in his role, was qualified for his job, and had an exceptional performance record.

607.    SRNS terminated or constructively discharged Mr. Vinson on or about October 15, 2021, for upholding his religious beliefs and practices in conflict with the Mandate, when it put him on an indefinite, uncertain unpaid leave and told him that the SRNS COVID-19 vaccination Mandate was permanent and would not be dropped in the future. At that time, Mr. Vinson was informed that he could no longer complete his essential job duties while adhering to his sincerely held religious beliefs.

608.    Mr. Vinson is a Christian, belonging to the Baptist denomination.

609.    Mr. Vinson believes that God blessed him with a well-created, divine, and functioning immune system and he cannot preemptively alter his immune system, which would exhibit a lack of faith and be a sin in his religious system of beliefs. Because of this, Mr. Vinson does not receive vaccinations. With this sincerely held religious belief, Mr. Vinson is precluded from receiving one of the then available COVID-19 vaccines.

610.    Mr. Vinson believes that he must trust in God because God has a plan for him and came under the firm conviction not to receive a COVID-19 vaccine.

611.    Accordingly, because of the above-described religious objections to receipt of a COVID-19 vaccine, Mr. Vinson requested a religious accommodation from SRNS's COVID-19

vaccination policy because of his strongly held religious beliefs in conflict with receiving a COVID-19 vaccine.

612.    As explained above, SRNS denied Mr. Vinson's religious accommodation request after verifying that he held a religious belief in conflict with receipt of a COVID-19 vaccine.

613.    SRNS pretextually refused to offer or otherwise provide any accommodation options because of Mr. Vinson's disfavored religious beliefs.

614.    There were multiple no-cost and/or less than de minimis cost accommodation options available that SRNS could have provided to Mr. Vinson. Specifically, SRNS could have required Mr. Vinson to be tested prior to entering facilities or performing any other role SRNS determined required in-person contact. Mr. Vinson also would have willingly paid out of pocket or had the cost of testing deducted from his pay for testing in order to retain his job.

615.    SRNS even acknowledged that "regular testing" was a reasonable accommodation in their Position Statement filed with the Equal Employment Opportunity Commission but refused to offer it to a single religious exemption requester.

616.    In addition to the testing accommodation option, there were also multiple other no-cost and/or less than de minimis cost accommodation options available that SRNS could have provided to Mr. Vinson. Mr. Vinson was willing to bear any such costs personally in an effort to simultaneously preserve his career and religious convictions.

617.    SRNS did not address several low-cost and no-cost alternative reasonable accommodations available, including but not limited to: recognition of natural immunity in lieu of vaccination or required testing, enhanced safety protocols, a strict quarantining when symptomatic protocol (because one cannot transmit the virus if not infected),  telework, schedule swapping with

vaccinated employees if in-person contact requiring proof of vaccination were an actual requirement for the job, or any combination of these options.

618.     During the height of the pandemic, Mr. Vinson contributed to the ongoing operation and success of SRNS while unvaccinated and while preserving his religious convictions.

619.     SRNS provided functional accommodations, consistent with Mr. Vinson's religious convictions, during this period and allowed Mr. Vinson to work unvaccinated while observing enhanced safety protocols. These safety protocols included some combination of a social distancing policy, mask requirements, sanitizer, temperature checks, and/or remote work.

620.     Mr. Vinson's sincerely held religious beliefs in conflict with vaccination could have been accommodated without any undue burden whatsoever and Mr. Vinson would have accepted any of the numerous reasonable accommodation options available that SRNS refused to consider.

621.     SRNS did not engage in any interactive process calculated towards finding a reasonable accommodation for any individual employee, which the company would have identified had it engaged in an actual good faith accommodation process.

622.     Simultaneously, SRNS accommodated those with medical/secular objections to receipt of a COVID-19 vaccine.

623.     As a direct and proximate cause of SRNS's discriminatory actions, Mr. Vinson's finances were significantly and negatively impacted. Specifically, Mr. Vinson lost out on regular pay, overtime pay, bonus pay, benefits, vacation time, and loss of 401k benefits, amongst other financial harm.

624.     In addition to financial loss, Mr. Vinson suffered emotional and psychological harm while still employed at SRNS from the months of uncertainty and repeated coercion to abandon

his sincere religious beliefs in order to preserve his livelihood and career, all related to the adverse employment actions taken by SRNS.

625.    As a result of the discriminatory treatment he experienced, Mr. Vinson suffered from emotional distress which is or has been marked by some combination of feelings of despondency, social anxiety, loss of interest in leisure activities, and feelings of agitation, and irritability. Mr. Vinson was forced to drain his 401k to pay bills, which caused him significant stress. During the relevant period, Mr. Vinson's pregnant wife suffered complications, which he relates to the stress he and his family endured during this period.

626.    Mr. Vinson was diagnosed with Ulcerative Colitis, which he relates to the stress of the adverse employment actions taken by SRNS.

627.    Following this adverse employment action, Mr. Vinson suffered financial, emotional and psychological harm.

**Ryan Wagner**

628.    Plaintiff, Ryan K. Wagner ("Mr. Wagner") worked for SRNS for over one year. Mr. Wagner was employed at SRNS as an Associate Network Ops Engineer at the time of being put on an indefinite, uncertain unpaid leave and being told that the SRNS COVID-19 vaccination Mandate was permanent and would not be dropped in the future.

629.    Throughout his career, Mr. Wagner performed well in his role, was qualified for his job, and had an exceptional performance record.

630.    SRNS placed Mr. Wagner on unpaid leave on or about October 15, 2021, for upholding his religious beliefs and practices in conflict with the Mandate.

631.    Mr. Wagner is a Baptist.

632.     Mr. Wagner believes that human life begins at conception and that abortion is murder.  As such, it is a sin in his system of religious beliefs to use medical products he understands to be created using aborted fetal cell lines. It is Mr. Wagner's understanding that the Pfizer and Moderna vaccines used aborted fetal cell lines in their testing, development, and/or manufacture, and that the Johnson & Johnson vaccine used aborted fetal cells in the production of their vaccine. With this understanding, Mr. Wagner is precluded from receiving one of the then available COVID-19 vaccines because they are the result of the taking of an innocent human life.

633.     Separately and independently, Mr. Wagner believes that an individual is morally guided by his God-given conscience. Mr. Wagner believes his conscience was given to him by God and allows him the ability to discern right from wrong. Mr. Wagner believes following his God-given conscience is incredibly important. After significant prayer and reflection, Mr. Wagner's came under the strong religious conviction that he cannot receive a COVID-19 vaccine, and to act in conflict with his God-given conscience would be a profound violation of his religious integrity. With this understanding, Mr. Wagner is precluded from receiving one of the then available COVID-19 vaccines.

634.     Separately and distinctly, Mr. Wagner believes that his body is a living temple where the Spirit of God resides and indwells. He must protect this Temple, his body, both spiritually and physically. The introduction of COVID-19 vaccines to his body is not prudent stewardship of his body and would be a sin in his religious system of beliefs because it would harm him spiritually. With this understanding, Mr. Wagner is precluded from receiving one of the then available COVID-19 vaccines.

635.     Separately and distinctly, Mr. Wagner believes that God blessed him with a well-created, divine, and functioning immune system and he cannot preemptively alter his immune

system, which the COVID-19 vaccines would do. Mr. Wagner believes that the God created him in His image and that he cannot alter His Design. The COVID-19 vaccines are specifically intended to alter the immune system's design. To do so would be a sin in his religious system of beliefs. With this understanding, Mr. Wagner is precluded from receiving one of the then available COVID-19 vaccines.

636. Accordingly, because of the above-described religious objections to receipt of a COVID-19 vaccine, Mr. Wagner requested a religious accommodation from SRNS's COVID-19 vaccination policy because of his strongly held religious beliefs in conflict with receiving a COVID-19 vaccine.

637. As explained above, SRNS denied Mr. Wagner's religious accommodation request after verifying that he held a sincere religious belief in conflict with receipt of a COVID-19 vaccine.

638. SRNS pretextually refused to offer or otherwise provide any accommodation options because of Mr. Wagner's disfavored religious beliefs.

639. There were multiple no-cost and/or less than de minimis cost accommodation options available that SRNS could have provided to Mr. Wagner. Specifically, SRNS could have required Mr. Wagner to be tested prior to entering facilities or performing any other role SRNS determined required in-person contact. Mr. Wagner also would have willingly paid out of pocket or had the cost of testing deducted from his pay for testing in order to retain his job.

640. SRNS even acknowledged that "regular testing" was a reasonable accommodation in their Position Statement filed with the Equal Employment Opportunity Commission but refused to offer it to a single religious exemption requester.

641.    In addition to the testing accommodation option, there were also multiple other no-cost and/or less than de minimis cost accommodation options available that SRNS could have provided to Mr. Wagner. Mr. Wagner was willing to bear any such costs personally in an effort to simultaneously preserve his career and religious convictions.

642.    SRNS did not address several low-cost and no-cost alternative reasonable accommodations available, including but not limited to: recognition of natural immunity in lieu of vaccination or required testing, enhanced safety protocols, telework, schedule swapping with vaccinated employees if in-person contact requiring proof of vaccination were an actual requirement for the job, or any combination of these options. Mr. Wagner was, in fact, teleworking on a regular basis at the time he was put on unpaid leave.

643.    During the height of the pandemic, Mr. Wagner contributed to the ongoing operation and success of SRNS while unvaccinated and while preserving his religious convictions.

644.    SRNS provided functional accommodations, consistent with Mr. Wagner's religious convictions, during this period and allowed Mr. Wagner to work unvaccinated while observing enhanced safety protocols. These safety protocols included some combination of a social distancing policy, mask requirements, sanitizer, temperature checks, and/or remote work.

645.    Mr. Wagner's sincerely held religious beliefs in conflict with vaccination could have been accommodated without any undue burden whatsoever and Mr. Wagner would have accepted any of the numerous reasonable accommodation options available that SRNS refused to consider.

646.    SRNS did not engage in any interactive process calculated towards finding a reasonable accommodation for any individual employee, which the company would have identified had it engaged in an actual good faith accommodation process.

647.    Simultaneously, SRNS accommodated those with medical/secular objections to receipt of a COVID-19 vaccine.

648.    As a direct and proximate cause of SRNS's discriminatory actions, Mr. Wagner's finances were significantly and negatively impacted. Specifically, Mr. Wagner lost out on regular pay, benefits, vacation time, and insurance, amongst other financial harm.

649.    In addition to financial loss, Mr. Wagner suffered emotional and psychological harm while still employed at SRNS from the months of uncertainty and repeated coercion to abandon his sincere religious beliefs in order to preserve his livelihood and career, all related to the adverse employment actions taken by SRNS.

650.    As a result of the discriminatory treatment he experienced, Mr. Wagner suffered from emotional distress which is or has been marked by some combination of feelings of despondency, social anxiety, feelings of agitation, and irritability, and substantial stress on his family and marriage.

651.    Following this adverse employment action, Mr. Wagner suffered financial, emotional and psychological harm.

**Mitchell Whittington**

652.    Plaintiff Mitchell Whittington ("Mr. Whittington") worked for SRNS for over two and a half years. Mr. Whittington was employed at SRNS as a Systems Engineer at the time of being put on an indefinite, uncertain unpaid leave and being told that the SRNS COVID-19 vaccination Mandate was permanent and would not be dropped in the future.

653.    Throughout his career, Mr. Whittington performed well in his role, was qualified for his job, and had an exceptional performance record.

654.    SRNS terminated or constructively discharged Mr. Whittington on October 15, 2021, for upholding his religious beliefs and practices in conflict with the Mandate, when it put him on an indefinite, uncertain unpaid leave and told him that the SRNS COVID-19 vaccination Mandate was permanent and would not be dropped in the future. At that time, Mr. Whittington was informed that he could no longer complete his essential job duties while adhering to his sincerely held religious beliefs.

655.    Mr. Whittington believes that Christianity is a belief system which holds that Jesus Christ is God's Son and the Lord and Savior of all creation, God being the Creator and Supreme Ruler over all of existence, and that it is every individual's destiny, after being redeemed by Jesus' sacrifice and baptized in His Holy Spirit, to work with God to reconcile every person back to Him as His sons and daughters and to restore creation back to His original intent by showing His love.

656.    Mr. Whittington believes that human life begins at conception and that abortion is equal to murder.  As such, it is a sin in his system of religious beliefs to use medical products he understands to be created using aborted fetal cell lines. It is Mr. Whittington's understanding that the Pfizer and Moderna vaccines used aborted fetal cell lines in their testing, development, and/or manufacture, and that the Johnson & Johnson vaccine used aborted fetal cells in the production of their vaccine.  With this sincerely held religious belief, Mr. Whittington is precluded from receiving one of the then available COVID-19 vaccines because they are the result of the taking of an innocent human life.

657.    Separately and independently, Mr. Whittington must follow his conscience. He will not ingest a substance when his conscience convicts him that his motives for taking it are impure, and to do otherwise would be to violate his God-given and stewardship duties over his body, which

he believes is a responsibility commanded by God. With this sincerely held religious belief, Mr. Whittington is precluded from receiving one of the then available COVID-19 vaccines.

658.     Mr. Whittington believes that an individual is morally bound to obey his conscience. Mr. Whittington believes following his conscience is incredibly important, especially during life situations where an individual is being pressed to make a quick decision in conflict with his conscience. After thoughtful prayer and reflection, Mr. Whittington's conscience was provoked not to receive a vaccine, and to act in conflict with his conscience would be a profound violation of his religious integrity.  With this sincerely held religious belief, Mr. Whittington is precluded from receiving one of the then available COVID-19 vaccines.

659.     Separately and independent, Mr. Whittington believes the COVID-19 vaccines are a prelude to the "Mark of the Beast." This warning is near Revelation 13:16-18, the verse understood to discuss the "Mark of the Beast," which Mr. Whittington interprets as an explicit warning from God to the believer, to be cautious and obedient when God leads him to believe a situation potentially spoken about in Revelations arises. In Mr. Whittington's personal system of religious beliefs, if he does not heed God's warnings, he would be subject to judgment and could lose God's blessings. With this sincerely held religious belief, Mr. Whittington is precluded from receiving one of the then available COVID-19 vaccines.

660.     Separately and distinctly, Mr. Whittington believes that his body is a living temple where the Spirit of God resides and indwells. He must protect this Temple, his body, both spiritually and physically. The introduction of COVID-19 vaccines to his body is not prudent stewardship of his body and would be a sin in his religious system of beliefs because it would harm him spiritually. With this sincerely held religious belief, Mr. Whittington is precluded from receiving one of the then available COVID-19 vaccines.

661.    Separately and distinctly, Mr. Whittington believes that God blessed him with a well-created, divine, and functioning immune system and, without the right motives, given by God, he cannot preemptively alter his immune system, which would exhibit a lack of faith and be a sin in his religious system of beliefs. With this sincerely held religious belief, Mr. Whittington is precluded from receiving one of the then available COVID-19 vaccines.

662.    Mr. Whittington believes that God created him in His image and that he cannot alter His Design. The COVID-19 vaccines are specifically intended to alter the immune system's design. To do so would be a sin in his religious system of beliefs. With this sincerely held religious belief, Mr. Whittington is precluded from receiving one of the then available COVID-19 vaccines.

663.    Separately and independent, in 1 John 4:1 Christians are told to "test the spirits to see whether they are from God." Based on the way the company went from encouraging the vaccine to mandating it, how they surveyed the workforce to see who was already vaccinated or planned on getting the vaccine, and the emails sent by the president of the company during the relevant period, Stuart MacVean, denouncing those who were opposed to getting the vaccine, Mr. Whittington discerned that the spirit of fear and manipulation was at work behind the mandate for nefarious purposes. Based on 1 Timothy 1:7, a spirit of fear is not from the Lord. Instead of submitting to such a spirit Christians are called to stand against it in Ephesians 6:12. For this reason, Mr. Whittington is precluded from the vaccine mandate instituted by SRNS at that time.

664.    Accordingly, because of the above-described religious objections to receipt of a COVID-19 vaccine, Mr. Whittington requested a religious accommodation from SRNS's COVID-19 vaccination policy.

665.    As explained above, SRNS denied Mr. Whittington's religious accommodation request after verifying that he held a religious belief in conflict with receipt of a COVID-19

vaccine, despite his attempts to explain his sincerely held religious beliefs that were in conflict with the COVID-19 vaccine.

666.     SRNS pretextually refused to offer or otherwise provide any accommodation options because of Mr. Whittington's disfavored religious beliefs.

667.     There were multiple no-cost and/or less than de minimis cost accommodation options available that SRNS could have provided to Mr. Whittington. Specifically, SRNS could have required Mr. Whittington to be tested prior to entering facilities or performing any other role SRNS determined required in-person contact.  Mr. Whittington also would have willingly paid out of pocket or had the cost of testing deducted from his pay for testing in order to retain his job.

668.     SRNS even acknowledged that "regular testing" was a reasonable accommodation in their Position Statement filed with the Equal Employment Opportunity Commission but refused to offer it to a single religious exemption requester.

669.     Importantly, Mr. Whittington had tested positive for COVID-19 on or about December 27, 2020, and informed SRNS of this. This means that Mr. Whittington had naturally occurring COVID-19 antibodies and could have been treated equally as vaccinated employees, who were not made to regularly test.

670.     In addition to the testing accommodation option, there were also multiple other no-cost and/or less than de minimis cost accommodation options available that SRNS could have provided to Mr. Whittington. Mr. Whittington was willing to bear any such costs personally in an effort to simultaneously preserve his career and religious convictions.

671.     SRNS did not address several low-cost and no-cost alternative reasonable accommodations available, including but not limited to: recognition of natural immunity in lieu of vaccination or required testing, enhanced safety protocols, a strict quarantining when symptomatic

protocol (because one cannot transmit the virus if not infected), telework, schedule swapping with vaccinated employees if in-person contact requiring proof of vaccination were an actual requirement for the job, or any combination of these options.

672.    During the height of the pandemic, Mr. Whittington contributed to the ongoing operation and success of SRNS while unvaccinated and while preserving his religious convictions.

673.    SRNS provided functional accommodations, consistent with Mr. Whittington's religious convictions, during this period and allowed Mr. Whittington to work unvaccinated while observing enhanced safety protocols. These safety protocols included some combination of a social distancing policy, mask requirements, sanitizer, temperature checks, and/or remote work.

674.    Mr. Whittington's sincerely held religious beliefs in conflict with vaccination could have been accommodated without any undue burden whatsoever and Mr. Whittington would have accepted any of the numerous reasonable accommodation options available that SRNS refused to consider.

675.    SRNS did not engage in any interactive process calculated towards finding a reasonable accommodation for any individual employee, which the company would have identified had it engaged in an actual good faith accommodation process.

676.    Simultaneously, SRNS accommodated those with medical/secular objections to receipt of a COVID-19 vaccine.

677.    As a direct and proximate cause of SRNS's discriminatory actions, Mr. Whittington's finances were significantly and negatively impacted. Specifically, Mr. Whittington lost out on regular pay, benefits, vacation time, and bonus pay potential, amongst other financial harm.

678.     In addition to financial loss, Mr. Whittington suffered emotional and psychological harm while still employed at SRNS from the months of uncertainty and repeated coercion to abandon his sincere religious beliefs in order to preserve his livelihood and career, all related to the adverse employment actions taken by SRNS.

679.     As a result of the discriminatory treatment he experienced, Mr. Whittington suffered from emotional distress which is or has been marked by some combination of feelings of despondency, social anxiety, loss of interest in leisure activities, and feelings of agitation, and irritability. Specifically, Mr. Whittington missed out on activities or events out of financial conservatism, experienced stress while figuring out how to pay for the new home that he just bought while simultaneously having to delay all home improvement needs, experienced stress over thinking about how he was going to be able to pay bills, experienced spiritual turmoil in the form of doubt regarding how God would provide or work things out and in the form of temptation to fear that he would be stigmatized by family, friends, and coworkers for having to explain to them that the reason he was unemployed was due to his sincerely held religious beliefs precluding receipt of a COVID-19 vaccine, and experienced social isolation and the feeling of burdening family and friends for being in need.

680.     Following this adverse employment action, Mr. Whittington suffered financial, emotional and psychological harm.

**Tina Wingfield**

681.     Plaintiff Tina Marie Wingfield ("Mrs. Wingfield") worked for SRNS for over eight years. Mrs. Wingfield was employed at SRNS as an Executive Assistant at the time of being put on an indefinite, uncertain unpaid leave and being told that the SRNS COVID-19 vaccination Mandate was permanent and would not be dropped in the future.

682.    Throughout her career, Mrs. Wingfield performed well in her role, was qualified for her job, and had an exceptional performance record.

683.    SRNS terminated or constructively discharged Mrs. Wingfield on October 15, 2021, for upholding her religious beliefs and practices in conflict with the Mandate, when it put her on an indefinite, uncertain unpaid leave and told her that the SRNS COVID-19 vaccination Mandate was permanent and would not be dropped in the future. At that time, Mrs. Wingfield was informed that she could no longer complete her essential job duties while adhering to her sincerely held religious beliefs.

684.    Mrs. Wingfield is a non-denominational Christ-follower and believes that human life begins at conception. This belief is deeply rooted in her Christian faith, which compels her to oppose abortion unequivocally. As a Christ follower, Mrs. Wingfield believes life begins at conception, a conviction drawn from scripture such as Psalm 139:13-16 and Jeremiah 1:5. She views abortion as murder, violating God's commandment, "Thou shalt not kill" (Exodus 20:13). She understood that the available COVID-19 vaccines utilized fetal cell lines like HEK-293 and PER.C6, derived from aborted fetuses, in their testing, development, or production, which rendered receipt of a COVID-19 vaccine incompatible with her faith. Having accepted Christ at age 11 and reaffirmed her commitment through baptism at 13, Mrs. Wingfield has consistently upheld the sanctity of life, a principle solidified in her teenage years when she witnessed the horror of abortion performed on her friend and vowed never again to be complicit. Her faith demanded that she not betray God by receiving a vaccine linked to abortion, an act she believed would sever her spiritual bond with Him, as warned in Matthew 26:24.

685.    Mrs. Wingfield's opposition to vaccines stems from extensive research she began in 2016, which revealed the use of aborted fetal cells in vaccine development—a practice she

deemed barbaric and sinful, corroborated by Dr. Stanley Plotkin's deposition detailing fetal tissue harvesting. She believes her body is a temple of the Holy Spirit (1 Corinthians 6:19-20), and injecting substances tied to abortion desecrates her spiritual being, betraying her moral conscience and her relationship with God. This conviction has led her to secure religious exemptions for her children's school vaccinations since about 2017. Mrs. Wingfield has not been vaccinated since childhood.

686.     Mrs. Wingfield trusted in God's protection and healing, having sought only to uphold her sincerely held beliefs while fulfilling her professional duties.

687.     Accordingly, because of the above-described religious objections to receipt of a COVID-19 vaccine, Mrs. Wingfield requested a religious accommodation from SRNS's COVID-19 vaccination policy.

688.     As explained above, SRNS denied Mrs. Wingfield's religious accommodation request after verifying that she held a religious belief in conflict with receipt of a COVID-19 vaccine.

689.     SRNS pretextually refused to offer or otherwise provide any accommodation options because of Mrs. Wingfield's disfavored religious beliefs.

690.     There were multiple no-cost and/or less than de minimis-cost accommodation options available that SRNS could have provided to Mrs. Wingfield. Specifically, SRNS could have required her to be tested prior to entering facilities or performing any other role SRNS determined required in-person contact.  She also would have willingly paid out of pocket or had the cost of testing deducted from her pay for testing in order to retain her job.

691.     SRNS even acknowledged that "regular testing" was a reasonable accommodation in their Position Statement filed with the Equal Employment Opportunity Commission but refused to offer it to a single religious exemption requester.

692.     In addition to the testing accommodation option, there were also multiple other no-cost and/or less than de minimis cost accommodation options available that SRNS could have provided to Mrs. Wingfield. She was willing to bear any such costs personally in an effort to simultaneously preserve her career and religious convictions and put that request in writing.

693.     SRNS did not address several low-cost and no-cost alternative reasonable accommodations available, including but not limited to:  recognition of natural immunity in lieu of vaccination or required testing, enhanced safety protocols, a strict quarantining when symptomatic protocol (because one cannot transmit the virus if not infected),  telework, schedule swapping with vaccinated employees if in-person contact requiring proof of vaccination were an actual requirement for the job, or any combination of these options.

694.     During the height of the pandemic, Mrs. Wingfield contributed to the ongoing operation and success of SRNS while unvaccinated and while preserving her religious convictions.

695.     SRNS provided functional accommodations, consistent with Mrs. Wingfield's religious convictions, during this period and allowed her to work unvaccinated while observing enhanced safety protocols. These safety protocols included some combination of a social distancing policy, mask requirements, sanitizer, and temperature checks. She requested to telework, but her manager denied the request, even though several of the other Executive Assistants on who worked for SRNS were allowed to telework.

696.    Mrs. Wingfield's sincerely held religious beliefs in conflict with vaccination could have been accommodated without any undue burden whatsoever and she would have accepted any of the numerous reasonable accommodation options available that SRNS refused to consider.

697.    SRNS did not engage in any interactive process calculated towards finding a reasonable accommodation for any individual employee, which the company would have identified had it engaged in an actual good faith accommodation process.

698.    Simultaneously, SRNS accommodated those with medical/secular objections to receipt of a COVID-19 vaccine. Mrs. Wingfield's co-worker was given a medical exemption.

699.    As a direct and proximate cause of SRNS's discriminatory actions, Mrs. Wingfield's finances were significantly and negatively impacted. Specifically, she lost out on regular pay, benefits, 401(K), vacation time, amongst other financial harm.

700.    Mrs. Wingfield suffered financial, emotional, and psychological harm due to SRNS's discriminatory treatment, stemming from her refusal to abandon her sincere religious beliefs and receive a mandated COVID-19 vaccine.

701.    Mrs. Wingfield's emotional distress has been marked by despondency, social anxiety, panic attacks, loss of interest in activities, agitation, and irritability. Moreover, SRNS labeled unvaccinated employees a "national security threat" which devastated her mentally, threatening a career she was proud of and planned to retire from. The bullying and harassment triggered PTSD, causing severe anxiety and panic attacks.

702.    Financially, Mrs. Wingfield was unable to support her family, lost medical/dental benefits, and suffered penalties and fees when Transamerica deducted a 401(k) loan balance after barring payments during her unpaid leave. SRNS reported Mrs. Wingfield's termination as a

violation of company policy in an attempt to block Mrs. Wingfield from obtaining unemployment benefits.

703.    SRNS forced Mrs. Wingfield to work segregated within a roped barricade, causing embarrassment, shame, and humiliation. She expressed concerns verbally and in writing to SRNS.

704.    Ms. Wingfield saw multiple meeting invitations sent that said that only the vaccinated employees could attend the meetings in person.

***Events Following Termination***

705.    Plaintiffs, with the exception of Mr. Wagner, filed Charges of Discrimination with the EEOC alleging religious discrimination related to SRNS's failure to accommodate their sincerely held religious beliefs precluding receipt of a COVID-19 vaccine, treating them less favorable than similarly situated employees, and creating a work environment hostile to religion. Mr. Wagner participated in the EEOC investigation of this claim, SRNS was on notice of the collective nature of the religious discrimination claims against them, and Mr. Wagner has substantially similar claims to all Plaintiffs.[3]

706.    On January 31, 2025, the EEOC issued an official Right to Sue notice for Plaintiffs.

## VI.    CAUSES OF ACTION

### COUNT ONE

**Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.
Religious Discrimination – Failure to Accommodate**

***On Behalf of all Plaintiffs, Martha Boettjer, Tania Brown, Harry Corey, Courie Dennis, Thomas Diaz, Daniel Dodson, Josh Floyd, Jeffrey Garlington, Jeffrey Grinnell, Stephen Hall, Phil Harmon, Ryan Mann, Jason Marella, Charisse Nagy, Mark Redd, Vanessa Rewis, Shawn Rhoades, Milton Sanders, Tracy Stover, Nick Vinson, Ryan Wagner, Mitchell Whittington, and Tina Wingfield***

---

[3] *See* Exhibit 1, Charges of Discrimination with class allegations.

126

707.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as fully set forth herein.

708.    For Title VII purposes, SRNS employed all Plaintiffs during the relevant period. SRNS made all decisions related to their religious accommodation requests, including the implementation of the Mandate, solicitation, review, and denial of their religious accommodation requests, ultimately resulting in SRNS taking adverse employment action against all Plaintiffs. SRNS controlled Plaintiffs' work at the Savannah River job site.

709.    Title VII of the Civil Rights Act of 1964, as amended in 1972, makes it unlawful for an employer to discriminate against an employee on the basis of religion. 42 U.S.C. § 2000e-2(a)(1).

710.    The statute states that it is unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion[.]" *Id*. The term "religion" as used within Title VII includes "all aspects of religious observance and practice, as well as belief." *Id*.

711.    "Religion" is defined to include all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C.S. § 2000e(j). Because this definition includes a requirement that an employer "accommodate" an employee's religious expression, an employee is not limited to the disparate treatment theory to establish a discrimination claim.

712.    An employee can bring suit based on the theory that the employer discriminated against them by failing to accommodate the employee's religious beliefs in conflict with an employment policy. *See Chalmers v. Tulon Co*., 101 F.3d 1012, 1014 (4th Cir. 1996).

713.    To establish a *prima facie* case of failure to accommodate a religious belief, a plaintiff must show that: (1) he holds a *bona fide* religious belief that conflicts with an employment requirement; (2) he has informed the employer about the belief; and (3) he was discharged or disciplined for failing to comply with the conflicting employment requirement. *Id*. at 1019.

714.    For the reasons detailed throughout, Plaintiffs hold sincere beliefs that preclude them from receipt of a COVID-19 vaccine and informed SRNS of same.

715.    Plaintiffs' beliefs in conflict with the vaccine are religious in nature, as demonstrated above and acknowledged by SRNS in the official communication denying their religious accommodation requests.

716.    Plaintiffs submitted their religious exemption requests and outlined their religious conflict with receipt of a COVID-19 vaccine, placing SRNS on notice of its duty to accommodate them short of undue hardship.

717.    Plaintiffs' beliefs are indeed sincere, as evidenced by their willingness to uphold their religious integrity while threatened with the loss of their livelihood and career.

718.    For the reasons detailed throughout, Plaintiffs' beliefs in conflict with receiving a COVID-19 vaccine are based on their religious convictions.

719.    The "proper analysis of what constitutes a religious belief under Title VII is the same as that applied in the selective service cases." *EEOC v. Alliant Techsystems*, 1998 WL 777015, at *18-19 (W.D. Va. 1998) *(citing Welsh v. United States*, 398 U.S. 333, 26 (1970) and *United States v. Seeger*, 380 U.S. 163, 13 (1969)).

128

720.   "[T]he belief must only 'stem from [the person's] moral, ethical, or religious beliefs about what is right and wrong and that these beliefs be held with the strength of traditional religious convictions.'" *Id. (citing Welsh*, 398 U.S. at 340).

721.   "A plaintiff's religious beliefs 'need not be acceptable, logical, consistent, or comprehensible to others.'" *Id*. Citing *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 714 (1981).

722.   "The Supreme Court has made it clear that as long as a party's beliefs are religiously asserted, it is not for the courts to challenge the truthfulness of such assertions simply because they developed 'from revelation, study, upbringing, gradual evolution, or some source that appears entirely incomprehensible.'" *Id*. (*citing Hobbie v. Unemployment Comm'n of Fla.*, 480 U.S. 136, 144 n.9 (1987).

723.   Defendant denied Plaintiffs' religious accommodation requests while explicitly acknowledging that Plaintiffs presented religious beliefs that conflicted with receipt of a COVID-19 vaccine and that reasonable accommodation, regular testing, is the "sole reasonable accommodation."

724.   Defendant did not engage in a good faith interactive process with Plaintiffs to determine if it was possible to accommodate their articulated and sincere religious objections to receipt of a COVID-19 vaccine, and in fact, never discussed or offered potential accommodation options, in opposite of their prior guidance to Plaintiffs stating that if any exemption request is approved (meaning that SRNS determined an employee held religious beliefs in conflict with receipt of a COVID-19 vaccine), "HR will work with the employee to identify the appropriate accommodations, which will include regular testing on a weekly basis."

725.    Defendant never offered Plaintiffs the option to test regularly, even at their own expense, or any other potential accommodation.

726.    Defendant refused to even consider alternative accommodations, even though many low-cost and no-cost alternatives were available.

727.    On October 11, 2021, SRNS emailed employees the "Next Steps for Unvaccinated Employees." This email detailed dates certain for out-processing, return of site badges, and dates certain for termination if early retirement was not taken. Importantly, this email noted that "there is no plan for SRNS to drop the vaccination requirement in the future. This is a permanent requirement for SRNS and applies to our staff…regardless of telework status."

728.    SRNS took adverse employment action against Plaintiffs when it denied their religious accommodation request and when it gave them a date certain for termination and effectively terminated their employment or forced them to take involuntary, early retirement from SRNS.

729.    Alternatively, SRNS constructively discharged Plaintiffs because SRNS forced Plaintiffs to make the "choice of facing discipline or complying with an employer's orders at perceived spiritual cost." *Lumley v. Town of Knightdale*, 2024 U.S. Dist. LEXIS 138790 at *11 (E.D.N.C. Aug. 6, 2024) (citing *U.S. EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 144-45 (4th Cir. 2017)).

730.    "Putting an employee to the choice of facing discipline or complying with an employer's orders at perceived spiritual cost qualifies as an objectively intolerable situation sufficient to render a resignation a constructive discharge, legally equivalent to a termination." *Id.*

731.    In the unique circumstances present here, any Plaintiffs' resignation was legally equivalent to a termination, an adverse employment action, given that SRNS put their religious employees in an objectively intolerable situation.

732.    Similarly, any Plaintiffs' involuntary, early retirement was forced on them by SRNS and similarly qualifies as an adverse employment action taken against them.

733.    Once the plaintiff has established a *prima facie* case, the burden shifts to the defendant employer to show that it could not reasonably accommodate the employee without undue hardship. *Alliant Techsystems*, 1998 WL 777015, at *18-19.

734.    The Supreme Court's recent ruling in *Groff v. DeJoy* 600 U.S. 447, 470 (2023) makes clear that an "employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Id*.

735.    When evaluating whether an accommodation would constitute an undue burden, employers must take "into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, 'size and operating cost of [an] employer.'" *Id.* Thus, "courts should resolve whether a hardship would be substantial in the context of an employer's business in the common-sense manner that it would use in applying any such test." *Id.*

736.    Defendant is a large and sophisticated organization with considerable resources. Defendant has substantial resources and as such is able to accommodate its religious employees to a greater degree and with less burden than employers with fewer resources.

737.    Because there were multiple no-cost and low-cost accommodation options available, Defendant could have accommodated Plaintiffs short of undue hardship. SRNS

accommodated those with secular, medical reasons for not receiving a COVID-19 vaccine, unequivocally proving their ability to accommodate unvaccinated employees.

738.    The most obvious accommodation option was regular testing, at an employee's expense, coupled with other safety protocols, which SRNS acknowledged was a reasonable accommodation.

739.    Another obvious accommodation option was telework, even if temporary until the threats associated with the pandemic subsided. Notably, many Plaintiffs had already demonstrated they were capable of teleworking while fulfilling the essential duties of their jobs in hybrid remote roles.

740.    There were other low-cost and no-cost accommodation options SRNS refused to consider. In the event that Plaintiffs were required to travel on-site to perform their jobs, they could have seamlessly performed their job through, inter alia: (1) providing regular proof of a negative COVID-19 test (which Plaintiffs were willing to do at their own expense); (2) a strict quarantining when symptomatic protocol (because one cannot transmit the virus if not infected), (3) recognizing the scientific reality of natural immunity against COVID-19 as an accommodation option and inquiring whether Plaintiffs possessed antibodies to COVID-19 from prior infection; (4) allowing for a vaccinated colleague to travel to a worksite in the event that Plaintiffs would have been required to travel to a site (i.e., voluntary schedule swapping); (5) observing other enhanced safety protocols where necessary (e.g., social distancing, masking, quarantining when symptomatic), or (6) any combination of the above.

741.    With any of these easily identifiable and low-cost/no-cost accommodation options, Plaintiffs would have been able to continue performing the essential functions of their jobs with minimal or no burden to Defendant.

742.     Defendant refused to consider, much less provide, any of the above-referenced accommodations options for Plaintiffs.

743.     Instead, Defendant terminated and/or constructively discharged or otherwise took adverse employment action against Plaintiffs for choosing to uphold their religious convictions in conflict with receipt of a COVID-19 vaccine.

744.     Because their sincere religious beliefs precluded Plaintiffs from receiving one of the COVID-19 vaccines, and in light of the fact Defendant knew that the required vaccines were incapable of preventing infection and transmission (which Defendant had actual knowledge of through its own business records and admitted in sworn testimony in a federal court proceeding related to a motion for a preliminary injunction filed by SRNS employees attempting to stop enforcement of the Mandate), but would violate Plaintiffs' sincerely held religious beliefs, Defendant's actions were in reckless disregard of Plaintiffs' rights under Title VII.

745.     On information and belief, attorneys also reached out to Defendant in advance of Plaintiffs' termination and detailed to Defendant that its actions related to its religious employees and the Mandate violated Title VII. Nonetheless, Defendant forged ahead with its discrimination, recklessly and maliciously disregarding Plaintiffs' Title VII rights. In other words, Defendant knew it was violating the law but took adverse employment against Plaintiffs anyway.

746.     Further, Defendant's decision to refuse to accommodate Plaintiffs based on a pretextual workplace safety justification further demonstrates SRNS's reckless disregard of Plaintiffs' Title VII rights.

747.     As a result of Defendant's unlawful actions, Plaintiffs have suffered emotional and psychological distress from the loss of past and future wages, loss of promotional opportunities, loss of benefits, salary increases, amongst other financial harm, and the months of uncertainty and

repeated coercion to disregard their bona fide religious beliefs in order to preserve their livelihood and career.

748.     As a result of the discriminatory treatment they experienced, they are suffering from, as applicable to each Plaintiff, emotional distress which is or has been marked by lack of focus and mental errors in everyday life; feelings of despondency; social anxiety; trouble sleeping, stomach issues, and feelings of agitation; and irritability, amongst the other issues described throughout.

749.     As a result of Defendant's unlawful actions, Plaintiffs have also suffered financial harm including loss of compensation, loss of benefits, loss of salary increases, loss and/or reduced coverage of health insurance, employee assistance program, short, and long-term disability insurance, company matched retirement, and accidental death insurance, amongst other financial harm.

750.     Defendant's actions were willful, wanton, and/or malicious, and demonstrate reckless disregard for Plaintiffs' rights under Title VII. As a direct and proximate result of SRNS's discriminatory treatment, Plaintiffs have suffered, and continue to suffer, economic, pecuniary damages for which they are entitled to judgment.

751.     The foregoing conduct constitutes illegal, and intentional failure to accommodate that is prohibited under 42 USC § 2000e-2 *et seq*.

752.     Plaintiffs seek back pay, interest on back pay, the value of back benefits, and front pay all through the date of trial, attorney fees, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, other nonpecuniary losses and punitive damages, and any other damages they may be entitled to.

753.    As a direct and proximate result of the discriminatory treatment, Plaintiffs have suffered, and continue to suffer, the damages hereinafter described. Accordingly, Plaintiffs requests relief as hereinafter described.

## COUNT TWO

**Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.
Religious Discrimination – Disparate Treatment**

*On Behalf of all Plaintiffs, Martha Boettjer, Tania Brown, Harry Corey, Courie Dennis, Thomas Diaz, Daniel Dodson, Josh Floyd, Jeffrey Garlington, Jeffrey Grinnell, Stephen Hall, Phil Harmon, Ryan Mann, Jason Marella, Charisse Nagy, Mark Redd, Vanessa Rewis, Shawn Rhoades, Milton Sanders, Tracy Stover, Nick Vinson, Ryan Wagner, Mitchell Whittington, and Tina Wingfield*

754.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as fully set forth herein.

755.    For Title VII purposes, SRNS employed all Plaintiffs during the relevant period. SRNS made all decisions related to their religious accommodation requests, including the implementation of the Mandate, solicitation, review, and denial of their religious accommodation requests, ultimately resulting in SRNS taking adverse employment action against all Plaintiffs. SRNS controlled Plaintiffs' work at the Savannah River job site.

756.    Plaintiffs will also demonstrate a *prima facie* case for religious discrimination under a disparate treatment model.

757.    A *prima facie* case for disparate treatment requires the plaintiff to show: (1) he or she is a member of a protected class, (2) satisfactory job performance (3) he or she suffered an adverse employment action, and (4) by presenting a mosaic of circumstantial evidence that raises an inference of discrimination. *See EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 851 n. 2 (4th Cir. 2001).

758.     Plaintiffs all notified Defendant of their religious conflict with the Mandate by submitting religious accommodation requests to the Mandate and refusing to violate their sincerely held religious beliefs in conflict with receipt of a COVID-19 vaccine despite adverse employment action by Defendant, establishing Plaintiffs as members of a protected class. On separate grounds, Plaintiffs are in a protected class by way of announcing to Defendant that they were "religious" in general.

759.     As demonstrated by their strong performance records, including working throughout the pandemic and often receiving praise from Defendant, Plaintiffs were qualified for their jobs and possessed satisfactory performance records.

760.     Plaintiffs suffered adverse employment action when they requested religious accommodations to the Mandate and were denied. They suffered additional adverse action when they were terminated, constructively discharged, or forced to take involuntary, early retirement from SRNS due to their religious beliefs precluding receipt of a COVID-19 vaccine.

761.     The circumstances surrounding the adverse actions taken against Plaintiffs generate strong inferences of discrimination.

762.     Defendant treated secular employees, with medical conflicts with the Mandate, more favorably than similarly situated employees, religious employees with a religious conflict with the Mandate by accommodating their exemption requests.

763.     SRNS knew or should have known during the relevant time frames that the mandated vaccines were incapable of preventing infection of COVID-19. Yet, the company terminated Plaintiffs on provably false rationales, asserting that Plaintiffs must violate their religious beliefs because workplace safety could only be achieved through vaccination. SRNS also knew that many low-cost and no-cost accommodations were readily available, yet counterfactually

claimed the opposite. SRNS also knew its vaccinated employees were contracting COVID-19 at similar or higher rates than unvaccinated religious employees, like Plaintiffs. Nonetheless, the company counterfactually maintained that Plaintiffs posed an unacceptable safety risk relative to its secular vaccinated employees, and that they could no longer continue employment with SRNS. In these circumstances, an inference of discrimination is more than plausible.

764.    On belief, SRNS also replaced Plaintiffs with employees outside the relevant protected class, vaccinated employees who did not possess religious beliefs in conflict with vaccination, giving rise to further inferences of discrimination.

765.    On belief, SRNS also accommodated unvaccinated employees similarly situated to Plaintiffs who had significantly more in-person contact than Plaintiffs, provided those employees sought accommodation for secular medical reasons. This gives rise to additional inferences of unlawful discrimination. *See EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015) (holding that Title VII's "disparate-treatment provision prohibits actions taken with the *motive* of avoiding the need for accommodating" religious beliefs) (emphasis in original)).

766.    Refusing to accommodate religious beliefs because of their religious nature, but accommodating medical needs, is precisely the type of behavior the Supreme Court recently stated would violate Title VII. The Supreme Court ruled "a hardship that is attributable to employee animosity to a particular religion, to religion in general, or to the very notion of accommodating religious practice cannot be considered 'undue.'" *Groff*, 600 U.S. at 472.

767.    Defendant accommodated secular employees with medical accommodations but denied all religious accommodation requests. These medically exempt employees worked in comparable job roles to Plaintiffs.

768.    Defendant also knew that requiring Plaintiffs to comply with the Mandate would force them to violate their religious beliefs.

769.    For religious reasons, Plaintiffs declined any hypothetical personal protection the COVID-19 vaccines may have provided in order to preserve their religious convictions in conflict with receipt of a COVID-19.

770.    For the reasons detailed throughout, any reasons Defendant attempts to justify the adverse employment actions taken against Plaintiffs are pretext. Most glaringly, SRNS could have accommodated Plaintiffs without any undue hardship whatsoever because Plaintiffs would have paid for the cost of regular testing, and in fact, could have accessed free testing during the relevant periods.

771.    Furthermore, the publicly available data that the vaccines were incapable of preventing infection or transmission, or at least providing some defined level of protection, further demonstrates Defendant's disingenuous justification for terminating religious employees, like Plaintiffs. If workplace safety was truly its intention, Defendant would have accepted natural immunity as satisfying the Mandate's requirements (which it did not), would have informed its employees of the significant safety risks associated with the COVID-19 vaccines, and would have required its vaccinated employees, who were contracting COVID-19 at similar or higher rates than unvaccinated religious employees like Plaintiffs during the relevant time frames, to adhere to enhanced safety protocols to ensure vaccinated employees did not spread the virus to vulnerable co-workers and to members of the public at large.

772.    In short, considering the foregoing, Plaintiffs were terminated, constructively discharged, or suffered adverse employment action "because of" their religious beliefs.

773.    SRNS possessed unlawful motivations to purge the maximum number of employees who possessed religious objections to receipt of a COVID-19 vaccine as possible, including Plaintiffs.

774.    The aforementioned conduct is prohibited under Title VII and constitutes a violation of the same.

775.    For the reasons detailed throughout, Defendant recklessly and maliciously disregarded Plaintiffs' Title VII rights, meriting punitive damages.

776.    In addition to financial loss, Plaintiffs suffered, where applicable to each Plaintiff, emotional and psychological harm from the months of uncertainty and repeated coercion to disregard their bona fide religious beliefs in order to preserve their livelihood and career. As a result of the discriminatory treatment they experienced, they are suffering from emotional distress which is or has been marked by lack of focus and mental errors in everyday life, feelings of despondency, social anxiety, trouble sleeping, stomach issues, and feelings of agitation, and irritability, amongst other emotional distress described above.

777.    Plaintiffs seek back pay, interest on back pay, loss of salary increases, the value of back benefits, and front pay all through the date of trial, attorney fees, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, other nonpecuniary losses and punitive damages, and any other damages they are entitled to.

778.    All of the aforementioned damages were actually and proximately caused by Defendant's violation of Title VII.

779.    As a direct and proximate result of the discriminatory treatment, Plaintiffs have suffered, and continue to suffer, the damages hereinafter described.

780.    Accordingly, Plaintiffs request relief as hereinafter described.

## COUNT THREE

**Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.
Religious Discrimination – Hostile Work Environment**

*On Behalf of all Plaintiffs, Martha Boettjer, Tania Brown, Harry Corey, Courie Dennis,
Thomas Diaz, Daniel Dodson, Josh Floyd, Jeffrey Garlington, Jeffrey Grinnell, Stephen Hall,
Phil Harmon, Ryan Mann, Jason Marella, Charisse Nagy, Mark Redd, Vanessa Rewis,
Shawn Rhoades, Milton Sanders, Tracy Stover, Nick Vinson, Ryan Wagner, Mitchell
Whittington, and Tina Wingfield*

781.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as fully set forth herein.

782.    Defendant also subjected Plaintiffs to a hostile work environment on the basis of their disfavored religious beliefs.

783.    Plaintiffs will also demonstrate a prima facie case of hostile work environment. A *prima facie* hostile work environment claim requires Plaintiffs to show that: (1) he or she experienced unwelcome harassment; (2) the harassment was based on religion; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and to create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *Baqir v. Principi*, 434 F.3d 733, 746 (4th Cir. 2006) (citing *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003)).

784.    Plaintiffs experienced unwelcome harassment in the form of being segregated in the workforce due to their inability to receive a COVID-19 vaccine because of their sincerely held religious beliefs.

785.    Plaintiffs experienced unwelcome harassment in the form of being continually asked about their vaccination status, a personal medical decision, after they had informed Defendant that they were precluded from receiving a COVID-19 vaccine for religious reasons.

140

786.　On belief, Defendant received multiple complaints about the continued harassment of Plaintiffs and other employees who sought accommodation for religious reasons, but did nothing to remedy these complaints. Simultaneously, Defendant continued to harass religious employees, pushing against their unvaccinated status, a personal, medical decision they made for religious reasons and were not comfortable being continually asked about.

787.　The Sr. VP. of Technical Services was made personally aware of this on or about June 1, 2021, when Mrs. Wingfield advised him of the harassment she was suffering. He replied that he will look into the allegations and that, "Clearly, this is a personal choice that needs to be respected." Yet, SRNS continued to harass employees who declined vaccination for religious reasons, inquiring when they would become vaccinated and later continually reminding them that they would face certain adverse employment action if they did not violate their religious convictions.

788.　Plaintiffs experienced unwelcome harassment in the form of being excluded from in-person attendance at meetings when Defendant was well-aware that the COVID-19 vaccine did not stop transmission and infection of COVID-19. And on belief, Defendant did not require vaccinated employees to adhere to enhanced safety protocols – while knowing they posed a significant transmission risk – showing that SRNS's policies were calculated towards putting maximum pressure on religious employees, not about workplace safety.

789.　Plaintiffs experienced unwelcome harassment in the form of being out-processed in the presence of multiple armed guards after they had clearly stated their religious conflict with vaccination. SRNS did this in an attempt to force Plaintiffs to sign "voluntary" resignations. This was both objectively and subjectively humiliating to the Plaintiffs subjected to this process.

790. Plaintiffs experienced unwelcomed harassment during their out-processing because Defendant allowed all of Human Resources members to sit comfortably in chairs while they forced Plaintiffs to complete necessary paperwork. Conversely, Plaintiffs were forced to stand and were not provided any chairs to sit in while they reviewed consequential documentation.

791. Defendant did not subject unvaccinated employees who remained unvaccinated for secular medical reasons and who received a medical accommodation to this humiliating process.

792. The unwelcomed harassment was based on Plaintiffs' religious objections to receipt of a COVID-19 vaccine, which they could not receive due to their sincerely held religious beliefs.

793. The unwelcomed harassment was severe or pervasive because it took place over a matter of months, from multiple members at different levels of Defendant, and was not corrected by management when reported. Defendant's top-down pressure campaign against religious employees was sufficiently severe and pervasive as to alter the terms and conditions of Plaintiff's employment.

794. The unwelcomed harassment created an abusive atmosphere.

795. The unwelcomed harassment is imputable to the employer because top levels of management actively cultivated the unwelcomed harassment and/or refused to remedy the unwelcomed harassment once they were made aware of same.

796. The aforementioned conduct is prohibited under Title VII and constitutes a violation of the same.

797. For the reasons detailed throughout, Defendant recklessly and maliciously disregarded Plaintiffs' Title VII rights and created a hostile work environment, meriting punitive damages.

798.    In addition to financial loss, Plaintiffs suffered emotional and psychological harm from the months of unwelcomed harassment, uncertainty about their continued employment, and repeated coercion to disregard their bona fide religious beliefs in order to preserve their livelihood and career. As a result of the hostile work environment, they suffered from emotional distress as detailed above.

799.    Plaintiffs seek back pay, interest on back pay, loss of salary increases, the value of back benefits, and front pay all through the date of trial, attorney fees, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses and punitive damages.

800.    All of the aforementioned damages were actually and proximately caused by Defendant's violations of Title VII.

801.    As a direct and proximate result of the discriminatory treatment, Plaintiffs have suffered, and continue to suffer, the damages hereinafter described.

802.    Accordingly, Plaintiffs request relief as hereinafter described.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendant, awarding relief as follows:

i.      Declare that Defendant discriminated against Plaintiffs in violation of Title VII for its failure to provide a reasonable accommodation to their sincere religious beliefs when numerous no-cost or low-cost options were available;

ii.     Declare that Defendant violated Title VII by treating religious employees like Plaintiffs less favorably than similarly situated employees outside the relevant protected class;

iii.    Declare that Defendant violated Title VII in creating a religiously hostile workplace;

iv.     Declare that Defendant recklessly disregarded Plaintiffs' Title VII rights;

v.      Require Defendant's supervisors and upper management to undergo training for Title VII regarding their duties to avoid discrimination on the basis of religion, consistent with Title VII's requirements;

vi.     Issue a permanent injunction requiring Defendant to expunge Plaintiffs' personnel files of any derogatory, false, or misleading information relating to this matter;

vii.    Award each Plaintiff damages, which each individually exceed $100,000.00, including back pay, front pay, loss of salary increases and promotional opportunities, loss of benefits and back benefits, pre-judgment and post-judgment interest, punitive damages, compensatory damages, for each individual Plaintiff, and other affirmative relief necessary to eradicate the effects of Defendant's unlawful employment practices;

viii.   Award each Plaintiff damages necessary to make him or her whole by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described above, including but not limited to, emotional pain, suffering, inconvenience, loss of enjoyment of life, humiliation, and loss of civil rights, in an amount to be determined at trial;

ix.     Award each individual Plaintiff damages for severe emotional distress that resulted from Defendant's unlawful actions;

x.      Award each Plaintiff his or her reasonable attorneys' fees and costs; and

xi.     Grant any other relief that the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38 and 29 U.S.C. § 626, Plaintiff demands a jury trial on all issues upon which there is a federal right to a jury trial.

RESPECTFULLY SUBMITTED this 28th day of April, 2025 by:

*/s/ Neil P. Williams*
Neil P. Williams
SC Fed Bar No.: 14401
SIRI & GLIMSTAD LLP
745 Fifth Avenue, Suite 500
New York, NY 10151
Phone: 929-474-6448
Facsimile: 646-417-5967
nwilliams@sirillp.com

Walker D. Moller*
SIRI & GLIMSTAD LLP
1005 Congress Avenue
Suite 925-C36
Austin, TX 78701
Phone: 512-265-5622
Facsimile: 646-417-5967
wmoller@sirillp.com

Jack R. Spitz*
SIRI & GLIMSTAD LLP
8 Campus Drive, Suite 105 PMB#161
Parsippany, New Jersey 07054
Phone: 212-532-1091
Facsimile: 646-417-5967
jspitz@sirillp.com

*\* Pro Hac Vice Motions forthcoming*